DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
ANDREW CHAN KIM, SBN 315331
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: danmsiegel@gmail.com;
emilyrose@siegelyee.com;
chankim@siegelyee.com

Attorneys for Plaintiff
CAMERON ROCHA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CAMERON ROCHA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ANTIOCH, Antioch Chief of Police TAMMANY BROOKS, Antioch Sergeant MATTHEW KOCH, Antioch Officer ZECHARIAH MATIS, Antioch Officer KRISTOPHER KINT, Antioch employees DOES 1-25, Jointly and Severally,<br><br>Defendants. | Case No.: 3:19-cv-07312-MMC<br><br>**DECLARATION OF ANDREW CHAN KIM IN SUPPORT OF PLAINTIFF'S MOTIONS IN LIMINIE Nos. 1-6**<br><br>Date: March 30, 2021<br>Time: 10 a.m.<br>Judge: Hon. Maxine M. Chesney<br>Ctrm.: 7 - 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102 |

I, Andrew Chan Kim, declare as follows:

1. I am an attorney licensed to practice in the State of California and an associate with the law firm Siegel, Yee, Brunner & Mehta, the attorneys for plaintiff Cameron Rocha in this case.

This declaration is based on my personal knowledge and I am competent to testify with respects to the matters stated herein.

2. Attached hereto as Exhibit A is a true and correct copy of excerpts from the deposition of Shadi Rocha taken on August 14, 2020.

3. Attached hereto as Exhibit B is a true and correct copy of the Antioch Police Report for the incident involving Cameron Rocha on March 12, 2018, Bates stamped COA (Rocha) 1-21.

4. Attached hereto as Exhibit C is a true and correct copy of Defendants' Expert Disclosure.

5. Attached hereto as Exhibit D is a true and correct copy of excerpts from the deposition of Cameron Rocha taken on September 30, 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 17, 2021 at Belmont, California.

*/s/ Andrew Chan Kim*
Andrew Chan Kim

# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

CAMERON ROCHA, )
)
Plaintiff, )
)
vs. ) Case No.: 19-cv-07312-MMC
)
CITY OF ANTIOCH, Antioch Chief )
of Police, )
)
Defendants. )
______________________________ )

DEPOSITION OF

SHADI ROCHA

Appearing Remotely From

Reseda, California

Friday, August 14, 2020

Job No. 4183940

Stenographically reported by:

EMILY SAMELSON, CSR No. 14043

Pages: 1 - 73

Q Yeah.
A I believe so.
Q Had they ever responded to your home before?
A Not that I can remember. The only -- not the police. The ambulance, yes, not the police.
Q Okay. Had you ever interacted with a police officer before this day?
A In general?
Q Yeah.
A Yeah, of course.
Q Okay. And had it ever -- when you had interacted with a police officer prior to this, did it ever involve Mr. Rocha?
A I'm trying to think here.
Q In other words, had you ever called the police because of something --
A On him?
Q Yeah, on him.
A No. No.
Q Had you ever made any police reports against Mr. Rocha?
A No. Not prior to this.
Q After this?
A After that, I did.
Q And we're not going to get into that other than

I just want to ask you did it have to do with -- was it a report of domestic violence?

A Yes.

Q Let's talk about Mr. Rocha having Tourette's.

Do you know if Mr. Rocha has Tourette syndrome?

Do you know what Tourette's is?

A Of course, I do.

Q As far as you know, did Mr. Rocha have Tourette syndrome?

A No. I'm sorry. I have to laugh on that one.

Q And why are you laughing?

A Because I'm studying mental health. And I've lived with Mr. Rocha, and he does not have Tourette's.

Q Okay. So you're studying mental health. Tell me about that a little bit more.

A I'm working on my master's of social work. I have my bachelor's in psychology.

Q And as part of that area of study, have you learned anything about Tourette syndrome?

A I haven't looked into it much, but I have a basic understanding of it.

Q Would you say it's more than the average person -- your understanding?

A More than an average person?

Q Yeah. So if someone -- that's a bad question.

I'll move on.

You're confident that you didn't believe he had Tourette's.

Is that a fair statement?

A That's a fair statement.

Q At any point during that interaction, based on your understanding of what Tourette's is, did you observe Mr. Rocha say anything or do anything that a person with Tourette's would do?

A No.

Q As far as you are aware, did Mr. Rocha -- or does Mr. Rocha have any mental or physical disabilities that you're aware of?

A Nothing diagnosed. No.

Q Is there anything that you believe -- and again, you're not a professional. Okay? I understand that you're working towards becoming a professional.

But is there anything that you believe -- because you said "nothing diagnosed," is there anything that you think was undiagnosed?

A Possibly bipolar.

Q But as far as you're aware, he was never officially diagnosed?

A No, he was not.

Q Let's talk about Mr. Rocha's employment.

A No. I mean, other than marijuana, if that's considered drugs.

Q Okay. And how often did he use marijuana?

A Once a day. I can't remember.

Q When you spoke to police when the officer came and interviewed you, do you remember telling him that Mr. Rocha doesn't really drink?

A Yes.

Q Is that true?

A No.

Q Why did you tell the officer that Mr. Rocha doesn't drink?

A Because at the time, I was protecting him, one; and, two, I was -- I had the fear of retaliation of him getting really angry with me if I did tell the truth.

Q So as we sit here today and you're under oath, what's the answer to that question?

Does Mr. Rocha drink, at least at the time of this incident? Was he a drinker?

A Yes.

Q How often would Mr. Rocha consume alcohol at the time of this incident?

A To answer truthfully, he did not drink in front of me because we had an agreement that he had a problem with drinking. And especially with our daughter, we

A His walking style, his wobbling, his -- just his facial expressions.

Q Have you ever heard the term "happy drunk"?

A Yes.

Q Was Mr. Rocha a happy drunk?

A No.

Q Was he aggressive when he was intoxicated?

A Yes.

Q In your opinion, was Mr. Rocha an alcoholic?

A Yes.

Q Just give me one second. I think I'm wrapped up here but just one second. Okay?

A Sure.

Q From when this happened till today, do you know if Mr. Rocha has ever held a job?

A I am not sure.

MR. ROBINSON: That's all I have, Shadi. Thank you for answering my questions.

THE WITNESS: Sure.

MR. KIM: Can we go off the record for a quick second?

MR. ROBINSON: Sure.

(Off the record.)

///

///

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is an accurate transcription thereof.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 28th of August, 2020

E. Samelson

EMILY SAMELSON,

CSR No. 14043

# Exhibit B

# Combined Case Report
# Antioch Police Department

**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** 18002492
**EVENT NO:** 18016693

Classification: VC 23152(A) (DUI ALCOHOL/DRUGS) - MISDEMEANOR

Officer ID: KINT #3652

Location Name: PGE STORAGE LOT RMP GATEWAY STATION
Location: 3225 WILBUR AV ANTIOCH
XStreet: HWY 160 HY
2nd XStreet:
Beat: 2

| Occurred | Date | Time | Day |
|---|---|---|---|
| On/From | 03/12/2018 | 16:01 | Mon |
| To | 03/12/2018 | 17:02 | Mon |
| Received | 03/12/2018 | 16:01 | Mon |

ANTIOCH POLICE
CONTROLLED DOCUMENT
FEB 27 2019
RELEASED TO MPA/City Attorney #5456
CONFIDENTIAL

# Combined Case Report
# Antioch Police Department

CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

## VIC VICTIM HIX, BRIAN JOSHUA

Race: White Sex: M DOB: 10/02/1993 Age: 24 Type: PERSON
Height: 509 Weight: 200 Hair: Blond Eyes: Brown

ADDRESS INFORMATION

Address Type: PERSONAL/HOME Phone: (925) 848-7225
Address: 1309 HARGROVE ST ANTIOCH CA 94509 Time at Address:
Comments:

School: Grade #: Occupation:
Employer: How long: Work Hrs:
Language: Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
|---|---|---|
| Drivers License | STATE OF CALIFORNIA | F4683531 |

## WIT WITNESS HIX, DEANNA CAROL

Race: White Sex: F DOB: 04/01/1966 Age: 51 Type: PERSON
Height: 507 Weight: 225 Hair: Brown Eyes: Brown

ADDRESS INFORMATION

Address Type: PERSONAL/HOME Phone: (925) 727-5527 / (925) 848-7711
Address: 1309 HARGROVE ST ANTIOCH CA 94509 Time at Address:
Comments:

School: Grade #: Occupation:
Employer: How long: Work Hrs:
Language: Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
|---|---|---|
| Drivers License | STATE OF CALIFORNIA | D3552118 |

## TCR TCR ROCHA, CAMERON DAVID

Race: White Sex: M DOB: 02/02/1978 Age: 40 Type: PERSON

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** **18002492**
**EVENT NO:** **18016693**

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

**ROCHA, CAMERON DAVID** (Cont'd)

Height: 511 Weight: 200 Hair: Brown Eyes: Hazel

ADDRESS INFORMATION

Address Type: PERSONAL/HOME Phone: (925) 628-0980
Address: 414 W 11TH ST ANTIOCH CA 94509 Time at Address:
Comments:

Address Type: PERSONAL/HOME Phone: (925) 628-0980
Address: 414 W 11TH STREET PITTSBURG CA 94565 Time at Address:
Comments:

School: Grade #: Occupation:
Employer: How long: Work Hrs:
Language: Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
|---|---|---|
| Drivers License | STATE OF CALIFORNIA | B3821776 |

**TCR TCR HIX, DEANNA**

Race: White Sex: F DOB: 04/01/1966 Age: 51 Type: PERSON
Height: Weight: Hair: Eyes:

ADDRESS INFORMATION

Address Type: PERSONAL/HOME Phone: (925) 727-5527
Address: 1309 HARGROVE ST ANTIOCH CA 94509 Time at Address:
Comments:

School: Grade #: Occupation:
Employer: How long: Work Hrs:
Language: Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

**TCR TCR HIX, BRIAN JOSHUA**

Race: White Sex: M DOB: 10/02/1993 Age: 24 Type: PERSON
Height: 509 Weight: 200 Hair: Blond Eyes: Brown

ADDRESS INFORMATION

# Combined Case Report
# Antioch Police Department

CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

**HIX, BRIAN JOSHUA** (Cont'd)

Address Type: PERSONAL/HOME
Phone: (925) 848-7225
Address: 1309 HARGROVE ST ANTIOCH CA 94509
Time at Address:
Comments:

School:
Grade #:
Occupation:
Employer:
How long:
Work Hrs:
Language:
Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
| --- | --- | --- |
| Drivers License | STATE OF CALIFORNIA | F4683531 |

## TCR TCR HIX, DEANNA

Race:
Sex:
DOB:
Age:
Type: PERSON
Height:
Weight:
Hair:
Eyes:

School:
Grade #:
Occupation:
Employer:
How long:
Work Hrs:
Language:
Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

## VEH TCR License: 5EPR424

State: CALIFORNIA
LIC Year:
LIC Type:
Color: Aluminum or Silver
Year: 2003
Make/Model: HONDA / ELEMENT
Body: 4 DOOR SEDAN
VIN: 5J6YH28533L009487
Vehicle Type:
Sticker/Decal:

Other Oddities:
Modified Paint:
Condition: Good condition, works and is usable.
Value: 12000
Legal Owner:
Officer ID: KINT #3652
Recovered at:
Recovered by:
Store at:
Inv Date: 03/12/2018 16:01
Storage Authority:
Veh Dispo: Left at Scene
Release Location:
Location of Keys:

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** **18002492**
**EVENT NO:** **18016693**

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

**5EPR424** (Cont'd)

Description: RESPONSIBLE VEHICLE

PARTIES ASSOCIATED WITH THIS VEHICLE

| Association: | Full Name: |
|---|---|
| Driver | ROCHA, CAMERON DAVID |

## VEH TCR — License: 8ASM277

State: CALIFORNIA
LIC Year:
LIC Type:
Color: Chrome or Silver
Year: 2005
Make/Model: CHEVROLET / IMPALA
Body: 4 DOOR SEDAN
VIN: 2G1WF52E659340581
Vehicle Type:
Sticker/Decal:

Other Oddities:
Modified Paint:
Condition: Usable but poor condition
Value: 5000
Legal Owner:
Officer ID: KINT #3652
Recovered at:
Recovered by:
Store at:
Inv Date: 03/12/2018 16:01
Storage Authority:
Veh Dispo: Released to Owner
Release Location:
Location of Keys:
Description: VICTIM VEHICLE

PARTIES ASSOCIATED WITH THIS VEHICLE

| Association: | Full Name: |
|---|---|
| Driver | HIX, BRIAN JOSHUA |

## PROP Evidence PHOTOGRAPH — ITEM#: 1

Quantity: 1 Category: Photos Digital/Film/Polaroids etc
Article: PHOTOGRAPH
Brand:
Model:
Value:
Color: White
Serial #:
Owner Applied #:
Size:
Special Marks:
Officer ID:
Inv Date: 04/15/2018 20:44
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: PHOTO TAKEN OF RESPONSIBLE VEHICLE

RELATED PERSONS

| Person: | Relation: |
|---|---|
| ROCHA, CAMERON DAVID | SUSP |

| Combined Case Report<br>Antioch Police Department<br>CA0070100 - 300 L Street (925)779-6900 | CASE NO: | 18002492 |
|---|---|---|
| | EVENT NO: | 18016693 |

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

Total Evidence: $

**NARRATIVE**

On 3/12/2018, at approximately 1603 hours, I was dispatched to the intersection of Wilbur Avenue and Bridgehead Road, regarding a hit & run accident that just occurred. Information in the call stated that that a male subject driving in a Honda Element with license plate number "5EPR424" just collided into the RP (Deanna Hix) and took off W/B on Wilbur Avenue. Additional information in the call described the subject as possibly being a HMA wearing a cream colored tank top with tattoo's on his shoulder. The RP (Deanna Hix) advised APD Dispatch that the subject was also intoxicated.

Upon my arrival on the scene, I made contact with the RP-Deanna Hix and her son, Brian Hix. Deanna Hix was not involved in the accident, but she was a witness and was driving directly behind her son (Brian Hix) in her own vehicle when this accident occurred. Both Deanna Hix and Brian Hix were positively identified at the scene after viewing their California driver's licenses.

RP-Deanna Hix took a picture of the responsible vehicle and the license plate number as it left the scene of this accident. The license plate number to the responsible vehicle was determined to be "5EPR424." A license plate check on "5EPR424" revealed that it came back registered to a subject named Cameron Rocha, who resided at 414 West 11th Street (see below). I requested Officer Matis to respond to 414 West 11th Street in an effort to contact Cameron Rocha and/or see if the responsible vehicle was back at the registered address.

I then spoke to RP-Deanna Hix and she related the following information in summary:

**She and her son, Brian Hix, were just in Oakley (Ca.) running errands. She was driving in her car and Brian was driving in his Chevy Impala (8ASM277), which is registered to her. They made a left hand or W/B turn onto Wilber Avenue, from Bridgehead Road, and began driving W/B on Wilbur Avenue towards their house. She was driving directly behind Brian as they were headed home. She observed a Honda Element make a left hand turn in front of Brian, as the WMA or HMA driver appeared to be getting onto Highway 160. The driver of the Honda collided into Brian and there was a minor collision. The front of the Honda Element ran into the front of the Chevy, but the driver to the Honda was required to yield before turning. The driver to the Honda Element then sped off W/B on Wilbur Avenue, so she followed him because it appeared as if he was not going to stop. She honked her vehicle horn several times at the responsible driver and vehicle.**

**The driver to the Honda (5EPR424) eventually pulled over near 3225 Wilbur Avenue, so she and Brian Hix parked and thought that they would conduct an information exchange, but she was wrong. The driver to the Honda Element got out of his vehicle and he appeared really drunk. She really does not recall what the driver was saying, but he appeared "drunk and high." The driver then brushed past her and tried to get back into her vehicle instead of his, which she found strange. The driver was not trying to car jack her vehicle, but he appeared really confused and/or intoxicated. The driver then got back into his vehicle and sped away. She took a picture of the responsible vehicle as it was leaving the scene. The driver of the Honda Element never identified himself or changed any information with her or Brian after the accident occurred.**

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 1 Primary Case Report

Officer ID: KINT #3652
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

I then contacted Brian Hix, who had a very similar statement as Deanna Hix. I spoke to Brian Hix and he related the following information in summary:

**He was driving W/B on Wilbur Avenue in his Chevy Impala with license plates "8ASM277." He was alone in the vehicle, but his mother was following behind him in her vehicle. A Honda Element with license plates "5EPR424" made a quick left hand turn in front of him and they collided into one another. The driver took off W/B on Wilbur Avenue and his mother followed him honking her horn the entire time. The responsible pulled over briefly near 3225 Wilbur Avenue, which enabled them to take a picture of his vehicle and license plate. The responsible also got out of the vehicle and appeared drunk or high or possibly having some kind of medical emergency. The driver was acting really strange and even tried to get into his mother's vehicle.**

Both Deanna and Brian Hix described the responsible as being a WMA or a HMA, approximately 30-38 years in age, approximately 6'-0" in height, medium to muscular build, wearing a tank-top and unknown colored pants or shorts.

The license plates on Brian Hix's Chevy Impala was "8ASM277", which came back registered to Deanna Hix (see below). I observed little to no damage to the front of the listed Chevy (8ASM277). Brian Hix added that the collision was minor and that he was not injured as a result. Brian Hix refused medical attention at the scene, but did acknowledge that his back and neck area felt a little sore. Brian Hix advised me that he would obtain his own medical attention at a later time if neccessary.

There were several photograph's taken of the listed Chevy and the damaged caused, which I later attached to this report (see attached).

Deanna Hix later emailed the photograph she took of the responsible vehicle, which I collected and later placed into APD evidence (see attached).

Officer Matis later advised me over the radio that he had stopped the responsible vehicle and the driver, who was later determined to be the R/O-Cameron Rocha near his address at 414 West 11th Street. Refer to Officer Matis' report for further information and for the DUI investigation.

I asked Brian Hix and Deanna Hix if they would be able to identify the driver to the Honda Element (5EPR424) if they saw him again. Both Brian Hix and Deanna Hix advised me that they would be able to identify him again, so I read them the in-field admonishment. Both Deanna Hix and Brian Hix stated that they understood my instructions and they agreed to conduct an in-field line-up. Deanna Hix and Brian Hix did not wish to be transported in the rear of my APD patrol vehicle and they wished to drive themselves to the in-field show-up, so I agreed.

I then drove to Officer Matis' location with Deanna and Brian Hix following behind me in there vehicle. Officer Matis removed Cameron Rocha from his patrol vehicle and an in-field show-up was conducted. Cameron Rocha was handcuffed during the show-up and viewed from an approximate distance of 20-25 feet away. Both Deanna and Brian Hix stated that Cameron Rocha was most definitely the solo driver or occupant

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 7 of 21

COA (Rocha)000007

**Combined Case Report** **CASE NO:** 18002492
**Antioch Police Department** **EVENT NO:** 18016693
CA0070100 - 300 L Street (925)779-6900

REPORT - 1 Primary Case Report Officer ID: KINT #3652
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

inside of the Honda Element when it collided into Brian Hix.

Deanna Hix and Brian Hix also positively identified the listed Honda Element (5EPR424) as being the responsible vehicle.

Brian Hix also signed a medical release waiver, which I collected and later placed in this file (see attached).

Officer Matis then arrested Cameron Rocha for CVC 23152(a) and CVC 20002(a). Refer to Officer Matis' supplemental report for further details.

I provided Deanna Hix and Brian Hix with the Antioch Police report number and they were released on the scene. I asked Deanna Hix and Brian Hix if they could estimate a cost to repair the damage to the listed Chevy (8ASM277) and they both advised me that they could not provide an estimate at this time.

Refer to accident report for further information regarding this incident.

No further information

K.Kint #3652
*************************************************************

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 8 of 21

COA (Rocha)000008

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 1 Primary Case Report

Officer ID: , KINT #3652
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

*********************************************************************

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**ARR ARRESTED** **ROCHA, CAMERON DAVID**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Race: | White | Sex: | M | DOB: | 02/02/1978 | Age: | 40 | Type: | PERSON |
| Height: | 511 | Weight: | 200 | Hair: | Brown | Eyes: | Hazel | | |

ADDRESS INFORMATION

Address Type: PERSONAL/HOME Phone: (925) 628-0980
Address: 414 W 11TH ST ANTIOCH CA 94509 Time at Address:
Comments:
Address Type: PERSONAL/HOME Phone: (925) 628-0980
Address: 158 NAVY ST PITTSBURG CA 94565 Time at Address:
Comments:

School: Grade #: Occupation:
Employer: How long: Work Hrs:
Language: Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

# Combined Case Report
# Antioch Police Department

CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**ROCHA, CAMERON DAVID** (Cont'd)

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
|---|---|---|
| Drivers License | STATE OF CALIFORNIA B3821776 | |

ARREST INFORMATION

Arrest Number: 1800817 Arrest Date: 03/12/2018 16:20
Location: 3225 WILBUR AV ANTIOCH
Arrest Officer: MATIS #5214 Booked By:
Arrest Lvl: MISDEMEANOR Book Date: 03/12/2018 17:07
Transport Officer: Booking No. 261800817
XStreet: HWY 160 HY Cite No.:
Blood Alcohol: Appear Court: Pittsburg Superior Court
Attitude: Test Perfomance: Book
Dispo: CITE RELEASE

CHARGE INFORMATION

Charge: VC 23152(A) (DUI ALCOHOL/DRUGS) - MISDEMEANOR
Counts: 1 Bail: Warrant No:
Description: DUI ALCOHOL/DRUGS
Charge: VC 20002(A) (HIT AND RUN:PROP DAMAGE) - MISDEMEANOR
Counts: 1 Bail: Warrant No:
Description: HIT AND RUN:PROP DAMAGE

PROBABLE CAUSE DECLARATION

Declarant Officer: PCD Date: 03/14/2018 16:20
Facts:
PCD Inds:

PROSECUTION LIAISON INFORMATION

DA Date: 09/19/2018 12:14 DA No.:
DA Name:
Charges Reqst'd: VC 23152(A) AND VC 20002(A) Charges Filed: DKT. 04-194745-6., VC23152(A), VC23152(B), VC23152(F), VC20002(A)
Lvl Requested: M Lvl Filed: M
Status: DIR FILE
Court Date: Court No.:
Comments: 9/19/2018 12:14:25 PM CHS, R-1-R2, TCR1, LAB (#18-1093-1 AND 18-1093-2), CERT CAD, PHOTOS. 3657
10/18/2018 8:52:46 AM*RTA 1 PHOTOS/AUIDO CD TO DDA WHITFIELD. 5550.
12/31/2018 10:55:00 AM*CERT CAD FAXED TO DDA CHASE. 5550.
2/13/2019 2:27:02 PM*I/R FROM DDA CARNAHAN. 5550.
2/22/2019 3:36:12 PM*911/PHOTO/AUDIO/STATEMENTS CDS TO DDA CARNAHAN. 5550.
Detective ID: KINT #3652 Det Assignment:

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**ROCHA, SHADI** (Cont'd)

PROSECUTION LIAISON INFORMATION (Cont'd)

NCF Code:
Inv Unit:
Strike No:

## OTH OTHER — ROCHA, SHADI

Race: White
Sex: F
DOB: 09/20/1985
Age: 32
Type: PERSON
Height: 506
Weight: 120
Hair: Brown
Eyes: Brown

ADDRESS INFORMATION

Address Type: PERSONAL/HOME
Phone: (925) 305-5866
Address: 414 W 11TH ST ANTIOCH CA 94509
Time at Address:
Comments:

School:
Grade #:
Occupation:
Employer:
How long:
Work Hrs:
Language:
Clothing:
Crime Type:
Suspect Status:
Additional Info:

Comments:

IDENTIFICATION NUMBERS

| Identification: | Issued By: | ID No: |
|---|---|---|
| Drivers License | STATE OF CALIFORNIA | D5316960 |

## VEH Responsible Vehicle — License: 5EPR424

State: CALIFORNIA
LIC Year:
LIC Type:
Color: Aluminum or Silver
Year: 2003
Make/Model: HONDA / ELEMENT
Body: 4 DOOR SEDAN
VIN: 5J6YH28533L009487
Vehicle Type:
Sticker/Decal:

Other Oddities:
Modified Paint:
Condition:
Value:
Legal Owner:
Officer ID:
Recovered at:
Recovered by:
Store at:
Inv Date: 03/12/2018 16:01
Storage Authority:
Veh Dispo: Left at Scene
Release Location:
Location of Keys:
Description:

PARTIES ASSOCIATED WITH THIS VEHICLE

| Association: | Full Name: |
|---|---|
| Driver | ROCHA, CAMERON DAVID |

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO: 18002492**
**EVENT NO: 18016693**

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

## PROP Evidence BLOOD VIALS — ITEM#: 1

Quantity: 4 Category: Biological Blood, Saliva Etc.
Article: BLOOD VIALS Brand:
Model: Value: Color:
Serial #: Owner Applied #: Size:
Special Marks:
Officer ID: Inv Date: 03/12/2018 16:01
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: BLOOD VIALS DRAWN FROM RIGHT ARM OF ROCHA

## PROP Evidence DIGITAL PHOTOS — ITEM#: 2

Quantity: 16 Category: Other (Use only if art. cant be cat. in above codes)
Article: DIGITAL PHOTOS Brand:
Model: Value: Color:
Serial #: Owner Applied #: Size:
Special Marks:
Officer ID: Inv Date: 03/12/2018 16:01
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: DIGITAL PHOTOS

## PROP Evidence DIGITAL AUDIO — ITEM#: 3

Quantity: 3 Category: Other (Use only if art. cant be cat. in above codes)
Article: DIGITAL AUDIO Brand:
Model: Value: Color:
Serial #: Owner Applied #: Size:
Special Marks:
Officer ID: Inv Date: 03/12/2018 16:01
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: DIGITAL AUDIO STATEMENTS

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**Evidence 4** (Cont'd)

**PROP** **Evidence SEARCH WARRANT DOCS** **ITEM#: 4**

Quantity: 4 Category: Documents, indicia, misc papers
Article: SEARCH WARRANT DOCS Brand:
Model: Value: Color:
Serial #: Owner Applied #: Size:
Special Marks:
Officer ID: Inv Date: 03/13/2018 15:04
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: SEARCH WARRANT AND SEARCH WARRANT RETURN DOCS

Total Evidence: $

**PROP** **Safekeeping/Prisoner Property SHOES** **ITEM#: 1**

Quantity: 2 Category: Items/Clothing/Accessories
Article: SHOES Brand: VANS
Model: Value: Color: Blue
Serial #: Owner Applied #: Size:
Special Marks:
Officer ID: Inv Date: 03/12/2018 16:01
Obliterated Restored:
Obliterated Removal Code:
Obliterated Drill Size:
Comments: 2 VAN SHOES

RELATED PERSONS

| Person: | Relation: |
|---|---|
| ROCHA, CAMERON DAVID | OWN |

Total Safekeeping/Prisoner Property: $

**NARRATIVE**

*****Supplemental Report - Ofc. Z. Matis #5214*****

On 3/12/2018 at approximately 1604 hours, I was working as 2Y2 wearing a fully identifiable APD BDU and driving a fully marked APD patrol vehicle. I was dispatched to assist Ofc. Kint in a report of a hit-and-run collision near Wilbur Ave and the HWY 160 off-ramp. APD dispatch advised the responsible vehicle which fled the scene was a silver colored, Honda Element. The CA PL of the vehicle was **5EPR424**. DMV showed

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

the listed address for the Honda to be 414 W 11th St and registered to Cameron Rocha.

Ofc. Kint advised he would contact with the victim on Wilbur Ave. I drove to 414 W 11th St in an attempt to locate the responsible vehicle. 414 W 11th St is a single story residence. The front of the residence faces south and has a yard with a metal gate in front of it. To the east of the residence is a driveway which belongs to the residence.

At approximately 1613 hours, I was driving eastbound on W 11th St when I observed a Honda Element (CA PL: **5EPR424**) driving into the front driveway of 414 W 11th St. The vehicle had been driving westbound on W 11th St right before it made a northbound turn into the driveway of 414 W 11th St. The vehicle stopped in the driveway and the vehicle engine turned off. Before any of the doors to the vehicle opened, I activated my emergency lights (which consist of a solid, forward facing, red light). I also chirped the siren to my patrol vehicle.

I stopped my patrol vehicle directly behind the Honda. As I started to exit my patrol vehicle, a white male adult (later positively identified via a valid CA DL to be ARR- Cameron Rocha) exited the front driver seat of the Honda. He was the solo occupant of the vehicle and stumbled out of the vehicle and had an unsteady gait.

I instructed Cameron to sit on the ground, but he did not. I watched Cameron place a set of black colored keys on the hood of a vehicle parked next to the Honda. The other vehicle had a cover over it and was parked directly next to the Honda in the driveway of the residence. Cameron started leaning up against the covered vehicle but started to fall. I had to grab his arms to stop him from falling. I immediately noticed Cameron's bloodshot and watery eyes as well as the smell of alcohol emitting from him. His speech was slow and slurred. He had constricted pupils. I suspected he was under the influence of alcohol as well as possibly narcotics.

I asked Cameron what happened and he stated, "This sucks." I asked how much he had to drink today and he stated, "Not that much, dude." Cameron was confrontational with me and became upset that I was communicating with APD dispatch on my radio. He told me I was "rude" for using my radio. Cameron stated he was, "Trying to get food for [his] daughter and [his] wife." I asked if he was diagnosed with anything and he stated he was not.

A white female adult exited the front door of 414 W 11th St. She was holding an infant. Cameron looked at her and started becoming visibly upset. His fists clenched and he started to breath heavier. He yelled toward the female, "Shadi." The female was later identified as Cameron's wife (Shadi Rocha). At this point, I did not have a cover officer. However, I wanted to place Cameron in handcuffs before he became more upset. I did this for his safety and mine. At approximately 1620 hours, I placed handcuffs on Cameron, checked for proper fit, and double locked. Cameron began yelling and swinging his body around. I requested over radio for an additional officer to assist me.

Once my cover officer arrived, I attempted placing Cameron in the rear of my patrol vehicle. Cameron

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 14 of 21

COA (Rocha)000014

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

continued yelling "Shadi" and kept telling me to let go of him. I placed Cameron in the rear of my patrol vehicle.

I opened the doors to the Honda. I did not observe bottles of alcohol or drug paraphernalia. I grabbed the keys I observed Cameron place on the hood of the vehicle next to the Honda. I was able to start the Honda with the keys by inserting them into the ignition of the Honda. I observed various dings and scratches all over the body of the vehicle. I took photos of the Honda and placed them into APD evidence.

I made contact with Shadi in front of the residence. Shadi stated she is the wife of Cameron. they both live at 414 W 11th St. The infant is Cameron's child. The Honda is Cameron's vehicle. She last saw him a few hours ago when he left the residence when he drove away in his Honda. He told Shadi he was going to get a parts to fix Shadi's vehicle (not the Honda) as well as get food for them. Shadi stated Cameron was recently upset because she told him "the other day" she had kissed another man a few years ago. Shadi stated Cameron is not diagnosed with anything and is not prescribed medication. She does not know him to drink alcohol or use illegal narcotics. I digitally recorded my contact with Shadi and attached it to this case.

While I was interviewing Shadi, Cameron began kicking the interior door to my patrol vehicle. I could see the patrol vehicle rocking back and forth. I could hear Cameron yelling inside the vehicle. I rolled down the window to my patrol vehicle. I told Cameron to stop kicking my patrol vehicle. Cameron stated, "Fuck you" multiple times and said, "Let me out."

Ofc. Kint advised he was enroute with two (2) subjects to conduct an in field show up. Ofc. Kint arrived on scene with both subjects. I opened the rear door to my patrol vehicle and observed Cameron. I could see he was ringing both of his wrists around in circles, as if to escape the handcuffs which were placed on him. The handcuffs were to the rear of him. I had Cameron exit the patrol vehicle and stand next to it. Ofc. Kint told me in person that his subjects positively identified Cameron as the responsible party. Refer to Ofc. Kint's report for information on the collision, hit-and-run, and subject statements.

While the in field show up was being conducted, Cameron continued pulling his body away from me and was yelling. With Sgt. Koch and other APD officers on scene, Cameron was placed in a WRAP. The WRAP was placed on Cameron for his own safety. I took photos of Cameron at this time. I also digitally recorded the contact with Cameron during the WRAP process. I attached the photos and audio to this case. Cameron was placed into the rear of my patrol vehicle.

Due to Cameron's combative nature, I did not perform Field Sobriety Tests. He refused to perform a PAS Test and also refused to submit to a blood or breath test.

The Honda Cameron was driving was legally parked in his driveway. Cameron told me he wanted me to provide the keys to the Honda to his wife, Shadi, which I did. I left the vehicle on scene.

I transported Cameron from W 11th St to Martinez Detention Facility. While I was transporting Cameron, he was yelling various statements such as, "Shadi!", "Fuck you!" and "Bitch."

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 15 of 21

COA (Rocha)000015

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

APD dispatchers notified MDF staff that Cameron was placed in a WRAP. Once I arrived at the MDF sally port, multiple MDF deputies removed Cameron from the rear of my patrol vehicle and removed him from the WRAP. He was taken into the MDF booking area.

A nurse at MDF medically rejected Cameron. She stated the reason for her rejection was because his blood pressure was high and he had a high pulse rate. The nurse at MDF stated she called a doctor at Contra Costa County Regional Medical Center (CCCRMC) who stated an ambulance should transport Cameron from MDF to CCCRMCto be medically cleared. I had AMR arrive at the MDF sally port. I heard the paramedic for AMR rig #81 ask Cameron what happened. Cameron stated he had no idea. He told her he did not recall driving and did not recall a vehicle collision. I followed AMR to CCCRMC with Cameron in the ambulance.

Once at CCCRMC, medical staff placed restraints on Cameron's arms and legs. While Cameron was speaking with a doctor at CCCRMC, I heard the doctor ask how much alcohol Cameron had to drink today. Cameron replied, "One to two ounces."

Due to the fact that I did not have access to ARIES and my work e-mail address at CCCRMC, Ofc. Kint obtained a warrant for the forced blood draw of Cameron on my behalf. Ofc. Kint sent to the CCCRMC fax machine a copy of the warrant. The copy of the warrant was provided to Cameron. I put a copy of the blood draw warrant into the case file jacket.

Phlebotomist J. Young arrived at CCCRMC. At approximately 2033 hours, I observed J. Young draw four (4) vials of blood from Cameron's right arm in a medically approved manner. I collected the vials and later placed them into APD evidence. I placed the blood draw declaration from J. Young into the case file jacket.

Cameron was arrested for 23152(a) CVC and 20002(a) CVC. He was cite released from CCCRMC. Cameron signed a citation. I placed the citation into the case file jacket. Cameron was provided a copy.

I completed a DS 367 form and provided Cameron a copy. I collected Cameron's CA DL and attached it to the DS 367. I placed the DS 367 into the case file jacket.

When Cameron was originally taken into MDF, they removed his earrings and collected his cell phone. When he was transported to CCCRMC, his cell phone and earrings were given back to me. When Cameron was cite released at CCCRMC, I provided him his cell phone and earrings. Cameron's blue colored shoes (Vans) were accidentally left in my patrol vehicle when he was transported by AMR to CCCRMC. I collected the shoes and logged them into APD safekeeping.

On 3/13/2018, I drove to Delta Court and made contact with Honorable Judge O'Malley. I returned the warrant for the blood draw to Judge O'Malley. I took the warrant and the warrant return to a court clerk who stamped the forms. I placed the forms into APD evidence as well as made copies and placed them into the case file jacket.

Cameron did not show to have a RAP sheet. He did not show to be on parole or probation. He did not show to have prior contact with APD in RMS as an arrested or responsible party.

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** **18002492**
**EVENT NO:** **18016693**

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

I took no further action.

***Ofc. Z. Matis #5214***

*********************************************

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 17 of 21

COA (Rocha)000017

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

*************************

**STATEMENT OF EXPERTISE**
**ANTIOCH POLICE DEPARTMENT**
**OFFICER ZECHARIAH MATIS**

I have been a Police Officer since March 2013, beginning my law enforcement career with the City of Antioch, California and currently hold a Bachelor of Arts Degree in Organizational Communication (Magna Cum Laude). I am currently assigned as a Patrol Officer. Prior to becoming a Police Officer I attended Los Medanos Community College and California State University East Bay. During my junior and senior years in college I attended the UC Davis Law School Outreach Program where I gained knowledge of how the legal system works. After graduating college, I was employed at Wai & Connor, LLP in Pleasant Hill as a Legal File Clerk. While working in this position I furthered my knowledge and experience in the field of law.

As a Police Officer, I primarily work in high crime areas and I have conducted criminal investigations which included murder, burglary, robbery, theft, domestic violence, sexual assault, illegal narcotics (for sales and personal use), vehicle collisions, vehicle theft, DUI, and gang activity. During these investigations, I have interviewed and observed numerous individuals.

I have also conducted criminal investigations regarding narcotics. I have contacted numerous illegal drug users who used and/or possessed methamphetamine and marijuana. I have observed the associated drug paraphernalia used to traffic, store, package, sell, use, and possess controlled substances. I have observed subjects being under the influence of alcohol and/or controlled substances. During these investigations, I have had the opportunity to interview and converse with illegal drug and/or alcohol addicts in regard to their drug use and habits surrounding alcohol and narcotic activities.

**EDUCATION:**

Printed 02/27/2019 14:01 Data911 - Version 8.17.9921 Page 18 of 21

COA (Rocha)000018

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

| DATE | University | Degree |
|---|---|---|
| 2009 | Los Medanos College | Associates Degree of Liberal Arts |
| 2011 | CSU East Bay | Bachelors Degree of Organizational Communication |

**MEMBERSHIP:**

2013 California Narcotic Association Member

**TRAINING:**

| DATE | ORGANIZATION | HOURS | COURSE |
|---|---|---|---|
| 03/08/2013 | CCCSO | 1020 Hours | POST Basic Academy |
| 08/09/2013 | POST | 2 Hours | Communication: Keeping YourEdge |
| 08/10/2013 | POST | 1 Hour | Ofc. Safety: Hot or Not (WEB) |
| 08/11/2013 | POST | 2 Hours | Ofc. Safety: Make the Right Choice |
| 08/12/2013 | POST | 3 Hours | Gangs: PC 186.22 for Patrol__ |
| 10/18/2013 | CNOA | 8 Hours | Emerging Drug Trends<br>- Instructor: Sgt. Troy Gielish (Irvine PD) |
| 01/31/2014 | POST | 4 Hours | Domestic Violence: (Volume 1) |
| 10/24/2014 | Third Degree Comm. | 24 Hours | Interview & Interrogation<br>- Instructors: Sgt. Paul François (San Jose PD)& Lt. Enrique Garcia (ret)(San Jose PD) |
| 04/15/2015 | POST | 3 Hours | Search Warrant Fundamentals |
| 04/20/2015 | CSU Long Beach | 24 Hours | Tactical Communications Instructor<br>- Instructor: Sgt. Mike Siegfried (San Bernardino County Sheriff) |
| 04/24/2015 | POST | 5 Hours | IdentityTheft for Patrol |
| 01/14/2016 | CCCSO Laboratory | 8 Hours | Drug Presumptive Testing Program<br>Instructor: Richard Bowden (CCC Crime Lab) |

**Combined Case Report**
**Antioch Police Department**
CA0070100 - 300 L Street (925)779-6900

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

| | | | |
|---|---|---|---|
| 02/16/2016 | NCRIC | 8 Hours | Electronic Surveillance (Wiretap)<br>- Instructor: Rori Robinson (San Diego County DA) |
| 03/23/2016 | CNOA | 24 Hours | Drug Abuse Recognition (DAR)<br>- Instructors: Det. Vaughn Gates (Retired - CHP) & Inspector John George (Marin County DA Office) |
| 05/26/2016 | Serrato & Assoc. | 8 Hours | Criminal Street Gangs & Current Trends<br>Instructor: Rick Serrato<br>(Santa Ana PD) |
| 08/26/2016 | NAMI | 6 Hours | In the Aftermath of Trauma<br>- Instructor: Dr. Lawrence N. Blum<br><br>Verbal De-Escalation Strategies: The Mosaic Art of CIT<br>- Instructor: Major Sam Cochran (ret) |
| 10/20/2016 | CCCDA | 4 Hours | Domestic Violence & Sexual Assault<br>- Instructor: Dana Filkowski<br>(CCC District Attorney, Domestic Violence Supervisor) |
| 12/7/2016 | BATI | 9 Hours | Interviewing for First Responders<br>- Instructor: Richard Kimball (ret) (Nevada County Undersheriff) |
| 01/9/2017 | Napa SO | 40 Hours | FTO School<br>- Instructor:Lt. Mark Covington (ret)(Napa County Sheriff's Office) |

**Combined Case Report**
**Antioch Police Department**
**CA0070100 - 300 L Street (925)779-6900**

**CASE NO:** 18002492
**EVENT NO:** 18016693

REPORT - 2 SUPPLEMENT

Officer ID: MATIS #5214
Supervisor: KOCH #3018

**NARRATIVE** (Cont'd)

| | | | |
|---|---|---|---|
| 04/07/2017 | D-Prep, Inc | 40 Hours | Basic Crisis Negations<br>- Instructors: Lt. Gary Gregson (ret)(SacramentoPD) & LT. Tom Sweeney (ret)(Sacramento PD) |

**POSITIONS:**

| DATE | POSITION |
|---|---|
| 03/11/2013 - Current | Patrol Officer |
| 08/07/2014 - Current | Rifle Team |
| /13/2015 - Current | VSET (Vehicle Theft Suppression Enforcement Team) |
| 03/20/2015 - Current | Mobile Task Field Force (MAMFF) |
| 03/24/2015- Current | Tactical Communications Instructor |
| 04/10/2016 - Current | Peer SupportTeam |
| 10/11/2016 - Current | Field Training Officer |
| 11/07/2016 -Current | Hostage Negotiation Team |

REPORT - 3 SUPPLEMENT

Officer ID: TIERNAN #8289
Supervisor: TIERNAN #8289

**NARRATIVE**

DA COMPLAINT ATTACHED

# Exhibit C

DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
KEVIN P. ALLEN, State Bar No. 252290
kallen@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 697-2000
Facsimile: (415) 813-2045

Attorneys for Defendants
CITY OF ANTIOCH, CHIEF OF POLICE TAMMANY BROOKS, SGT. MATTHEW KOCH, OFC. ZECHARIAH MATIS, and OFC. KRISTOPHER KINT

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CAMERON ROCHA,

Plaintiff,

v.

CITY OF ANTIOCH, Antioch Chief of Police TAMMANY BROOKS, Antioch Sergeant MATTHEW KOCH, Antioch Officer ZECHARIAH MATTIS, and KRISTOPHER KINT, Antioch employees DOES 1-25,

Defendants.

Case No. 3:19-CV-07312-MMC

**DEFENDANTS CITY OF ANTIOCH, TAMMANY BROOKS, MATTHEW KOCH, ZECHARIAH MATTIS AND KRISTOPHER KINT'S EXPERT DISCLOSURE PURSUANT TO F.R.C.P. RULE 26(A)(2)**

Pursuant to *Federal Rule of Civil Procedure* 26(a)(2) and the Court's Order of November 24, 2020 (see Docket No. 38), defendants CITY OF ANTIOCH, TAMMANY BROOKS, MATTHEW KOCH, ZECHARIAH MATTIS, AND KRISTOPHER KINT (hereinafter collectively "Defendants") hereby disclose the following expert witnesses they intend to call at trial:

**RETAINED**

1. Dan Field, M.D., F.A.C.E.P., 11249 Gold Country Blvd.,. Suite 165, Gold River,

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

CA 95670 (916) 863-7301.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

2. Ronald Albucher, M.D., Psychiatry, 11010 White Rock Road, Suite 120, Rancho Cordova, CA 95670 (800) 458-1261.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

3. Steve Papenfuhs, 3303 Palantino Way, San Jose, CA, 95135 (408) 621-3955.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

4. John J. Panagotacos, M.D., General Neurology and Stroke Specialist, 87 Scripps Drive, Suite 114, Sacramento, CA 95825 (916) 273-7449.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

5. Vina Spiehler, Ph.D., F-ABFT, 422 Tustin, Newport Beach, CA 92663 (949) 642-0574.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

Defendants may also call any witnesses designated by Plaintiff CAMERON ROCHA, (“Plaintiff”). and may designate other experts to rebut experts designated by Plaintiff.

Respectfully submitted,

Dated: December 14, 2020

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

By: ______________________
DALE L. ALLEN, JR.
KEVIN P. ALLEN
Attorneys for Defendants
CITY OF ANTIOCH, TAMMANY BROOKS, MATTHEW KOCH, ZECHARIAH MATTIS, AND KRISTOPHER KINT

# 1. Dan Field, M.D.

DEFENDANTS' EXPERT DISCLOSURE 003



December 11, 2020

Kevin Allen
Allen, Glaessner, Hazelwood & Werth, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104

**RECORD REVIEW REPORT**

**RE:** **Cameron ROCHA** v. City of Antioch
**DOI:** 03/12/18
**MRK#:** 13136

Dear Mr. Allen:

Per your request and authorization, I reviewed the medical records pertaining to Cameron Rocha.

I was provided with medical records encompassing a time period from 01/11/16 through 08/18/20. These records have been indexed and summarized by technical staff. Though all entries are read, non-pertinent entries (e.g. common cold, etc.) may not receive comment. Illegible and/or nondated material may not be commented upon. These records have been reviewed in detail and are attached as an addendum to the report.

**MATERIALS REVIEWED:**

1. Photographs
2. Police reports
3. Medical records
4. Depositions (3)
   - Cameron Rocha
   - Shadi Rocha
   - Officer Matis

**SUMMARY:**

The incident began on 03/12/18. Mr. Rocha left his house in Antioch angry at his wife. He went to a bar and consumed several shots of tequila and used marijuana at some point. He began

driving and was involved in a minor motor vehicle accident (MVA) after failing to yield. Mr. Rocha drove away from the accident and was followed by the two other persons (in 2 separate vehicles) involved in the MVA, who stated Mr. Rocha appeared “drunk and high” when he exited his vehicle. These witnesses reported the event and the vehicle’s license number to the police. Office Matis drove to the home of the vehicle’s registered owner arriving just after Mr. Rocha parked his car in the driveway of his home and exited the vehicle. The time is documented at 1613 hrs.

Officer Matis began questioning Mr. Rocha who said he did not recall any accident and when asked about alcohol consumption he replied, "Not that much, dude." Mr. Rocha was observed to be having difficulty standing and the officer moved to keep him from falling. Mr. Rocha's wife came out of the house and upon observing her, Mr. Rocha became agitated and began yelling at her and cursing. At this point, because of the anger and apparent intoxication, he was placed in handcuffs for the general safety of those involved and the officer who was alone. The handcuffs were checked for proper fit and double locked to prevent accidental constriction. The officer put Mr. Rocha in the back of the police vehicle and began talking to Mrs. Rocha. Mr. Rocha began some type of violent activity in the vehicle, rocking the vehicle back-and-forth. Mr. Rocha apparently used his feet because at one point, Mrs. Rocha commented she saw him kicking the windows.

Officer Kint arrived with the two persons involved in the motor vehicle accident to do an “in field show up” to see if Mr. Rocha was the person involved in the incident. Officer Matis opened the door of his patrol vehicle and observed Mr. Rocha ringing both his wrists around in circles as if to escape the handcuffs. Mr. Rocha was identified as the driver of the vehicle involved in the MVA.

During the “in field show up,” Mr. Rocha continued to pull away from the officer and yell and when backup arrived, Mr. Rocha was placed in a WRAP device for his safety while he was being transported. Photographs were taken of Mr. Rocha at this time and then he was placed in the back of the patrol vehicle. A field sobriety test could not be performed. Officer Matis stated the subject refused to perform a PAS test and refused to submit a blood or breath test. Mr. Rocha was first transported to the Martinez Detention Facility (MDF). With the assistance of multiple deputies, he was removed from the rear of the vehicle and from the WRAP device and was taken into the booking area.

In the booking area, a nurse medically rejected Mr. Rocha, stating his blood pressure was high and he had a high pulse rate. Contra Costa County Regional Medical Center (CCCRMC) was contacted, and Mr. Rocha was transported there to be medically cleared. At the CCCRMC, medical staff placed restraints on Mr. Rocha's arms and legs. A warrant for a forced blood draw was obtained and the sample was subsequently obtained at 2033 hours. This sample was analyzed for blood alcohol and other drugs. THC related compounds were identified. The blood alcohol concentration (BAC) was 0.230 more than 5 hours after his last known drink of alcohol. A BAC of 0.0 is sober, while in the United States 0.08 is legally intoxicated. BAC levels above 0.40 are potentially fatal.

The emergency department notes begin at 2124 hrs. The emergency department medical record lists the chief complaint as hypertension. History of the present illness documents Mr. Rocha was rejected from detention at the MDF for abnormal vital signs. The doctor records that Mr. Rocha denied any complaints at this time other than not wanting to be there. On the review of systems, the doctor positively records bilateral hand numbness. [Mrs. Rocha testified that Mr. Rocha complained of bilateral hand numbness to some degree prior to the incident, which they blamed on his occupation as a meat cutter]. On physical exam, the vital signs list blood pressure at 155/102, heart rate 130, temperature 98.1, respiratory rate 16. The blood pressure and heart rate are significantly abnormal. He is said to be in no distress. Mr. Rocha's extremity exam: "Bilateral hands with superficial abrasion at proximal wrist crease." Under medical decision making the exam notes bilateral hand swelling distal to where his handcuffs were placed and somewhat decreased sensation in his hands. The physician wanted to continue evaluating and caring for Mr. Rocha, but he had been cited and released from law enforcement and at that point, chose to leave the emergency department against medical advice without further care.

**ANALYSIS OF PHOTOGRAPHS:**

1. COA (Rocha) 000038 View of handcuffed wrists at scene - blood visible on shirt and one dot on the base of his right thumb. There are no visible excoriations under the cuffs and the hands do not appear swollen or discolored.

2. COA (Rocha) 000039 Left wrist and hand likely obtained in the emergency department hospital since handcuffs have been removed and replaced by hospital type soft restraints. The hands appear swollen and there are very superficial abrasions on the wrist located mostly in the radial aspect just distal to the radial stylus. No circumferential injury is visible.

3. COA (Rocha) 000040 Right wrist with a similar though smaller superficial abrasion visible and somewhat less swelling of the hand.

4. Page 975 [Rocha000006] The photograph shows much more severe semi-circumferential abrasions on the right wrist crease. Photograph location is uncertain but appears to be institutional.

5. Page 976 [Rocha000007] Left hand and wrist with large deeper abrasion at the wrist crease and significant hand swelling. Both 000006 and 000007 have plethora discoloration.

6. Page 977 [Rocha000008] Shows healing wrist wounds with continued swelling of the hands left greater than right. This appears to be at a residence because there is a dog present in the picture. The hands continue to appear swollen. There is an abrasion seen more proximal on the radial aspect of the left wrist that was not seen in earlier photographs.

**CONCLUSIONS:**

1. Photos taken at the incident scene do not indicate any injury to the wrist or hands.

2. Photos taken in the emergency department after the handcuffs were exchanged for soft restraints document very minor superficial abrasions to the wrists. The hands might be mildly swollen. No significant discoloration on either hand is visible.

3. The initial abrasions are very superficial, and they are seen in that state prior to the change to the soft restraints in the emergency department. What is very unclear is how the wrists became so much worse after the removal of the handcuffs. The severe wounds manifesting after the removal of the handcuffs and after the removal of the soft restraints suggest additional injuries out of police custody.

4. Mr. Rocha did have some pre-existing bilateral hand numbness from his occupation as a meat cutter. To great medical certainty, Mr. Rocha's disability was significantly worsened by the injuries he sustained after this incident.

5. To a great medical certainty, Mr. Rocha's violent activity after being handcuffed caused most of the damage he sustained prior to reaching the hospital.

The opinions and conclusions in this report are based upon a reasonable degree of medical probability.

I reserve the right to change any opinions expressed upon production of additional medical records. Questions should be directed to my attention at MRK Medical Consultants.

**DECLARATION:**
I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information I have received from others. As to that information, I declare that it accurately describes the information provided to me and, except as noted herein, I believe it to be true. The opinions and conclusions expressed in this report are my own. No one else participated in the examination or preparation of this report. All conclusions reached and opinions expressed are based on the premise that the information is properly admissible evidence and has been properly obtained in accordance with the laws of the State of California and/or the jurisdiction where the legal action has been filed.

Executed on **December 11, 2020** in the County of Sacramento.

RESPECTFULLY,

**DAN FIELD, M.D., F.A.C.E.P.**
Emergency Medicine Consultant

DF:dp

**MEDICAL RECORD REVIEW OF CAMERON ROCHA**

The following is a chronological summary of the review of the medical records of Cameron Rocha. Records received for review were dated from 01/11/16 through 08/18/20. The following summary may contain spelling, typographical and/or grammatical errors.

Police procedural manual regarding restraints.

01/11/16 Dr. James Edwards. Handwritten progress note, indicates anxiety, sleeping problems, depression.

12/09/16 Delta Medical Center. Thomas Sugarman, MD. ED. DX: altered mental status, alcohol intoxication. Had argument with wife, has been depressed recently, vaping, and unknown other drug use. Found in bathroom unresponsive. Apparently uses drugs through vaporizer. Normal CT of brain.

01/12/17 AMR Contra Costa County prehospital care report. Patient lying on couch unresponsive with empty bottle of vodka.

01/12/17 Delta Medical Center. Anthony Rodigin, MD. ED. Altered mental status secondary to alcohol intoxication. HX of alcohol abuse. BIBA, drunk at mothers' home when urinated on self, slipped, and fell. Unremarkable head CT.

01/12/17 CT brain without contrast completed at Delta Medical Center. Impression: Unremarkable noncontract CT.

01/12/17 CT cervical spine without contrast at Delta Medical Center. Impression: no evidence of acute traumatic injury. Mild cervical degenerative changes. Satisfactory alignment.

**03/12/18 DATE OF INCIDENT**

03/12/18 Traffic Collision Report.

03/12/18 Case Report Antioch Police Department.

03/12/18 Supplemental Report Antioch Police Department.

03/12/18 Photos.

03/12/18 Contra Costa Regional Medical Center. David Piccinati, MD. ED. CC: HTN. 40-year-old male with no HX who presents today after rejection from MDF for abnormal vital signs. Admits alcohol use today. Denies illicit drug use. Does not want to be here. PE: Positive for numbness bilateral hands. BP 155/102, HR 130. Tachycardic. Bilateral hands with superficial abrasion at proximal wrist crease. Patient presented to ED for medial clearance for incarceration. Exam notable for bilateral hand swelling distal to where hand cuffs had been placed. Somewhat decreased sensation in his hands as well. Initial discussion with patient was going to involve at minimum ECG and wrist radiographs. However, once patient was site released, he refused all medial care. Plan: Discharge home AMA with clear verbal return

precautions, FU with PCP strongly encouraged. DX: tachycardia, hand numbness, abrasion of multiple sites of hand and wrist, unspecified laterality, initial encounter. Disposition: AMA.   Encounter note indicates patients need for restraint/seclusion due to imminent violence toward self or others.

03/13/18   Sutter Health East Bay Urgent Care Antioch. Tangie Lewis, NP. Presents with joint swelling, both hands were in restraints last night for at least six hours. C/o of bilateral wrist abrasions, hand/wrist pain and swelling after being handcuffed in ER last night by police. Left against medical advice per record review. Felt numbness yesterday, improved. PE: Bilateral wrists and dorsal hands swollen with tenderness. Circumferential dry abrasions with come confluent erythema around both in a couple of areas. Bilateral dorsal hands with soft tissue swelling. No circumferential swelling. Bilateral hands/wrist 5/5 motor strength, normal sensation to light touch. Ace wrap applied bacitracin applied to bilateral wrist, gauze dressing. Neurovascularly intact. DX: bilateral wrist pain, bilateral hand pain, infected abrasion. Plan: pantoprazole sodium, x-ray hand and wrist, doxycycline hyclate, ace wrap, bacitracin. FU with PCP. DC.

03/13/18   X-rays left hand completed at Sutter. Impression: Normal study.

03/13/18   X-rays right hand completed at Sutter. Impression: Normal study.

03/13/18   X-rays left wrist completed at Sutter. Impression: Normal X-ray.

03/13/18   X-ray of right wrist completed at Sutter. Impression: Normal study.

03/15/18   Dr. James Edwards. Handwritten progress note. Patient here because he was placed in hand cuffs, but they were too tight and left on for 6 hours. C/o numbness, pain and swelling in bilateral hands and goes up to elbows at times. Was arrested for DUI. Went to Sutter urgent care had x-rays taken and was given antibiotics. C/o numbness on both dorsal hands, severe tingling in both palms. Tingling up both dorsal forearms to elbows. PE: Severe abrasions both wrists, moderate to severe swelling both hands. Photos taken on my phone. No bruising seen on sacrum but significant TTP. Apparently was carried into hospital and dropped on floor and hit coccyx and possible right elbow. Grip strength 2/5 bilateral, forearm strength 5/5 F and E bilateral, wrist flexion 2/5 bilateral, wrist extension 4+/5 bilateral.  Dressed both wrists with silverdene. Advise get attorney ASAP, Gabapentin, Sonata, tramadol, NCS/EMG both arms, X-rays sacrum and coccyx and right elbow.

03/16/18   Contra Costa County Office of the Sheriff. Forensic Services Division. Lab report. BAC .230%.

03/16/18   X-ray of sacrum and coccyx completed at Sutter Health ordered by Dr. Edwards. Impression: Unremarkable sacrum and coccyx, mild degeneration of L5-S1.

03/22/18 Dr. James Edwards. Progress notes. FU. Patient c/o bilateral burning sensation in palms up to fingertips. X-rays of sacrum and coccyx essential normal, mild degeneration symptoms L5-S1, could afford right elbow x-rays. Hands have burning sensation in palms to 5th fingers. Left middle finger has numbness, still has numbness in dorsal hands. Sonata very helpful. Tramadol did not help. Gabapentin no noticeable help. PE: abrasions dry and healing well at wrist, some ____to straighten fingers manually, left greater than right. Wrist flexion and extension full. Wrist abduction and adduction very painful. Grip strength 3/5. PROM of forearms and elbows ok. Mild discomfort with left elbow flexion and extension. DX: wrist neuropathy multiple nerves bilaterally. Healing abrasion bilaterally. Severe bruising of wrist structures.

03/29/18 Dr. James Edwards. Right hand fingers stiff. Resist forced extension. Grip 4+/5, wrist extension 5/5, wrist flexion 4/5, caused significant pain. Left hand symptoms worse than right per patient. Grip strength 4-/5, fingers not as stiff, wrist flexion and extension 5/5. Abrasions healing still has scabs bilaterally DX: same as 3/22/18. On family leave supposed to return to work around 4/10/18.

04/06/18 Contra Costa County Office of the Sheriff. Forensic Services Division. Lab exam. Positive for cannabinoids.

04/12/18 Dr. James Edwards. NCS planned, insomnia, neuropathy. Right wrist – Abrasions nearly healed, scars visible. Still significant TTP dorsa med and dorsa lateral wrist. FROM about 80%. Significant pain with flexion and extension, adduction less. Finger extension no pain just stiff. Left wrist wounds nearly healed, scars visible. Small open ___ dorsa lateral where dog scratched him. Very TTP dorsa lat. PROM pain especially with extension and adduction. Fingers stiff to extend. Grip 4+/5. Off work through 05/10/18.

05/04/18 NCS completed by Neurology Medical Group of Diablo Valley. Leslie Gillum, MD, MPH. Impression: Moderate to severe sensorimotor demyelinating and axonal neuropathy is seen in the bilateral median nerves localizing to the across-wrist segments. Severe sensorimotor axonal neuropathy is seen in left ulnar nerve. Moderate to severe sensorimotor axonal neuropathy is seen in the right ulnar nerve distal to the nerve twig supplying the flexor carpi ulnaris (FCU) muscle. Severe sensory axonal neuropathy is seen in bilateral radial nerve. Suprasegmental weakness seen in left EDC muscles. Referred urgently to UCSF Nerve injury clinic after personal discussion with Drs. Jeff Ralph and Line Jacques. Clinical correlation is advised with regard to all of above findings. No electrodiagnostic evidence of left C5/6 motor radiculopathy or myopathy.

05/10/18 Dr. James Edwards. FU, NCS/EMG. Referred to UCSF due to study. Not able to work yet. Off through 06/10/18.

06/07/18 Dr. James Edwards. FU, had NCS, has appointment to go to UCSF. Has not been working, does not see how he could work. Does have any attorney working with him. Off work through 7/7/18. RTC 4 weeks. Neurontin 600 mg.

06/12/18 UCSF. Brian Warmus, MD., John Engstrom, MD. Neurologic consult. Review of episode. Reports hands turned blue/purple and he was taken to hospital and had swelling for next 3 days. Palms regained some sensation in about 1 week. Tops of hands have not recovered. Palms and fingertips still have decreased sensation and have tingling at tips of his fingers worse at 4-5th digits. N/T is worse at night and can wake him. Has difficult using hand and reports weakness of fingers. Struggles with fine motor skills and has not returned to work as a meat cutter due to difficulties. Proximal arms seem strong. PE: Palms and fingers are very sweaty. Diminished light touch in medial palm of left hand. Left arm muscles 4/5 wrist extensors, 4/5 in 4th -5th finger flexors. Right arm power full. Pinprick sensation diminished from just above left wrist to palmar dorsum of hand but seemed worse in an ulnar distribution with splitting of this 4th digit. EMG/NCS today provides evidence for bilateral radial neuropathies, possible bilateral carpal tunnel and left ulnar neuropathy. Compared to prior EMG on 5/4/18 there has been a significant improvement in function of right ulnar nerve. In summary symptoms and exam localize the nerve tissue injury to bilateral radial, median, and ulnar nerves. EMG/NCS demonstrate bilateral radial neuropathies, possible bilateral carpal tunnel and left ulnar neuropathy. We did not find any evidence of right ulnar neuropathy on EMG/NCS which is an improvement compared to prior study. Repeat NCS in 4-6 months at UCSF. Begin hand PT with referral form PCCP. Prognosis for additional recovery is good. FU 4-6 months.

07/09/18 Dr. James Edwards. Waiting for MRI of wrists stopped Neurontin was not helping him that much. Taking Protonix, marijuana makes him less anxious. Unable to do his job as meat cutter. Off work through 09/07/18. Waiting for approval of MRI.

08/24/18 Contra Costa Regional Medical Center. Jared Hubbell, MD. ED. DX: GERD with esophagitis, insomnia. Limited supply of Ambien for insomnia.

08/29/18 Dr. James Edwards. Depression, ongoing and getting worse. Saw him originally for this 1/11/16. Gave him Ambien for sleep and Lorazepam. Was to come back in 2 weeks and nerve returned till wrist injury in March of this year. Now wife left him took baby and money and went to LA. Could not get MRI that UCSF wanted, could not tolerate tube, and could make appointment with open MRI due to insurance. Cannot cut meat anymore.

09/08/18 Focus well being form.

10/15/18 Pittsburg Health Center. Kathryn Hamlin, MD. CC: depression, abdominal pain, wrist pain bilateral. Hand pain since being in handcuff for 5 hours for suspected DUI. Told had moderate to severe nerve damage. PE: evidence of circumferential scarring around wrists as from reported h/o handcuff injury, two small abrasion on palms where he says he fell a few days ago. Unable to fully extend bilateral 4th of 5th digits, strength 4-/5 4th and 5th finger extensors, 5-/5 2nd-3rd finger extensors, 4/5 pincher strength. DX: depression, continue Cymbalta, FU with therapy, add mirtazapine for sleep, ordered repeat EMG and fu with neurology and OT. Consider MR neurography, may need to be done at UCSF? FU 4 weeks.

10/29/18 Legal Complaint.

12/12/18 Pittsburg Health Center. Shaista Rauf, MD. DX: bilateral carpal tunnel syndrome, radial neuropathy, unspecified laterally, cubital tunnel syndrome, right. Referred for repeat EMG. NCS completed patient declined EMG. Study is abnormal. Evidence of multiple nerve that include bilateral superficial sensory radial nerve at wrist, bilateral median sensory and motor neuropathy. Seems to be primarily demyelinating at wrist. Likely entrapment at carpal tunnel. Also has a right ulnar nerve entrapment across elbow and sensory ulnar neuropathy on left side. Compared to study at UCSF there is some improvement. Radial sensory nerve responses though reduced but is present, previously was absent. CMAP amplitudes are now normal in bilateral median and ulnar motor nerves. Slowing across left ulnar motor nerve has improved. More severe entrapment of the right ulnar nerve across elbow as it is now a conduction block.

12/13/18 Pittsburg Health Center. Kathryn Hamlin, MD. CC: fu labs, refill Cymbalta and Ambien. Doing much better by his report, still having trouble with sleep, reports NCS shows signs of healing. Legal struggles up in air. Little motivation to leave home. Not drinking smokes cannabis a few times per week. DX: bilateral radial medial and ulnar neuropathy, depression. Wrist splint LM, wrist splint RM, elbow pad. FU with OT as referred. Add Nortriptyline at night. Unable to stay to get elbow pad today.

01/10/19 Pittsburg Health Center. Dr. Hamlin. DX: depression, ulnar neuropathy at elbow of right UE, other social stressor, radial neuropathy, unspecified laterally. Nortriptyline caused him to wake up screaming. Had Kaiser mental health as child and found report and documents ADHD and Tourette's. Occasionally blacks out and does things he does not remember, happens when under extreme stress. Occasionally will hear things. Occasional cannabis 2 times per week. No ETOH since accident. Constant pins and needles in hands. Hard to tolerate wrist splints but has been suing them at night, has not scheduled with OT. Will refer to plastics for further evaluation of bilateral radial, medial, and ulnar neuropathy.

02/01/19 East County Behavioral Health. Jonathan Terry, DO. Partnership Plan for Wellness.

03/04/19 Pittsburg Health Center. Nathan Brooks, MD. DX: chronic GERD, Depression, dysphagia. Discussion of depression, stomach, and throat problems. Go to mental health today, avoid alcohol and drugs, FU 2 weeks. Referred to GI. FU 2 weeks.

03/18/19 Pittsburg Health Center. Dr. Brooks. DX: severe major depression with psychotic features, hematemesis with nausea. Did not schedule therapy, mostly isolating at home, went out drinking last night and ended up vomiting blood. Feels anxious all the time. Hears vague auditory hallucinations. Trial of busbar started today. Encouraged to see Dr. Terry. FU 4 weeks.

04/04/19 East County Behavioral Health. Crystal Costa, RN. Call from patients' mother, stating very concerned, depressed, lost family and job and now at risk of losing house, hopeless and isolative. Left message for patient, could not get in contact, advised to call 911 for welfare check. DX: PTSD.

04/08/19 East County Behavioral Health. Crystal Costa, RN. Drop in today depression 10/10. Sleeping only couple hours a night. C/o pain in bilateral hand and wrist nerve damage. Increase Seroquel to 100-200 mg nightly. FU with PCP next week regarding pain.

04/10/19 East County Behavioral Health. Cheyenne Carson Craft, ASW. Changed client's diagnosis form PTSD to major depressive disorder.

04/15/19 Pittsburg Health Center. Dr. Brooks. DX: severe episode of recurrent major depressive disorder with psychotic features, radial neuropathy, unspecified laterally, dysphagia, chronic GERD, nightmares. Slept poorly last night in part to wrist pain and in part to racing thoughts. Seeing BH, increased dose of Seroquel seems to be helping. Stop Buspar as not helping, start taking prazosin nightly, continue duloxetine and Seroquel. Can try steroid injections in wrist next time if you want to try. May be worst trying to reduce pain. FU 1 month.

04/17/19 East County Behavioral Health. Cheyenne Carson Craft ASW. No show for appointment today, called, unable to leave message due to mailbox full.

04/22/19 East County Behavioral Health. Crystal Costa, RN. Seroquel not covered by insurance. Sleeping better, voices are quieter and denies side effects. Pharmacy will provide him with emergency supply while TAR is processed. FU in 3 days.

04/25/19 East County Behavioral Health. Crystal Costa, RN. Pharmacy changed dose to 50mg, and Seroquel is covered. Will take 2-4 tablets nightly.

05/05/19 Delta Medical Center. Christina Nardi, NP. ED. Hand pain fell off unicycle last Wednesday. Left hand pain, hit head, no longer has a HA.

05/05/19 X-ray of left hand completed at Delta Medical Center. Impression: FX the fifth metacarpal FX.

05/05/19 X-ray of left wrist completed at Delta Medical Center. Impression: Fifth metacarpal FX, possible nondisplaced FX of distal radius.

05/07/19 Pittsburg Health Center. Mauricio Kuri, MD. DX: closed nondisplaced FX of other part of fourth metacarpal bone of left hand, sequela. Preop packet given. On disabity for neuropathy due to restraints presents with LSF MC neck FX with 40 degrees of volar angulation after a fall 7 days ago. Surgery scheduled.

05/07/19 X-ray of left hand completed at Pittsburg Health Center. DX: boxers type FX.

05/08/19 Contra Costa Regional Medical Center. Amarjit Dosanjh, MD. H & P. Preop physical. Closed reduction UE with percutaneous pinning left small finger. PE: left hand wrist with a splint, limited ROM. Low grade fever of 100 F. Having pain today, admits to stressful events in life.

05/10/19 Contra Costa Regional Medical Center. Dr. Dosanjh. Operative Report. DX: left small finger metacarpal FX. Procedure: Closed reduction and percutaneous pinning of metacarpal FX, intraoperative fluoroscopy, short arm splint.

05/10/19 X-ray of left hand intraoperatively. Impression: Interval post-operative change.

05/13/19 Pittsburg Health Center. Dr. Books. DX: remains same. FU on depression. Has hand surgery scheduled. Continue seeing Dr. Dosanjh for hand. Complete disability forms.

05/15/19 East County Behavioral Health. Cheyenne Carson Craft ASW. Feeling better. Recently fell of unicycle and injured his hand causing him to miss last court date.

05/21/19 Pittsburg Health Center. Dr. Dosanjh. DX: closed FX of fifth metacarpal bone of left hand with routine healing. Placed in cast, FU 4 weeks.

05/24/19 East County Behavioral Health. Jonathan Terry, DO. Behavioral Health Visit. Reports issues started following birth of first child and DUI and being handcuffed which resulted in bilateral radial neuropathy and then lost job as meat manager and wife and daughter left for LA. Income now from disability. Feels overwhelmed. Having nightmares related to DU, arrest and legal separation from wife. DX: Likely PTSD, chronic. Continue Seroquel.

06/19/19 Contra Costa Reginal Medical Center. Eric Kenley, MD. ED. Left hand pain. Reevaluation of FX of left-hand metacarpal. Pain in place and hand in splint. States having pain from cast. Increasing pains. Requested to see Dr. Dosanjh. Pin dorsum 5th MC removed by Dr. Dosanjh. DX: Closed FX of 5th metacarpal bone of left hand with routine healing, unspecified FX morphology, subsequent encounter.

06/19/19 East County Behavioral Health. Cheyenne Carson Craft ASW. Change of DX.

07/02/19 Pittsburg Health Center. Dr. Brooks. Left message for Dr. Terry about possible Seroquel side effects.

07/07/19 East County Behavioral Health. Cheyenne Carson Craft ASW. Behavioral health FU. Increased depressive symptoms. DX: major depressive disorder.

07/16/19 Pittsburg Health Center. Dr. Kuri. DX: closed nondisplaced FX of fourth metacarpal left hand. K wires removed last visit, awaiting evaluation for bilateral nerve neuropathy. Refer to OT for SF CRPP ROM. EMG evaluation from CCRMC. Discuss with colleagues on how to proceed and evaluate nerve findings.

07/17/19 East County Behavioral Health. Cheyenne Carson Craft ASW. Behavioral health FU.

09/10/19     Pittsburg Health Center. Dr. Brooks. Risk of losing home as not on disability. Not been to OT yet, cancelled last appointment with Dr. Kuri, needs to reschedule Dr. Terry. DX: radial neuropathy, unspecified laterality, severe episode of recurrent major depressive disorder with psychotic features, dysphagia, choric GERD, insomnia HTN. FU 3 months.

09/20/19     East County Behavioral Health. Cheyenne Carson Craft ASW. Behavioral health FU.

09/30/19     East County Behavioral Health. Crystal Costa, RN. Refill Seroquel.

10/23/19     East County Behavioral Health. Crystal Costa RN. Patient not doing well per his mother and wants to get him back in with providers.

10/29/19     Pittsburg Health Center. Dr. Kuri. S/p left small finger metacarpal FX repair. EMG showed evidence of multiple nerve that include bilateral superficial sensory radial nerve at wrist, bilateral median sensory and motor neuropathy. Seems to be primarily demyelinating at wrist. Likely entrapment at carpal tunnel. Also, right ulnar nerve entrapment across elbow and sensory ulnar neuropathy on left side. PE: 3/5 adduction/abduction grip 5/5, TPD unable to test, Tinel's at elbow and wrist. Doing better since last visits, improved dexterity and resolved claw hand. Repeat EMG, return after study.

10/31/19     East County Behavioral Health. Cheyenne Carson Craft ASW. Has been struggling with depression for last couple of months. Hard to get out of bed. DX: major depressive disorder, recurrent episode, severe.

11/14/19     East County Behavioral Health. Cheyenne Carson Craft ASW. Behavior health FU. DX: same.

12/03/19     East County Behavioral Health. Paramjit Chatwal, RN. Refill Seroquel 100 mg.

12/12/19     East County Behavioral Health. Cheyenne Carson Craft ASW. Feeling less depressed but struggles with motivation to get up. Increase in nightmares. DX: Major depressive disorder, recurrent episode, severe.

12/13/19     Pittsburg Health Center. Dr. Brooks. Hand pain FU. Remains disabled due to hand numbness/weakness, cannot even drive due to numbness in hands. Has repeat EMG in January. Depression, trouble sleeping. DX: Chronic GERD HTN, radial neuropathy, unspecified laterality, severe episode of recurrent major depressive disorder with psychotic features, tachycardia. FU with EMG, Dr. Kuri and psych. FU 3-4 months.

12/13/19     Contra County Regional Medical Center. Wellbeing screening.

12/19/19     East County Behavioral Health. Cheyenne Carson Craft ASW. Behavioral health FU. DX: same.

01/03/20     East County Behavioral Health. Valentia Loreto-Ashley, RN. Refill Seroquel.

01/06/20    East County Behavioral Health. Valentia Loreto-Ashley, RN. Mother called she forgot about appointment and asked to reschedule and have refills.

01/09/20    East County Behavioral Health. Cheyenne Carson Craft ASW. Behavioral health FU. DX: same.

01/15/20    Pittsburg Health Center. Shaista Rauf, MD. Here for nerve damage.  DX: cubital tunnel syndrome of both UE. Will be referred for repeat EMG to assess improvement of previously identified neuropathy, sustained after handcuffed in March 2018. N/T since that incidence. Prior diagnostic studies showed nerve damage affecting median, radial, and ulnar nerves bilaterally. Repeat NCS show persistence of damage to sensory nerves affecting bilateral median ulnar and radial nerves. Possible overlapping CTS on right affecting only sensory fibers. Entrapment of ulnar nerve previously noted as now improved.

02/10/20    East County Behavioral Health. Dr. Terry. Behavioral health FU.

02/18/20    Pittsburg Health Center. Mauricio Kuri, MD. Plastic Surgery. DX: closed nondisplaced FX of other part of fourth metacarpal bone of left hand. S/p handcuffed in 2018 resulting in hand paresthesia's, s/p left small finger metacarpal FX repair, k wires removed-healed. Awaiting evaluation for bilateral nerve neuropathy. 12/12/18 EMG showed evidence of multiple nerve that include bilateral superficial sensory radial nerve at wrist, bilateral median sensory and motor neuropathy. Seems to be primarily demyelinating at wrist. Likely entrapment at carpal tunnel. Also has right ulnar nerve entrapment across elbow and sensory ulnar neuropathy on left side. 1`/15/20 studies showed nerve damage affecting median, radial, and ulnar nerves bilaterally. Repeat NCS show persistence of damage to sensory nerves affecting bilateral median, ulnar, and radial nerves. Possible overlapping CTS on right affecting only sensory fibers. Entrapment of ulnar nerve previously noted has now improved. PE: Range full, 3/5 adduction/abduction, grip 5/5. TPD unable to test. Tinel's at elbow and wrist. Doing better since last visit. Improved dexterity and resolving claw hand. Discussed releases of CTS/Guyon's and CuTs if no improvement although hard to predict improvement given paradoxical presentation of symptoms include semi claw hand with no intrinsic atrophy or motor amplitude denervation. Repeat EMG in 3 months with needle EMG. RTC 6 weeks.

03/03/20    East County Behavioral Health. Cheyenne Carson Craft ASW. Patient would like to resume therapy.

03/04/20    East County Behavioral Health. Valentina Loreto-Ashley, RN. Refill Seroquel, he has picked up refills, none needed at this time.

04/07/20    Pittsburg Health Center. Dr. Kuri. Awaiting eval for bilateral nerve neuropathy. Exam same. Doing better since last visit. Improved dexterity and resolving claw hand. RTC after repeat EMG with needle EMG.  DX: cubital tunnel syndrome, unspecified laterally, radial neuropathy, unspecified laterally.

04/13/20 Pittsburg Health Center. Nathan Brooks, MD. SSDI paperwork, came despite COVID-19, no acute issues. Dr. Kuri needs to fill out documenting restrictions for both hands. Tachycardic today. Message sent to Dr. Kuri.

04/16/20 East County Behavioral Health. Dr. Terry. Psychiatrist Progress note. Telephone encounter attempted due to COVID-19 19.

04/20/20 Pittsburg Health Center. Dr. Kurt. Work form for social security.

06/10/20 Pittsburg Health Center. Dr. Brooks. Telephone encounter. FU, appealing disabity claim which was denied first time. EMG next week. Feels mental health is stable, some low-level anxiety. DX: chronic GERD, radial neuropathy, unspecified laterally, MDD, recurrent severe.

06/17/20 Pittsburg Health Center. Dr. Rauf. EMG complete. Reports ongoing N/T in both hands. Repeat NCS show persistence of damage primarily affecting sensory nerves of bilateral median, ulnar, and radial nerves. Very mild bilateral CTS on left affecting only sensory fibers.

06/18/20 NCS completed by Dr. Rauf. Impression: study shows evidence residual nerve damage primarily affecting sensory nerves. There is no evidence of Ulnar nerves at cubital tunnel or Guyon's canal. Mild biliteral carpal tunnel syndrome. Compare to previous study dated 1/2020 there is no significant change.

07/10/20 East County Behavioral Health. Cheyenne Carson Craft ASW. Telehealth visit. No answer. Left message.

07/16/20 East County Behavioral Health. Cheyenne Carson Craft ASW. Telehealth visit, no answer. Left message.

07/23/20 East County Behavioral Health. Dr. Terry. Telephone visit, patient states doing OK. Attending online court ordered classes and watching TV. Not taking trazodone. Some breakthrough anxiety.

07/27/20 East County Behavioral Health. Cheyenne Carson Craft ASW. Left message on phone.

08/14/20 Deposition of Shadi Rocha.

08/18/20 Pittsburg Health Center. Problem list: depression resolved; bilateral radial, medial and ulnar neuropathy 10/15/18 to present; other social stressor, severe episode of recurrent major depressive disorder with psychotic features, 4/15/19 – present, chronic GERD, closed fracture of metacarpal bone of left hand 5/7/19 to present, closed nondisplaced FX of fourth metacarpal bone of left hand 5/7/19 to present; MDD recurrent severe, without psychosis, hypertension.

09/28/20 Deposition of Zechariah Matis.

09/29/20 Deposition of Matthew Koch.

Medical Record Review Page 11
**RE: Cameron Rocha**

09/29/20 Deposition of Kristopher Kint.

09/30/20 Deposition of Cameron Rocha

**DAN FIELD, M.D.**
Emergency Medicine Consultant

DEFENDANTS' EXPERT DISCLOSURE 018

# CURRICULUM VITAE

**Dan L. Field, M.D.**
**M.R.K. Medical Consultants**
11249 Gold Country Blvd. Suite 165 Gold River, California 95670
916/863-7301 Fax: 916/863-7206

## EDUCATION

1974 to 1979 BS, Biology; U.C. Irvine, CA
1977 to 1978 Edinburgh University, Scotland, UK
1979 to 1983 MD degree; U.C. San Francisco, CA
1983 to 1984 Rotating Internship; Highland Hospital, Oakland, CA
1984 to 1987 Emergency Resident; University of Cincinnati, OH

## EMPLOYMENT

1987 - 11/16 Staff Physician, The Permanente Medical Group (ret.)
2001 - 2003 Physician Consultant, Eclipsys (now part of Allscripts)
2001 - 2003 CMO, PPI (medical software startup)
11/16- present Expert Witness/Consultant

## APPOINTMENTS, ACCREDITATIONS AND AFFILIATIONS

1987 to present Licensure, Medical Doctor, CA G57150
1988 to 12/2021 Board Certification, A.B.E.M. (current)
1989 to ~2015 Volunteer Clinical Faculty; U.C. Davis
1996 to present Sacramento Sheriff's Department SED (SWAT) physician
2009 to 11/2016 Speech Recognition liaison, North Valley TPMG
2011 to present Medical Director, Lourdes Pilgrimage, Order of Malta
2014 to present Board Member, Order of Malta Medical Clinic, Oakland
2014 to present Medical Expert Reviewer, California Medical Board
7/17 to present Vol. Med. School Instructor, California Northstate U.



# FEE SCHEDULE

## FOR

***Chiropractic, Emergency Medicine, Family Practice, Gastroenterology, Internal Medicine, Neurology, Physical Medicine & Rehabilitation, Radiology, Rheumatology***

**Effective December 1, 2019**

***(Applicable for cases scheduled on or after 12/01/2019)***

| Service | Description | Fee |
|---|---|---|
| Prepayment | This fee reserves the time for a medical evaluation or a record review. A letter confirming the evaluation/record review will be sent to the requester. | $2,000 |
| Physician Record Review | This fee represents the amount of time the expert has spent reviewing medical records in the preparation of a report following an examination or after receiving additional medical records and issuing a supplemental report. | $725/Hour |
| Staff Compilation of Records | MRK Medical Consultants is extremely thorough in the handling of medical records. Many medical records are not relevant to the issues for which the evaluation/record review has been scheduled and in many cases have nothing to do with the alleged injuries sustained. (Pediatric records, OB/GYN records, pre-existing comorbid disease). We separate these non-relevant records and focus on the pertinent medical records. This includes the preparation and organization of the records in a chronological fashion, tagging, sorting, color coding, cross-indexing, and summarizing. This process is performed by trained staff personnel and is a cost saving measure to the requester. | $180/hour |
| Comprehensive Evaluation | This fee is for the direct face-to-face interaction between the expert and the plaintiff being evaluated. | $725 |
| Comprehensive Evaluation w/ Interpreter | These are the same services that are provided as listed above, however the evaluation normally takes much longer due to the necessity of an interpreter. | $825 |
| Narrative Report | This fee represents the preparation of the report by the expert after obtaining the history, performing the examination and reviewing the submitted medical records and diagnostic studies. | $825 (minimum) |
| Supplemental Report | This fee represents the preparation of the supplemental report by the expert in regards to additional records or diagnostic studies which have been received following the evaluation and dictation of the Medical Evaluation report or the Record Review report. | $175 (minimum) |
| Review of X-rays and Diagnostic Studies | This fee represents the time spent by the expert in reviewing x-rays, bone scans, nerve conduction studies and EMG's. | $650/hour |
| Review MRI/CT scans | This fee represents the time spent by the expert in direct review of MRI's and/or CT scans. | $725/Hour |
| Literature Research | As is deemed necessary by the expert pursuant to questions posed by the requester, on occasion there is necessity for review of medical literature. | $725/Hour |
| Deposition Review | This fee represents the time spent by the expert for the review of all depositions submitted. Information gleaned from deposition testimony may be referred to in the narrative report or in supplemental reports. Information provided in the deposition testimonies of treating physicians and other identified experts may be relevant at the time of the deposition testimony of the expert or at the time of trial. | $725/Hour |
| Deposition Prep Time | testimony. This is applicable in situations where there are extensive medical records and a significant amount of time has passed since the evaluation. | $725/Hour |

**MRK Medical Consultants**

**Fee Schedule - Standard (cont.)Effective Dec. 1, 2019**

| | | |
|---|---|---|
| Trial/Arbitration Prep Time | This fee represents the time spent by the expert in reviewing the medical records prior to trial or arbitration testimony. On many occasions there has been a period of 3-6 months, sometimes longer, between the time of the evaluation and the time of the testimony. | $725/Hour |
| Review of Video | This fee represents the time spent by the expert in regards to reviewing video surveillance or accident scene investigation. | $725/Hour |
| Expedited Report - Comprehensive Evaluation | The normal turnaround from the time of the evaluation to submission of the report is 30 days. Preparation of expedited reports, either written or via telephone conference, within **20 days** of the examination is subject to the fees listed. The preparation of an expedited report demands that the expert set aside all other work and focus on the preparation of the expedited report. | 0-2 Days $950<br>3-5 Days $850<br>6-10 Days $750<br>11-20 Days $550 |
| Expedited Report - Record Review | The normal turnaround from the time of receving the medical records to submission of the report is 30 days. Preparation of expedited reports, either written or via telephone conference, within **20 days** of the receipt of medical records is subject to the fees listed. The preparation of an expedited report demands that the expert set aside all other work and focus on the preparation of the expedited report. | 0-2 Days $950<br>3-5 Days $850<br>6-10 Days $750<br>11-20 Days $550 |
| Deposition Testimony/ Video Deposition Testimony | This fee represents the time spent by the expert to provide expert testimony. There is a one-hour minimum payable in advance or at the time the deposition commences. All balances will be billed to the **deposing attorney**. The attorney who has engaged the services of the expert is ultimately responsible for all unpaid deposition fees. (See cancellation policies below). | $850/hour<br>Video $950/hour |
| Arbitration/Trial Testimony | This fee is for the expert providing arbitration/trial testimony. Based on our experience it requires the expert to schedule either a half-day or full day away from their office. (See cancellation policies below) | Half Day $4,500.00<br>Full Day $9,000.00 |
| Travel Expenses | Travel fees are for expenses and time for travel to evaluations, depositions, trials, arbitration or conferences outside the experts immediate area and can include driving time, air travel costs, hotels, and parking etc. | $325/hr plus expenses |
| Satellite Office Fees | This fee is for the use of satellite offices in order to comply with the requirement of the 75-mile plaintiff travel rules. | $300 - 500 (there may be apportionment if multiple evaluations are performed) |
| Telephone Conferences | This fee represents the time spent by the expert telephone conferencing with the requester. | $725/Hour |
| Pre-Deposition Conference | This fee represents the time spent by the expert for pre-trial or pre-deposition conferences. | $725/Hour |
| Conference | This fee represents the time spent by the expert for all conferences with the requester. | $725/Hour |
| Copy/Printing Fees | This fee represents the per page for copying existing records or printing records from CD or sent via email or double sided records that need to be copied to single sided. | 15 cent/page |

## CANCELLATION POLICIES

| | | |
|---|---|---|
| No Show/Late Cancel | This cancellation fee is applied if the plaintiff fails to appear or cancels with less than **five** days notice (exclusive of weekends and holidays). This creates significant inconvenience for the expert who has set this time aside. (Exceptions may be granted for extenuating circumstances). | $725 |
| Deposition | This cancellation fee is applied if the deposition is cancelled with less than **five** days notice unless there are extenuating circumstances. (exclusive of holidays and weekends). | $725 |
| Arbitration/Trial Testimony | Once an expert has committed to being available for arbitration and/or trial testimony a half day or full day will be set aside. With less than four days notice it is not possible for an expert to schedule surgical procedures or make themselves available for patient examinations. (This is exclusive of holidays and weekends.) | 5 or more working days notice - full refund<br>4 or less working days notice - No refund |

| date | Case | court | deposition or testimony | side | |
|---|---|---|---|---|---|
| 6.22.17 | Louis versus Kaiser | arbitration | deposition | plaintiff | malpractice |
| 6.24.19 | Chaffey v Swann | | deposition | plaintiff | malpractice |
| 11.19.20 | Hernandez v Dr. Patwell | | deposition | plaintiff | malpractice |
| 11.4.19 | US versus Cleek | Air Force | deposition and testimony | plaintiff | criminal |
| 1.20.20 | People versus Solice | Ninth judicial court, FL | testimony | prosecutiol | criminal |

# 2. Ronald Albucher, M.D.

DEFENDANTS' EXPERT DISCLOSURE 023

**Ronald Albucher, M.D.**
**Psychiatry**

December 11, 2020

Mr. Kevin Allen, Esq.
Allen, Glaessner, Hazelwood & Werth, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104

## RECORDS REVIEW

RE: Claim No: 3:19-cv-07312-MMC
Date of Accident: 3/12/2018
ROCHA, CAMERON

Dear Mr. Allen:

Thank you for the opportunity to comment on Mr. Rocha. I had the ability to review his extensive medical record files in addition to other documents which will be mentioned below. Furthermore, there were six MP3 audio files which were provided to me. I will be highlighting the records of importance below and opining on their significance at the end of the report.

**RECORDS REVIEW:**

1/11/2016 – Progress note. The patient complained of sleeping problems, anxiety, and depression. Symptoms had been present for one to two years but worse in the past four months. Lost a family member (cousin) recently. Also worked from 4:30 a.m. to 12:30 p.m. for the last six to eight months and could not get to sleep until 10:30 p.m. Medications at that time included Ambien and lorazepam. Signed by James Edwards, M.D.

12/9/2016 – Emergency department nurse Marvin Escueta. He documented that the patient's wife verbalized concerns about the patient's drinking problem and wanted the patient to talk with someone about his alcohol problem for guidance once he awoke. There is a note from that same admission where he signed out against medical advice related to his alcohol

intoxication. Final diagnoses included alcohol abuse with intoxication, altered mental status, and transient alteration of awareness.

12/9/2016 – Sutter Health Delta Medical Center. Mr. Rocha appeared with an altered mental status. His wife said he was last normal earlier in the afternoon, but they were in a verbal argument, and the patient had been depressed and vaping unknown drug use. He was given Narcan with no response. The initial diagnoses were altered mental status and alcohol intoxication. Mr. Cameron apparently used drugs through a vaporizer. He smelled of alcohol. They sent him for a CT scan without contrast which showed a normal CT scan of the brain. He was also screened for substances and found to be positive for cannabinoids in his urine. His serum alcohol level was 387. There is also an alcohol report on 12/9/2016 in which the provider stated that the wife and patient had been arguing. The patient had been depressed. He was last seen at 15:30 today. His wife stated that the patient was found in the bathroom. He was found naked from the waist down in the bathroom and had a small amount of blood in his left nose. The patient was not responding to light stimuli but, on deep painful stimuli, began kicking with his feet and flinging his arms. However, there was no eye opening or verbal response. Signed by Thomas Sugarman, M.D.

1/12/2017 – Sutter Health Delta Medical Center emergency department. Mr. Rocha was a 38-year-old male brought in by ambulance who presented with altered mental status secondary to alcohol intoxication. Per EMS, the patient had a history of alcohol abuse and was drunk at his mother's home when he urinated on himself, slipped, and fell with an empty bottle of vodka. He was sobered up onsite and treated for a facial laceration. His final diagnosis was alcohol intoxication. A note from that ED admission from nurse Courtilz Hyppolite stated that the patient's wife and mother called concerned that the patient may have been suicidal and depressed lately. She attempted to interview the patient unsuccessfully. Signed by Anthony Rodigin, M.D.

3/12/2018 – Contra Costa Health Service. He was in custody and rejected from MDF for abnormal vital signs. He admitted to alcohol use. He denied illicit drug use. He denied chest pain or pressure. He did acknowledge numbness in both hands. Again, he was discharged to home against medical advice with clear verbal precautions being discussed at length.

3/13/2018 – There is a note from Sutter Urgent Care, Antioch, where Mr. Rocha presented for joint swelling in both hands. He felt numbness yesterday, but this improved.

3/15/2018 – There is a note stating that the patient was here because he was placed in handcuffs, but they were too tight and had been placed on for hours. The patient was complaining of numbness, swelling, and pain in bilateral hands radiating to the elbows at times.

He was arrested for a DUI which occurred on 3/12/2018. He went to Sutter Urgent Care on 3/13/2018, had x-rays taken, and was given antibiotics. Signed by James Edwards, M.D.

3/20/2018 – There is a laboratory report from the Forensic Services Division, Contra Costa County, indicating a blood level of .23.

3/22/2018 – There is a handwritten follow up note. The patient was complaining of a bilateral burning sensation from the elbows to the fingertips. He stated that Sonata was very helpful. He was prescribed gabapentin for these symptoms. Signed by James Edwards, M.D.

4/6/2018 – There is a blood alcohol report from the Forensic Services Division, Contra Costa County indicating a positive test on cannabinoids.

5/4/2018 – There is an EMG report from Neurology Medical Group of Diablo Valley showing moderate-to-severe sensory motor demyelinating and axonal neuropathy in the bilateral median nerves localizing to the across-wrist segments. There was also severe sensory/motor axonal neuropathy seen in the left ulnar nerve with moderate-to-severe sensory/motor axonal neuropathy in the right ulnar nerve and severe sensory axonal neuropathy bilaterally in the radial nerves.

6/7/2018 – There is a follow up handwritten note. He had nerve conduction studies. He had an appointment to go to UCSF next Monday to see a neurologist. Referred the patient to them. Had still not been working. He did not see how he could work. He did have an attorney working with him. He was continued on Neurontin 600 mg twice daily. Signed by James Edwards, M.D.

6/12/2018 – There is a report from UCSF Neurology which stated evidence for bilateral radial carpal tunnel and ulnar neuropathies compared to the prior EMG on 5/4/2018. There had been significant improvement in function of the right ulnar nerve. In summary, the symptoms and neurologic exam localized a nerve tissue injury to the bilateral radial, median, and ulnar nerves. They recommended hand physical therapy with a referral from his PCP. His prognosis for additional recovery was good. They recommended a return in four to six months.

7/30/2018 – There is a letter separating him from Whole Foods Market stating that they had processed his separation due to job abandonment.

8/14/2018 – Contra Costa Regional Medical Center emergency department. The note states that Mr. Rocha was a 40-year-old gentleman with years of GERD-like symptoms. His wife left him recently, and he had been having difficulty sleeping. He also felt depressed after this but was not suicidal or homicidal and was able to care for himself. He went to the emergency

department with his mother today stating he was having increasing burning in the substernal area with nausea and a feeling as if there was something stuck in his throat. The doctor stated he was going to require upper endoscopy and a swallow study to evaluate this and would require referral to a gastroenterologist from his primary care doctor. He denied drinking alcohol or taking non-steroidal anti-inflammatory drugs and understood he should not mix Ambien with alcohol. Signed by Jarod Hubbell, M.D.

8/29/2018 – There is a handwritten note stating that Mr. Rocha had depression which had been getting worse and worse. He originally gave him Ambien for sleep and lorazepam for anxiety. He now prescribed Cymbalta 30 mg for one week and then increased to 60 mg per day thereafter. His wife left him and took their baby and money and went to live in L.A. with her family. Signed by James Edwards, M.D.

10/15/2018 – Pittsburgh Health Center. Chief complaints: Depression, abdominal pain, and wrist pain. She stated that the patient reported not sleeping. He was taking Cymbalta 60 mg for the past six months and ran out for two or three days, and the symptoms became worse. He thought it was helping a bit. He also started therapy last week. He stated this depression began around 3/20/2018 when he learned that his wife had been having an affair. Since then, he suffered an injury to his wrists which left him unable to work. He was handcuffed for a long period of time and had swelling, pain, and weakness afterward. He denied significant alcohol use but stated his last use was last night to try to get some sleep. Prior to that, he did not drink anything for over a month. He did use cigars as well as cannabis. Regarding bilateral hand pain, she stated this was the result of being in handcuffs for five hours for a suspected DUI. He had an EMG in June of 2018 which showed improvement in bilateral median and ulnar neuropathies but persistent severe superficial radial sensory neuropathies. Signed by Kathryn Hamlin, M.D.

11/1/2018 – There is a document filed from the Superior Court of California, Contra Costa County, stating four counts of misdemeanor against Mr. Rocha, including driving under the influence, driving with a 0.08 percent blood alcohol content, driving under the influence of a drug, and hit-and-run driving resulting in property damage.

12/12/2018 – There is a visit by Shaista Rauf, M.D. remarking that, compared to the prior study performed at UCSF, there was some improvement in a repeat EMG study.

12/13/2018 – Pittsburgh Health Center. There is a note stating the patient was doing much better than last time, by his report. He was still having legal struggles. He had not been able to see his daughter since August. He tried mirtazapine which made him non-functional in the morning and extremely groggy. He continued on Cymbalta 60 mg. He also tried Lunesta, but this did not help much. Ambien 5 mg did help. The patient stated he was not drinking at all now. His last drink was months ago, and he stated he had only had one drink since the DUI in

March of 2018. He smoked cannabis a few times a week when his mind was racing. They added nortriptyline at night into his regimen to try to help with the nerve pain. Signed by Nicole Forrest, CMA.

1/10/2019 – Pittsburgh Health Center. The patient was complaining of insomnia. He also followed up on his depression. He had a court date after multiple postponements and was granted supervised visitation but had to take five different classes on parenting, etc. He tried the nortriptyline, but he would wake himself up talking or screaming, and it did not help with the pain. He also reported that he had treatment through Kaiser Mental Health as a child. The report was recently found which documented ADHD and Tourette's. Sometimes he had compulsions such as swallowing or blinking. He occasionally blacked out and did things he did not remember in his sleep state. This would happen when under extreme stress. Occasionally he would hear things. He sometimes confused this with reality. Dr. Hamlin recommended that he call the mental health access line to set up therapy and that he restart mirtazapine. Signed by Kathryn Hamlin, M.D.

2/1/2019 – East County Behavioral Health in Pittsburgh. The patient was complaining of poor sleep, anxiety, and PTSD experiences. One of the recommendations was to reduce his cannabis use to less than twice per month as he tried to improve his sleep quality. There is additional documentation stating that the patient had been struggling since March of 2018. He was married. His firstborn was at the end of February, and he was told that his wife had had an affair. He had been drinking, blacked out, got a DUI, and lost his wife and daughter. She went to L.A. to live with her parents. The court custody case was ongoing. He was currently on disability. Mr. Rocha also stated: "When I see a police officer, I get anxiety feelings." He also had constant nightmares originally related to the incident and could be claustrophobic. He would get anxiety when a police car passed by. He was given the diagnosis of post-traumatic stress disorder by Jessica Johnson, LMFT. Later in that same note, Dr. Terry stated he had severe depression symptoms and was paranoid. "Anytime I go outside, I feel that something horrible is going to happen." During the 3/20/2018 DUI incident while under arrest, the cuffs were too tight, causing neuropathy. He lost his job shortly afterward. His wife cheating on him led him to get drunk and get into the car. He continued to use cannabis. He reported hearing booms in the middle of the night, but his dog did not bark. This tended to awaken him from sleep. He stated that now when he saw a police officer, he had an elevated heartrate and felt anxious. The patient declined therapy although would likely benefit if he would reconsider. He was begun on Seroquel 25 to 50 mg at bedtime. He had tried and failed several antidepressants and gabapentin, each of which may have had some benefit from mood PTSD as well as neuropathy. Signed by Jonathan Terry, D.O.

3/4/2019 – Contra Costa Health Services. The note states that the patient came in to discuss depression. He had been depressed for over one-half year and felt as if it was getting worse.

He was tired all of the time. He did not go outside and do activities due to both panic and lack of motivation. Reviewed events from the last year, including the DUI. There is some redacted information in the chart regarding his drug use. It appeared that he was using something three to four times per week but was starting to feel as if it made things worse. No other drugs were being used. He also stated that he saw a therapist once and did not schedule a follow up but now wanted to start seeing her regularly. He also had a psychiatrist appointment in a month. Dr. Brooks recommended that he should go to the mental health department today to be scheduled for therapy asap and again avoid alcohol and drugs. It was recommended in the patient instructions that the patient avoid alcohol and drug use and continue with his mental health appointment. Signed by Nathan Brooks, M.D.

3/18/2019 – Contra Costa Health Services. The patient stated that nothing had improved compared to last time. He did not schedule therapy but could not state why he didn't. He had been mostly isolating himself. He went out once with his mother and then another night with a friend when they went drinking, and he ended up vomiting blood once last night and felt very hung over. He felt very anxious all the time to the point of being physically shaky. He stated this was partially what was keeping him from scheduling therapy or going out to exercise in addition to lack of desire and motivation. He denied any thoughts of self-harm. He did endorse hearing auditory hallucinations but could not make out what they were saying. There was again redacted information about drug use. The diagnosis was severe major depression with psychotic features and hematemesis with nausea. The recommendations were to avoid alcohol and pain medication which could be causing an ulcer in his stomach. Again, he was to go to Behavioral Health to request therapy and follow up with his psychiatrist. He was prescribed BuSpar 5 mg three times daily, as well. Signed by Nathan Brooks, M.D.

4/4/2019 – East County Behavioral Health. The client's mother contacted the clinic stating she was very concerned about her son. She stated she was scared he may hurt himself, although he stated to her, he would not. She reported he had been very depressed, lost his family and job, and now was at risk of losing his house. They attempted to call the client multiple times with no answer. They left voice mails how to contact the clinic. They also notified the mother that they could not reach the client. Signed by Crystal Costa, R.N.

4/15/2019 – Pittsburgh Health Center. The patient had a couple of better days this week regarding his depression but felt really down today. He had been crying much of the day. He slept poorly last night due to wrist pain and racing thoughts. He would awaken a lot because of nightmares and sometimes would awaken swinging his arms and legs in a panic. He continued to see behavioral health, and the increased dose of Seroquel seemed to be helping. He now had a therapist he really liked and planned to keep going. Dr. Brooks stopped the BuSpar because it was not helping and prescribed prazosin to help with bad dreams and tension. He also recommended continuing duloxetine and Seroquel. Signed by Nathan Brooks, M.D.

5/5/2019 – Delta Medical Center. Final diagnosis: Displaced fracture of the neck of the fifth metacarpal bone, left hand, with a closed fracture of the distal end of the left radius. This was due to left hand pain after falling off a unicycle five days prior. Signed by Christina Nardi, N.P.

5/13/2019 – Pittsburgh Health Center. Here for follow up. He had been doing better recently. He still had some days when he cried a lot. Other days, he felt pretty good. He was sleeping better recently. He was not certain if the prazosin was helping and wondered if he should stop it. He had hand surgery on Friday. The pain was well-controlled. Signed by Nathan Brooks, M.D.

5/24/2019 – East County Behavioral Health. The patient stated: "I've been feeling a lot better. Finally, I'm getting to sleep. Still waking up with some nightmares, but I'm having fewer and fewer bad days. I've been getting out a bit." He stated he was pleased with Seroquel. "It's really helping me sleep." He had not noticed a change since beginning prazosin. He did receive a diagnosis of post-traumatic stress disorder. Signed by Jonathan Terry, D.O.

6/19/2019 – East County Behavioral Health. The social worker for the same program gave him the diagnosis of major depressive disorder, recurrent episodes, severe, and not a PTSD diagnosis. Signed by Cheyenne Carson-Craft, ASW.

6/25/2019 – East County Behavioral Health. They changed the client's diagnosis from post-traumatic stress disorder to major depressive disorder, based upon his current symptoms. Signed by Cheyenne Carson-Craft, ASW.

7/2/2019 – Pittsburgh Health Center. The patient's mood was somewhat improved for the past few days. He had really vivid dreams sometimes but was sleeping eight to 10 hours a night but felt groggy through much of the day after waking up. He also noted a feeling of restlessness in his arms and neck after taking the Lyrica. He did not discuss this with his psychiatrist. He also felt he was getting more muscle cramps recently and found himself acting out his dreams frequently. He noted that his sense of taste was significantly diminished. He was working on his disability application. Again, there is some redacted information. Signed by Nathan Brooks, M.D.

9/10/2019 – Pittsburgh Health Center. He was working with his caseworker and having financial problems. He continued to take quetiapine at bedtime, as he was not sleeping well. Still had the sensation of something stuck in his throat. He was not drinking except for one to two glasses *{redacted}* with dinner once or twice a week. Dr. Brooks recommended trazadone at bedtime instead of the prazosin which he discontinued. Signed by Nathan Brooks, M.D.

11/4/2019 – East County Behavioral Health. The client presented after he had no-showed for several appointments. He shared that he had been struggling with depression in the last couple of months, and it was hard to get out of bed. He reported an improved mood today. Signed by Cheyenne Carson-Craft, ASW.

12/13/2019 – Contra Costa Regional Medical Center. He remained disabled due to numbness/weakness. He could not even drive due to numbness in his hands. He had a repeat EMG scheduled for January. Signed by Jonathan Terry, D.O.

2/10/2020 – East County Behavioral Health. The patient stated he was doing okay but had not been sleeping. He had poor sleep maintenance most nights, only getting two to four hours per night. He then would catch up with 10 to 12 hours on another night. Sometimes nerve pain from his hands would awaken him at least three nights weekly. Reflux would awaken him on the other nights at least three times weekly. He denied snoring or symptoms of obstructive sleep apnea. He also had weight gain which was a risk factor for sleep apnea. The patient wondered if his sleep may have worsened after the start of Cymbalta but also felt like it helped with nerve pain and mood. He took gabapentin in the past, but it did not control his nerve pain. He stopped prazosin but did not know why. He thought it helped with vivid dreams and nightmares. He wanted to stop trazodone and continue Seroquel, as he thought he slept better with just Seroquel. Signed by Nathan Brooks, M.D.

6/10/2020 – East County Behavioral Health. The patient stated he was doing okay overall but was not very active. He was receiving general assistance benefits and was in the process of appealing his disability claim which was denied the first time. He was working with an attorney. He had an EMG scheduled for next week. He had not seen Dr. Terry for awhile and planned to reschedule. Overall, he felt his mental health was stable. He felt some low-level anxiety and depression but nothing too severe. Signed by Nathan Brooks, M.D.

7/23/2020 – Contra Costa Regional Medical Center. The patient stated he was doing okay and attending online court-ordered classes. He was not taking trazodone because it led to sleep abnormalities but was adherent to his other meds. He was having some breakthrough anxiety. Discussed the possibility of a Cymbalta increase, and the patient would discuss this with his PCP next week. Signed by Jonathan Terry, D.O.

9/30/2020 – **Deposition of Cameron Rocha**

Page 18: Mr. Rocha described he was in the meat department the entire time pretty much. After being a bagger, he was a meat cutter and then a meat manager, as well. When asked what he did in his previous job at Save Mart, he stated there was a dispute between himself and the store manager, and he was laid off from that job.

Page 21: He was asked if he remembered anything about the traffic accident, and he stated no. He only knew about it from what he was told.

Pages 22-23: He stated he remembered leaving his house, driving around, and deciding to get something to eat. While waiting for his food, he had a few too many drinks and then drove home.

Page 24: He acknowledged having shots of tequila while waiting for his food, but he could not remember how many.

Page 25: He also stated that he might have smoked cannabis earlier in the day.

Page 33: When asked whether or not the reason he did not remember anything that day was because he was drinking heavily, he answered: "That had a lot to do with it."

Page 53: He was asked about blackouts and whether or not he had blacked out on the day in question. He stated: "Absolutely."

Page 95: He reconfirmed that he had blacked out a lot during the day and did not remember things because of his level of intoxication.

Page 99: He was asked whether he had lost his memory throughout the day, and the patient acknowledged that he had.

Page 103: He was asked whether or not an officer told him to stop trying to pull out of the handcuffs. He said no initially. The attorney played several times the audio tape where the officer stated to stop trying to pull out of the handcuffs. He also was trying to get Mr. Rocha out of the police car so he would not hurt himself. Mr. Rocha agreed: "Yes."

Page 119: He was asked if he had Tourette's syndrome. Mr. Rocha stated: "Yes." He had been diagnosed with that before when he was maybe seven or eight years old.

Page 120: He had other learning disabilities and was taking a couple of medications such as Dexedrine or Ritalin. He mentioned an auditory processing disorder and attention deficit.

Page 140: When asked whether or not the depression was attributed 100 percent to the incident or were there other things that contributed to it, Mr. Rocha stated: "It's a factor. It really affected my mental health other than just depression." He had a hard time leaving the house and getting his tests, etc. When asked about what mental health issues he had suffered as a result of this incident, he stated that he would freak out whenever he saw a cop. "First of all, I have a really hard time leaving the house. I just have a terrible feeling like something really bad is going to happen. I'm just a nervous wreck. It just freaks me out." When asked whether he had any kind of treatment for this, he stated no.

Page 150: When asked whether or not he was disciplined for not wearing gloves, he said "something like that." In June of 2015, he was asked if he was disciplined for failure to complete daily logs, and he said yes. He was asked if he remembered being placed on a 12-month probation. He answered that it sounded familiar. In February of 2016, he was disciplined again for failure to punch in.

Page 151: He was asked in May of 2017 if he was disciplined for failure to check in. He answered: "I don't recall but okay." *In July of 2017, did you recall being disciplined for no show?* "Yes."

Page 152: He received in writing a final warning for failure to correct behavioral performance which resulted in termination. He said yes. This was all prior to March of 2018. He said, "of course, yeah."

Page 153: He was asked if he recalled receiving a letter from Whole Foods in April informing him that reaching him has been unsuccessful. He was asked if he remembered getting a letter like that. He said: "Yes."

Page 167: He was asked if he received any treatment for Tourette's, ADD, or an auditory processing disorder as an adult. He answered: "No." He asked if he recalled being admitted to Sutter Hospital by ambulance on 12/9/2016 for alcohol abuse and mental status. He said: "Yes." He admitted to being blacked out. He was asked if he knew that his blood alcohol content was .38. He said he was not aware of that. He was asked about going to Sutter on 1/12/2017 again for blacking out because he drank too much and that his blood alcohol level was .35. He was surprised about his alcohol level but acknowledged the admission.

8/14/2020 – **Deposition of Shadi Rocha**

Page 31: She was asked if Mr. Rocha had said anything to her before he was handcuffed. She said: "I just remember him screaming and just cursing at me, but I can't just remember if it was during or after. When he was sitting in the vehicle, he was shaking and screaming. The car was literally shaking.

Page 32: When asked whether or not Mr. Rocha appeared to resist in any way and fight back, she stated: "Yeah, it seemed that way. Like I said I can't remember the exact moment that it happened so quickly. He was really good at getting him restrained, but I don't remember the details. But I'm sure he was resistant."

Page 38: When asked whether or not he ever yelled anything to let her know he was in pain, she stated no. Whether or not he yelled about his handcuffs, she again said no. When asked about a report of domestic violence, she acknowledged yes.

Page 42: When asked whether or not he might have Tourette's syndrome, she was laughing, saying: "I'm studying mental health, and I've lived with Mr. Rocha. He does not have Tourette's." *As far as you are aware, did Mr. Rocha—or does Mr. Rocha—have any mental or physical disabilities that you are aware of?* She answered: "Nothing diagnosed. No." She stated there was possibly bipolar, but he was not officially diagnosed. When asked if he did any physical therapy for his wrist pain, she said no. When asked if anything about his psychology changed which she observed after this incident, she said nothing was different. He was still the same.

Page 54: When asked how often he used marijuana, she stated once a day.

Page 56: When asked whether or not he was aggressive when he was intoxicated, she answered: "Yes." When asked if he was an alcoholic, she agreed. "Yes." When asked if he was diagnosed with depression, she stated that he was never diagnosed "as far as I know," meaning he never went to a doctor to get tested or to be diagnosed.

9/28/2020 – **Deposition of Officer Matis**

Page 60: He was asked if Mr. Rocha complained about his handcuffs, the tightness of his cuffs. He stated that there was no point during his contact with Mr. Rocha that he complained of his handcuffs.

**DISCUSSION:**

With regard to the questions about the psychiatric significance of these findings:

1. **Is the diagnosis or current condition related to the injury or accident in question?**

   No. The causation of nerve damage appears to be excessive struggling against the handcuffs while in custody. This happened in a state of extreme intoxication in a patient who has a longstanding alcohol problem. Unfortunately, what alcohol does is to decrease the perception of pain, so the injury he was causing himself while in custody may not have been felt until he sobered up.

2. **Current Diagnosis- Is his current psychiatric diagnosis consistent with objective findings during the examination?**

   The clear diagnosis currently is that of alcohol dependence. He meets most of the criteria for this diagnosis, including tolerance to alcohol, ability to ingest large amounts of alcohol as documented by very high levels of blood alcohol content on at least three separate occasions. The alcohol was likely making both his reflux and sleep problems worse and likely increased his anxiety during the times he was restrained. He also had regular use of marijuana which can have an effect on a variety of areas, including sleep, motivation, energy level, and anxiety. Regarding the other diagnoses mentioned throughout the medical records, I believe they would be hard to establish while substance abuse is actively ongoing. Diagnosis of an anxiety disorder, depression, or post-traumatic stress disorder (PTSD) could not be made while there is ongoing severe alcohol abuse. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) prioritizes substance abuse over other disorders, meaning if a substance abuse disorder is present, it is difficult to determine whether a mood or anxiety disorder is due to the use or withdrawal from that substance versus a primary disorder in its own right.

The criteria for post-traumatic stress disorder have not been met. Black outs and poor memory of the date in question is also due to his extensive alcohol use, and it unclear what the “trauma” is in his claim of PTSD. Also, the documentation does not clearly indicate what his nightmares were. Having elevated anxiety or heart rate around police officers makes sense, given his previous interactions with the police. However, this reaction by itself does not qualify for a post-traumatic stress disorder. Tourette’s disorder, attention deficit disorder or auditory processing disorder do not seem relevant in the current case. There were no symptoms of these disorders during his recent treatment.

**3. What is the prognosis?**

The prognosis is very guarded. It is not clear whether or not Mr. Rocha is truly motivated to discontinue his alcohol and marijuana use. This would be necessary for him to address many symptoms including his poor sleep, his anxiety, and problems with personal and work relationships. Losing his job or his wife cheating on him are not the cause of his DUI. How Mr. Rocha deals with his feelings about these events is more central. He tends to drink or use marijuana to distance himself from his feelings and then externalize blame. Rather than assuming the responsibility for these events himself, he tends to blame others for them. This is a characteristic that goes hand-and-hand with the denial of alcohol abuse.

**4. Was the treatment to date reasonable and necessary?**

For the most part, treatment was reasonable and necessary. I would recommend, instead of symptomatically treating his anxiety and sleep problems, to first focus on substance abuse rehabilitation. If Mr. Rocha is not sober, he will not be able to correct these other problems and will just keep taking more and more medication to treat his symptoms.

**5. Please address the relationship between the plaintiff’s alcohol intoxication/marijuana consumption and how that would affect the plaintiff’s mental state.**

When intoxicated with both alcohol and marijuana, Mr. Rocha demonstrated very typical symptoms such as poor judgment, altered mental status, and the decreased perception of pain. This led to a decision to drive while under the influence and also resulted in the hit-and-run. When handcuffed and extremely agitated due to his substance use, Mr. Rocha would not necessarily be aware of pain. He was injuring himself by struggling against the handcuffs. The damage done was a result of his struggle against the handcuffs, as demonstrated by the photographs, which

documented the lesions on his wrists. If it were only an issue of the handcuffs being too tight, the skin lesions would have appeared just near the point of contact with the handcuffs. There were clearly extensive abrasions to his skin beyond where his wrists came in contact with the handcuffs. This would indicate that he had done damage as a result of his struggling. At the same time, he would not feel the immediate impact because of the intoxication which both alters his mental state and elevates his pain threshold. This was documented in one of the emergency department reports where Mr. Rocha became difficult to arouse except under conditions of extreme pain.

Thank you for the opportunity to consult with you on this case. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Ronald Albucher

Ronald Albucher, M.D.
Psychiatry

**CURRICULUM VITAE**
800-458-1261

**Name:** **Ronald C. Albucher, M.D.**

## EDUCATION

1981-1985 University of Pennsylvania,
Philadelphia, Pennsylvania;
B.A. in Biochemistry & Russian/Soviet Studies
*Cum Laude*

1985-1989 University of Michigan Medical School,
Ann Arbor, Michigan;
M.D.

## POSTDOCTORAL TRAINING

1989-1993 Resident, Department of Psychiatry,
University of Michigan Medical Center,
Ann Arbor, Michigan

1992-1993 Chief Resident, Department of Psychiatry
VA Ann Arbor Healthcare System,
Ann Arbor, Michigan

1993-1994 Fellowship, Anxiety Disorders Program,
University of Michigan Medical Center,
Ann Arbor, Michigan

1993-1994 Departmental Chief Resident,
Department of Psychiatry
University of Michigan Medical Center,
Ann Arbor, Michigan

2010-2011 Leadership at Stanford Training
Stanford University
Stanford, California

2013-2018 Intensive Short-Term Dynamic Psychotherapy Supervision
Diane Byster, MFT
Palo Alto, CA

2014-2017 Core Training, Intensive Short-Term Dynamic Psychotherapy
Patricia Coughlin, Ph.D.
Albany, NY

2017- Teacher Training, Intensive Short-Term Dynamic Psychotherapy
Patricia Coughlin, Ph.D.
Boston, MA

**ACADEMIC APPOINTMENTS**

| | |
|---|---|
| 1994-1997 | Lecturer, Department of Psychiatry<br>University of Michigan<br>Ann Arbor, Michigan |
| 1998-2005 | Clinical Assistant Professor,<br>Department of Psychiatry<br>University of Michigan Medical School,<br>Ann Arbor, Michigan |
| 2005-2008 | Lecturer, Department of Psychiatry<br>California Pacific Medical Center<br>San Francisco, California |
| 2005-2008 | Visiting Clinical Assistant Professor of Psychiatry<br>Department of Psychiatry<br>University of Michigan Medical School,<br>Ann Arbor, Michigan |
| 2008-2009 | Instructor, Department of Psychiatry<br>Stanford University<br>Stanford, CA |
| 2009- | Clinical Associate Professor,<br>Department of Psychiatry<br>Stanford University Medical School<br>Stanford, CA |

**ACADEMIC ADMINISTRATIVE APPOINTMENTS**

| | |
|---|---|
| 1994-2005 | Assistant Chief, Psychiatry Service,<br>VA Ann Arbor Healthcare System<br>Ann Arbor, Michigan |
| 1995-2005 | Associate Director of Resident Education,<br>Department of Psychiatry,<br>University of Michigan Medical School,<br>Ann Arbor, Michigan |
| 1999-2003 | Acting Chief,<br>Mental Health Clinic<br>VA Ann Arbor Healthcare System<br>Ann Arbor, Michigan |
| 2003-2005 | Director Psychiatry Section,<br>Comprehensive Clinical Assessment Examination<br>University of Michigan Medical School,<br>Ann Arbor, Michigan |
| 2003-2005 | Director, Medical Student Clerkship,<br>VA Ann Arbor Healthcare System<br>Ann Arbor, Michigan |

| | |
|---|---|
| 2003-2005 | Education Director of the VA Hospital Division<br>VA Ann Arbor Healthcare System<br>Ann Arbor, Michigan |
| 2008-2017 | Director, Counseling and Psychological Services<br>Vaden Health Center<br>Stanford University<br>Stanford, CA |
| 2017-present | Staff Psychiatrist, Counseling and Psychological Services<br>Vaden Health Center<br>Stanford University<br>Stanford, CA |

**CLINICAL/HOSPITAL APPOINTMENTS**

| | |
|---|---|
| 1994-2005 | Attending Psychiatrist, Anxiety Disorders Program,<br>Neurosurgical Program for Refractory Obsessive-<br>Compulsive Disorder,<br>University of Michigan Medical Center<br>Ann Arbor, Michigan |
| 1997-2005 | Attending Psychiatrist, Post-Traumatic<br>Stress Disorder Clinic<br>VA Ann Arbor Healthcare System<br>Ann Arbor, Michigan |
| 2002-2005 | Attending Psychiatrist, Medical Student/Resident/Fellow Mental Health<br>Treatment Clinic |
| 2005-2006 | Agency Medical Director<br>Westside Community Mental Health, Inc.<br>San Francisco, California |
| 2006-2008 | Chief Medical Officer<br>Westside Community Services<br>San Francisco, California |
| 2008- | Attending Physician<br>Department of Psychiatry<br>Stanford University Medical Center<br>Stanford, California |

**CONSULTING POSITIONS**

| | |
|---|---|
| 1991-1994 | Attending Psychiatrist and Team Leader,<br>Assertive Community Treatment Program,<br>Washtenaw County Community Mental Health,<br>Ann Arbor, Michigan |
| 2002-2005 | Psychiatric Consultant<br>Consulting Physicians<br>Southfield, Michigan |
| 2005- | Benchmark Consultants/ ExamWorks, Inc |

| | |
|---|---|
| | Sacramento, California |
| 2007- | MES Solutions<br>Sacramento, California |
| 2015- | Elite Medical Experts<br>Tucson, Arizona |
| 2017- | Meridian MedLegal Management<br>Roseville, California |

**SCIENTIFIC ACTIVITIES**

| | |
|---|---|
| 1999-2005 | Manuscript reviewer, *Federal Practitioner* |
| 2000-2005 | Medical Editor, eMedicine.com Website |
| 2002-2005 | Internet Editor for the Journal of Gay and Lesbian Psychotherapy<br>Hawthorn Press, Binghamton, NY |
| 2003-2005 | Medical Editor of the Mental Health section of the Consumer Health site at www.emedicinehealth.com |
| 2004-2010 | Editor, FOCUS, American Psychiatric Publishing, Inc., Arlington, VA |
| 2008- | Editorial Board, The Carlat Psychiatry Report, Clearview Publishing, LLC<br>Newburyport, MA |
| 2011-2020 | Editorial Board, Journal of College Student Psychotherapy, Taylor & Francis, Inc., Philadelphia, PA |

**CERTIFICATION AND LICENSURE**

| | |
|---|---|
| 1989-2006 | Physician License, State of Michigan |
| 1989 | Drug Enforcement Administration License |
| 1990 | Diplomate of the American Board of Medical<br>Examiners |
| 1994 | American Board of Psychiatry and Neurology,<br>Diplomate in Psychiatry |
| 2004 | Recertification American Board of Psychiatry and Neurology,<br>Diplomate in Psychiatry |
| 2004 | Distinguished Fellow, American Psychiatric Association |
| 2005 | Physician License, State of California |
| 2006 | Buprenorphine Certification |
| 2006 | American Society of Addiction Medicine Certificate #622707 |

| | |
|---|---|
| 2007 | Drug Enforcement Administration License, waiver to prescribe drugs for the maintenance and detoxification of opioid addiction |
| 2014 | Recertification American Board of Psychiatry and Neurology, Diplomate in Psychiatry |

**HONORS AND AWARDS**

| | |
|---|---|
| 1985 | Graduated *Cum Laude* ,<br>University of Pennsylvania<br>Philadelphia, Pennsylvania |
| 1990 | Completion of Internship with Distinction<br>University of Michigan Medical Center<br>Ann Arbor, Michigan |
| 1992-1993 | Chief Resident, Department of Psychiatry<br>VA Ann Arbor Healthcare System,<br>Ann Arbor, Michigan |
| 1993-1994 | Chief Resident, Department of Psychiatry<br>University of Michigan Medical Center,<br>Ann Arbor, Michigan |
| 2000 | Special Recognition of Service to Michigan Psychiatric Society Council |
| 2006 | Special Recognition of Service to the Practice of Psychiatry,<br>Michigan Psychiatric Society Council |
| 2014 | Distinguished Fellow status with the American Psychiatric Association |

**MEMBERSHIPS IN PROFESSIONAL SOCIETIES**

| | |
|---|---|
| 1986-1989 | Galens Medical Society |
| 1986-1994 | American Medical Student Association |
| 1988- | American Psychiatric Association |
| 1988-2005 | Michigan Psychiatric Society |
| 1996-2005 | American Association of Directors of<br>Psychiatric Residency Training (AADPRT) |
| 1996-2005 | Anxiety Disorders Association of America (ADAA) |
| 2005- | Northern California Psychiatric Society |
| 2008- | American College Health Association (ACHA) |
| 2016- | International Experiencial Dynamic Therapy Association (IEDTA) |

**TEACHING ACTIVITIES**

University of Michigan
VA Ann Arbor Healthcare System

| | |
|---|---|
| 1988-1989 | Lecturer, Community Outreach, AIDS Update |
| 1992-1995 | Lecturer, PGY-I Residents, Core Lecture Sequence: "Empathy," "The Hateful Patient," Personality Disorders, Supportive and Cognitive-Behavioral Psychotherapies |
| 1993-2005 | Lecturer, M-3/M-4 Core Lecture Sequence Anxiety Disorders; Personality Disorders; Psychodynamics - Introductory lectures |
| 1993-2005 | Lecturer, M-1 Introduction to the Patient Normal Mental Status Exam |
| 1993-2005 | Lecturer, PGY-I Core Lecture Sequence Outpatient Psychopharmacology; Supportive Psychotherapy; Termination; Anxiety Disorders; Emergency Psychiatry Orientation |
| 1994-2005 | Comprehensive Clinical Assessment Exam Instructor |
| 1995-2005 | Mentor, PGY-I Residents |
| 1996-2000 | Lecturer, PGY-3 Core Lecture Sequence Human Sexuality: Review of Sexual Orientation Issues In Psychiatry |
| 1996-2005 | Supervisor, Continuing Care Clinic for Psychiatry Residents |
| 1997-2005 | “Mock” Boards Examiner |
| 1997-1999 | Lecturer, PGY-4 Core Lecture Sequence; Psychosurgery for Psychiatric Disorders |
| 1998 | Supervisor for Social Work Intern University of Michigan School of Social Work |
| 2000-2005 | Lecturer, PGY-2 Core Lecture Series on Psychotherapy- Resistance, Transference and Countertransference |
| 2000-2005 | Lecturer, First Year Medical Students on Normal Development through the Lifecycle for Gays, Lesbians and Bisexuals |

California Pacific Medical Center (CPMC)

| | |
|---|---|
| 2005-2008 | Instructor, Third Year Residents in Cognitive-Behavioral Therapy Course |

Stanford University

| | |
|---|---|
| 2009-2018 | Lecturer, Pre/Post-Doctoral Students on Psychopharmacology |
| 2011-2014 | Co-Coordinator: Psychoanalysis at Stanford- Freud Reading Group |
| 2013-2014 | Advisor for PGY-4 Elective: Neuropsychoanalysis |

**INVITED PRESENTATIONS**

| | |
|---|---|
| 1995 | Lecturer, Psychopharmacology of Panic Disorder Recognition and Treatment. Sponsored by the NIMH and the Society for Education and Research in Psychiatric Nursing |
| 1996-2000 | University of Michigan Department of Social Work, Course SSW 707, "Issues of Transference and Counter-transference Regarding Sexual Orientation" |
| 1997 | Invited Lecturer: Anxiety Disorders Lecture Series Oakwood Hospital, Departments of Internal Medicine and Family Practice Dearborn, Michigan |
| 1998 | Invited Grand Rounds Speaker: Major Depression-Diagnosis and Treatment in the Primary Care Setting, Battle Creek VA Battle Creek, Michigan |
| 1999 | Invited Lecturer: Sexual Orientation Issues in the Family Practice Setting, Oakwood Hospital, Departments of Internal Medicine and Family Practice Dearborn, Michigan |
| 2000 | Invited Grand Rounds Speaker: Psychosurgery- Lesioning the Brain to Save the Mind University of Michigan, Department of Psychiatry Ann Arbor, MI |
| 2002 | Approaches to Treatment Refractory Obsessive Compulsive Disorder California Pacific Medical Center San Francisco, CA |
| 2003 | Invited Lecturer: Sexual Orientation Issues in the Family Practice Setting, Oakwood Hospital, Departments of Internal Medicine and Family Practice Dearborn, Michigan |
| 2004 | Invited Speaker: Consulting Physicians Seminar. Evaluation and Diagnosis of Post Traumatic Stress Disorder, Troy, MI |
| 2009 | Interviewed for National Public Radio, "Colleges See Rise in Mental Health Issues," Broadcast on October 19, 2009 |
| 2010 | Presented at Stanford University School of Medicine Department of Psychiatry and Behavioral Sciences: "Current trends in College Mental Health Services," Stanford, CA |

| | |
|---|---|
| 2011 | Radio Show on KQED "Forum": Identifying Violence-prone Students, San Francisco, CA |
| 2012 | Introduction to Lacanian Therapy: Applications for Student Mental Health, Counseling and Psychological Services, Stanford, CA, February 24 |
| 2012 | Opening Panel Discussion: Supporting Student Resilience: Strategies for Parents at The University of Michigan Depression on College Campuses Conference, Ann Arbor, MI, March 8 |
| 2013 | Stanford Student Mental Health: Developments in Service Delivery at Public Mental Health/Comorbidity of Sleep Disorders and Mortality, Palo Alto, CA, August 30 |
| 2013 | What Matters To Me. Presentation part of a series arranged by Stanford University Office of Religious Life, October 2013 |
| 2014 | The Importance of Accurate Diagnosis in Mental Illness and Strategies to Improve Treatment Adherence; Optum Health Education, 8th Annual Medical Director Forum, November 2014, Las Vegas, NV |
| 2016 | Northern California Intensive Short-Term Dynamic Psychotherapy (ISTDP) Society: The Unconscious Therapeutic Alliance. May, 2016, San Francisco, CA |
| 2018 | Introduction to Intensive Short-Term Dynamic Psychotherapy (ISTDP): one day conference, held at Vaden Health Center; Stanford University, March 3, 2018, with David Wolff, M.D., and Diane Byster, MFT. |
| 2018 | Electronic Bridge to Mental Health (eBridge): A web-based intervention to identify university students at risk for suicide and facilitate their linkage to mental health services King, C.[1], Zheng, K.[2] Eisenberg, D.[1], Chermack, S.[1], Pistorello, J[3,] Albucher, R[4,] Coryell, W[5,] Favorite, T[1,] [1]University of Michigan, Ann Arbor; [2]University of California, Irvine; [3]University of Nevada, Reno; [4]Stanford University; Stanford, California; [5]University of Iowa, Iowa City Presented at the panel for the ESSSB (European Symposium on Suicide and Suicidal Behavior) conference Ghent, Belgium; September, 2018. |
| 2019 | Mental Health Issues in the College-Age Population- A Primer for Primary Care Providers; Palo Alto Medical Foundation in Santa Cruz, California: "Mental Health Issues Across the Lifespan". September 15, 2019 |
| 2019 | Case presentation: ISTDP treatment of Adult ADHD for Northern California Intensive Short-Term Dynamic Psychotherapy (ISTDP) Society. November 9, 2019 |
| 2020 | "Anxiety and Depression claims due to motor vehicle accidents." For Examworks Lunch and Learn Series. Oakland Marriott City Center 1001 Broadway Oakland, CA. February 28, 2020. |
| 2020 | Introduction to Intensive Short-Term Dynamic Psychotherapy (ISTDP). 60th Annual Meeting and Scientific Program scheduled for March 13-15, 2020 at the Portola Hotel & Spa in Monterey, CA. |

## COMMITTEE AND ADMINISTRATIVE SERVICE

National/International

| | |
|---|---|
| 1988 | Medical Student Representative, American Medical Association National Meeting |
| 1991 | Physician in Training Representative, American Medical Association National Meeting |
| 1996-1997 | Program Committee, American Association of Directors of Psychiatric Residency Training |
| 1997-1999 | Consultant, Committee of Early Career Psychiatrists, Council on Medical Education and Career Development, American Psychiatric Association |
| 1999-2001 | Chairperson, Committee of Early Career Psychiatrists, Council on Medical Education and Career Development, American Psychiatric Association |
| 2000-2002 | Deputy Early Career Psychiatrist Assembly Representative, Area 4 American Psychiatric Association |
| 2001-2004 | Elections Committee, American Psychiatric Association |
| 2004-2007 | Finance and Budget Committee, American Psychiatric Association |
| 2005-2007 | Long-Term Planning Committee, American Psychiatric Association |
| 2019- | Secretary, International Experiential Dynamic Therapy Association (IEDTA) |

University of Michigan

| | |
|---|---|
| 1986-1987 | Co-Chair, Committee on Ethics and Humanism in Medicine |
| 1989-1991 | Director, House Officers Association |
| 1990-1992 | Program Director, Department of Psychiatry Film Group |
| 1992-2005 | Member, Department of Psychiatry Resident Education Committee |
| 1993-1994 | Member, Long Term Planning Committee, Department of Psychiatry |
| 1993-2005 | Department of Psychiatry Resident Selection and Review Committee |
| 1995 | Chair, Quality of Life Subcommittee, Residency Redesign Task Force |
| 1996 | Chair, Resident Evaluation Task Force |
| 1996-1998 | Liaison to Michigan Psychoanalytic Institute Committee on Graduate Training Programs |

| | |
|---|---|
| 1997 | Chair, Workgroup on Grand Rounds/Invited Speaker series on Human Sexuality |
| 1998-2000 | Member, Grand Rounds Committee, University of Michigan, Department of Psychiatry |
| 2000-2005 | Education Council, University of Michigan, Department of Psychiatry |
| 2013-2015 | American Psychoanalytic Association Board on Professional Standards, Committee on Psychoanalytic Education Study Group: Psychoanalysis and Neuroscience |

VA Ann Arbor Healthcare System

| | |
|---|---|
| 1994-1996 | Member, Quality Assurance Board |
| 1994-1995 | Co-Chair, Strategic Planning Task Force |
| 1996 | Chair, Merger Task Force |
| 1998- 2001 | Reviewer, Human Subjects Committee |

Michigan Psychiatric Society (MPS)

| | |
|---|---|
| 1991-1992 | MPS, Law and Psychiatry Committee |
| 1996-1999 | Chair, MPS Early Career Psychiatrist Committee |
| 1997-2000 | Member, MPS Program Committee |
| 1997-2000 | Member, MPS Nominations Committee |
| 1998- 2000 | Councilor, MPS Executive Board |
| 1998- 1999 | Co-Chair, MPS Membership Committee |
| 2001-2005 | Secretary/Treasurer, MPS Executive Board |

Other

| | |
|---|---|
| 2001-2005 | Michigan Psychoanalytic Foundation Liaison to the LGBT Community |

Northern California Psychiatric Society (NCPS)

| | |
|---|---|
| 2005-2008 | Member Education Committee |
| 2008-2012 | Treasurer |

Stanford University

| | |
|---|---|
| 2008-2013 | Mental Health and Well Being Task Force Oversight Committee |

| | |
|---|---|
| 2008- 2009 | Graduate Deans and Administrators Working Group (GDAWG) |
| 2008-2017 | Vaden Health Center<br>• Quality Improvement Committee<br>• Unit Heads Committee<br>• Management Team |
| 2008-2009 | Vice Provost for Student Affairs Cabinet |
| 2012-2017 | Mental Health and Well-Being Advisory Board (Co-Chair) |
| 2012-2017 | Weiland Health Initiative Advisory Board |
| 2015-2017 | Stanford Student Advisory Committee to CAPS |

## GRANT SUPPORT

Pilot Study: Deep Brain Stimulation for Refractory Obsessive-Compulsive Disorder Protocol # 1564 NIH General Clinical Research Center University of Michigan Health System (Principal Investigator: George Curtis, M.D.)

Development of Innovative, Interactive Computer-Based Programs for Teaching Psychiatry to Medical Students. Office of Medical Education, University of Michigan Medical School. (Principal Investigator: Ronald C. Albucher, M.D.) Total Award: $15,000

eBridge to Wellness multisite study. Grant Number: 1R01MH103244 - 01 (PI Name: Cheryl King, Ph.D. at University of Michigan; Stanford PI: Ronald Albucher, M.D.) Annual award: $81,966.00 for 5 years.

## RESEARCH INTERESTS

Resident Education: particularly psychotherapy (Intensive Short-Term Dynamic Psychotherapy, ISTDP)
Obsessive-Compulsive disorder: particularly psychotherapeutic and neurosurgical treatments
College Student Mental Health

## BIBLIOGRAPHY

Peer-Reviewed Publications

1. Shapiro BH, Albucher RC, MacLeod JN, Bitar MS: Normal levels of hepatic drug-metabolizing enzymes in neonatally induced growth hormone-deficient adult male and female rats. *Drug Metabolism and Disposition*, 14(5):585-589,1986 Sep-Oct

2. Albucher RC, DeQuardo JR, Tandon R: Case Report: Treatment of Catatonia with an Intravenous Anti-Cholinergic Agent. *Biological Psychiatry*, 29(5):513-4,1991 Mar 1

3. Albucher RC : Suicide in Adolescents. *Resident and Staff Physician*, 38(3):165, 1992 Mar

4. Albucher RC, Abelson JL, Nesse RM: Defense Mechanism Changes In Successfully Treated Obsessive Compulsive Disorder Patients, *Am J Psychiatry*, 155 (4): 558-559, Apr 1998

5. Albucher RC, Curtis G, Pitts K: Neurosurgery for Obsessive-Compulsive Disorder: Problems with Comorbidity, *Am J Psychiatry*, 156 (3): 495-496, Mar 1999

6. Albucher RC, Maixner SM, Riba M, Liberzon I: Neurology Training in Psychiatry Residency: Self-Assessment and Standardized Scores, *Acad. Psychiatry*, 23 (2): 77-81, Summer 1999

7. Loboprabhu S, King C, Albucher RC, Liberzon I: A Cultural Sensitivity Workshop for Residents, *Acad. Psychiatry*, 2000 24: 77-84.

8. Albucher RC, Curtis GC: Adderall for obsessive-compulsive disorder. American Journal of Psychiatry. 158(5):818-9, 2001 May.

9. Zamorski MA, Albucher RC: Eight Strategies for Managing Treatment-Refractory Panic Disorder. American Family Physician. 66(8): 1477-1484, October 15, 2002.

10. Albucher RC, Liberzon I: Psychopharmacological Treatment in Post Traumatic Stress Disorder: A Critical Review, Journal of Psychiatric Research, 2002 Nov-Dec;36(6):355

11. Abelson JL, Curtis, GC, Sagher, O, Albucher, RC, Harrigan, M, Taylor, SF, Martis, B, Giordani, B: Deep Brain Stimulation for Refractory Obsessive Compulsive Disorder, Biological Psychiatry, Volume 57, Issue 5, 1 March 2005, Pages 510-516

12. Albucher, RC: An Integrationist Perspective: A Response to “Bias: Thinking about College Student Psychotherapy versus Drug Treatment and Disability”, Journal of College Student Psychotherapy, Volume 27, Issue 4, 2013

13. Tinklenberg, J., Patel, B., Gelman, K., Albucher, R.: Assessing adult attention deficit hyperactivity disorder (ADHD) in the university setting Journal of American College Health, 2018; 66 (2): 141–44

14. Busby DR, Zheng K, Eisenberg D, Albucher RC, Favorite T, Coryell W, Pistorello, J & King, CA: (2019) Black college students at elevated risk for suicide: Barriers to mental health service utilization, Journal of American College Health, 2019 Oct 29, DOI: 10.1080/07448481.2019.1674316

15. Busby DR, Horwitz AG, Zheng K, Eisenberg D, Harper GW, Albucher RC, Roberts LW, Favorite T, Coryell W, Pistorello J, King CA, Suicide risk among gender and sexual minority college students: The roles of victimization, discrimination, connectedness, and identity affirmation, Journal of Psychiatric Research (2019), doi: https://doi.org/10.1016/j.jpsychires.2019.11.013

Non-Peer-Reviewed Publications

1. Albucher RC: Preparing for “The Real World,” *Parapraxis*, 6(1), Fall 1999

2. Albucher RC: Il comitato degli Early Career Psychiatrists dell’American Psychiatric Asssociation, *Studi di Psichiatria*, 2 (2): 43

3. Albucher RC, Levine BH: Patient Management Exercise for Anxiety Disorders: Focus, Summer 2004, Vol. II, No.3: 360-365

4. Levine BH, Albucher RC: Patient Management Exercise for Child and Adolescent Psychiatry: Focus, Fall 2004, Vol. II, No.4: 543-549

5. Levine BH, Albucher RC: Patient Management Exercise for Major Depressive Disorder: Focus, Winter 2005, Vol. III, No. 1: 27-33

6. Levine BH, Albucher RC: Patient Management Exercise for Sleep, Sex, and Eating Disorders: Focus, Fall 2005, Vol. III, No. 4: 537-545

7. Levine BH, Albucher RC: Patient Management Exercise for Gender, Race, Culture: Focus, Winter 2006, Vol. IV, No. 1: 14-22

8. Levine BH, Albucher RC: Patient Management Exercise for Psychopharmacology, Fall 2006, Vol. IV, No. 4: 496-504

9. Levine BH, Albucher RC: Patient Management Exercise for Bipolar Disorder: Focus, Winter 2007, Vol. V, No. 1: 20-32

10. Levine BH, Albucher RC: Patient Management Exercise for Substance Abuse Diagnosis and Treatment: Focus, Spring 2007, Vol. V, No. 2: 172-186

11. Levine BH, Albucher RC: Patient Management Exercise for Obsessive-Compulsive Disorder: Focus, Summer 2007, Vol. V, No. 3: 316-327

12. Levine BH, Albucher RC: Patient Management Exercise for Major Depressive Disorder and Suicide: Focus, Winter 2008, Vol. VI, No. 1: 47-57

13. Levine BH, Albucher RC: Patient Management Exercise for Schizophrenia: Focus, Spring 2008, Vol. VI, No. 2: 185-196

14. Levine BH, Albucher RC: Patient Management Exercise for Child and Adolescent Psychiatry: Focus, Summer 2008, Vol. VI, No. 3: 299-313

15. Levine BH, Albucher RC: Patient Management Exercise for Panic Disorder: Focus 2008 6: 451-458

16. Albucher RC: Interview in journal Nature: Under a Cloud; October 2012; Volume 490: 299-301

Books

1. Albucher RC: Editor, PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008.

2. Levine BH, Albucher RC: FOCUS: Patient Management Exercises in Psychiatry; American Psychiatric Press, Inc. 2011

Book Chapters

1. Albucher RC: Biography of Roy Cohn. In: *Gay and Lesbian Biography*, St. James Press, Detroit, 1997, pp. 123-125

2. Albucher RC: Psychotherapies. In *Psychiatry Pearls of Wisdom Board Review Text*, Boston Medical Publishing, Lincoln, NE, in press.

3. Albucher RC, VanEtten ML, Liberzon I: Psychopharmacological Treatment in PTSD. In: Simple and Complex Post-Traumatic Stress Disorder; Edited by Mary Beth Williams and John F. Sommer, Jr., Haworth Press, New York, 2002.

4. Albucher RC: Phobic Disorders. In: eMedicine: Medicine, OB/Gyn, Psychiatry, and Surgery, An Online Medical Reference; Boston Medical Publishing, Lincoln, NE, http://www.emedicine.com/, November 2002

5. Albucher RC: Major Depressive Disorder. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.1-3

6. Albucher RC: Dysthymia. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.5-6

7. Albucher RC: Mood Disorders with Seasonal Pattern. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.6-8

8. Albucher RC: Delusional Disorder. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.15-17

9. Albucher RC: Panic Disorder. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.37-38

10. Albucher RC: Obsessive-Compulsive Disorder. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.38-40

11. Albucher RC: Phobias. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.43-44

12. Albucher RC: Competency. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.77-78

13. Albucher RC: Reproductive Function. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.81-82

14. Albucher RC: Death and Dying. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.84-85

15. Kurtz B, Albucher RC: Pervasive Developmental Disorders. In PSYCHIATRY: JUST THE FACTS. Board Recertification Text; McGraw Hill; Feb 2008 p.91-94

Abstracts/Presentations

1. Albucher RC, Nesse RN, Silk K, Pitt E: Psychiatry Resident Survey of Educational Goals and Needs. Silverman Conference, University of Michigan Department of Psychiatry, Ann Arbor, Michigan 1994

2. Albucher RC, Abelson JL, Nesse RN: Defense Mechanism Changes in Successfully Treated Obsessive Compulsive Disorder Patients, 16th Annual Anxiety Disorders Association of America, Orlando, Florida 1996

3. Riba MB, Nesse RN, Albucher RC, Ryan R, Casada J, Godard SL: Swimming Upstream: Changing and implementing a new curriculum when the future is uncertain. Panel presented at the Mid-Winter Meeting of the American Association of Directors of Psychiatric Residency Training, San Francisco, CA, January 1996

4. Albucher RC, Maixner SM, Riba MB: Assessing and Improving Neurology Training in General Psychiatry Residencies. Panel presented at the Mid-Winter Meeting of the American Association of Directors of Psychiatric Residency Training, Charleston, SC, January 1997

5. Maixner SM, Albucher RC, Riba MB: Neurology Training in Psychiatry Residency: Self-Assessment and Standardized Scores. Presented at the 150th Annual Meeting, American Psychiatric Association, San Diego, CA, May 1997

6. Albucher RC, Tuthill C, Tasman A: Psychodynamic Contributions to Cognitive-Behavioral Therapy. Panel presented at the Institute on Psychiatric Services, Washington, DC, October 1997

7. Albucher RC, Maixner SM, Riba MB: Improving Neurology Training for Psychiatry Residents. Panel presented at the Mid-Winter Meeting of the American Association of Directors of Psychiatric Residency Training, Orlando, FL, January 1998

8. Riba MB, Jibson M, Albucher RC: Integrating Didactics in the Adult and Child Residencies: The Intensive/Modular Core. Panel presented at the Mid-Winter Meeting of the American Association of Directors of Psychiatric Residency Training, Orlando, FL, January 1998

9. Smith MK, Szigethy E, Albucher RC: Emerging from Residency: What Next? Panel presented at the Mid-Winter Meeting of the American Association of Directors of Psychiatric Residency Training, Orlando, FL, January 1998

10. Abelson JL, Albucher RC, Fantone R, Schweitzer PB, Himle JA: Clinical Challenges in OCD: Presentation and Interactive Discussion. Panel presentation at the 18th National Conference of the Anxiety Disorders Association of America, Boston, MA, March 1998

11. Dalack GW, Albucher RC, Carnahan J, Healy DJ, Kronfol Z, Meador-Woodruff, JH: A Prospective Open Trial of Olanzapine for Poorly Responsive Psychosis. Presented at the 151st Annual Meeting, American Psychiatric Association, Toronto, Ontario, May 1998

12. Loboprabhu S, King C, Albucher RC, Liberzon I: A Cultural Sensitivity Workshop for Psychiatry Residents. Presented at the 50th Institute on Psychiatric Services, American Psychiatric Association, Los Angeles, CA, October, 1998

13. Mccullumsmith R, Albucher RC: The Treatment of Chronic Masturbation with Fluoxetine. Presented at the 50th Institute on Psychiatric Services, American Psychiatric Association, Los Angeles, CA, October, 1998

14. Dalack GW, Albucher RC, Carnahan J, Healy DJ, Kronfol Z, Shapiro H, Meador-Woodruff JH: An Open Trial of Olanzapine in Poorly Responsive Psychosis. Presented at the Society of Biological Psychiatry Annual Meeting, Washington, DC, May, 1999

15. Dettman DA, Himle JA, Albucher RC: Improving Psychiatry Residents' Training and Skills in Effective Cognitive Behavioral Therapy for Posttraumatic Stress Disorder. Presented at the 28th Annual Meeting of the American Association of Directors of Psychiatric Residency Training, Santa Monica, California, March, 1999

16. Abelson JL, Albucher RC, Curtis GC, Himle JA, Cameron OG, Nesse RM: Symposium: From Whence? Where to? Perspective on anxiety and Anxiety Research from Past to Future. Moderator at the 18th National Conference of the Anxiety Disorders Association of America, San Diego, CA, March 1999

17. Albucher RC, Goldberg J, Thornhill J, Fried W: Leaving the Nest: Preparing Residents for the Transition into Practice. Workshop presented at the 29th Annual Meeting of the American Association of Directors of Psychiatric Residency Training, San Juan, Puerto Rico, March 2000

18. Hanna GL, Himle JA, VanEtten ML, Fischer DJ, Albucher RC: New Perspectives on Obsessive-Compulsive Disorder. Symposium presented at the 20th National Conference of the Anxiety Disorders Association of America, Washington, DC, March 2000

19. Sial R, Albucher RC: Substance Abuse- What Every Child and Adolescent Psychiatry Resident Should Know—Suggestions for a Model Curriculum. Poster presented at the 30th Annual Meeting of the American Association of Directors of Psychiatric Residency Training, Seattle, Washington, March 2001

20. Albucher RC, Curtis GC, Abelson JL: Anterior Capsulotomy Outcomes for Treatment Refractory Obsessive-Compulsive Disorder. Poster presented at the 21st National Conference of the Anxiety Disorders Association of America, Atlanta, GA, March 2001

21.    Albucher RC, Young, KW: The Great Beyond: Making Career Decisions at the End of Residency Training. Component Workshop from APA Committee of Early Career Psychiatrists presented at  154th Annual Meeting, American Psychiatric Association, New Orleans, LA, May 2001

22.    Goldfinger SM, Hales D, Albucher RC: The Other Side of the Mountain: From Residency to Reality. Leadership and Career Development Seminar presented at the 53rd Institute on Psychiatric Services, American Psychiatric Association, Orlando, FL, October, 2001

23.    Albucher RC: Treatment of Refractory Obsessive-Compulsive Disorder, presented at California Pacific Medical Center Grand Rounds, San Francisco, CA, May 2002

24.    Goldfinger SM, Hales D, Albucher RC: The Other Side of the Mountain: From Residency to Reality. Leadership and Career Development Seminar presented at the 54th Institute on Psychiatric Services, American Psychiatric Association, Chicago, IL, October, 2002

25.    Nakajima G, LeQuesne E, Cabaj RP, Albucher RC: Update on Psychiatric Issues for Gay and Lesbian Patients: A Review of Pertinent Clinical, Research and Educational Issues presented at the 55th Institute on Psychiatric Services, American Psychiatric Association, Boston, MA, November, 2003

26.    Abelson JL, Curtis GC, Sagher O, Albucher RC, Harrigan M, Taylor SF, Giordani B, Eden S, Martis B, Ross DA. Deep Brain Stimulation for the Treatment of Refractory Obsessive Compulsive Disorder (OCD).  Invited presentation in President's Symposium on Anxiety Disorders, New Directions, Novel Approaches – Psychiatric Research Society, Park City, Utah, February 12, 2004.

27.    Curtis GC, Abelson JL, Sagher O, Albucher RC, Harrigan M, Taylor SF, Giordani B, Eden S, Martis B., Ross DA: Deep Brain Stimulation for Treatment Refractory Obsessive Compulsive Disorder (OCD) presented at the Anxiety Disorders Association of American Annual Meeting, Miami, FL, March 2004

28.    Krain L, Albucher RC: Web-based Psychiatric Interactives: Assessing Competencies and Improving Education in Psychiatric Care.  Presented at the 33rd Annual Meeting of the American Association of Directors of Psychiatric Residency Training, New Orleans, LA, March 2004

29.    Taylor SF, Martis B, Abelson JL, Sagher O, Albucher RC, Harrigan M, Giordani, B, Curtis GC:  Effects of Sustained Deep Brain Stimulation on Regional Glucose Uptake in Obsessive Compulsive Disorder presented at the Society of Biological Psychiatry Annual Meeting, New York, NY, May 2004

30.    Krain L, Albucher RC: New Data on Web-based Psychiatric Interactives: Assessing Competencies and Improving Education in Psychiatric Care.  Presented at the 34th Annual Meeting of the American Association of Directors of Psychiatric Residency Training, Tucson, AZ, March 2005

31.    Albucher RC: Presentation to Stanford Faculty Senate on Stanford Student Mental Health and Services at Stanford Counseling and Psychological Services. November 10, 2016

32.    Albucher RC: Healthy Minds Study 2015 – 2016 Results; Vaden Health Center Staff Meeting; May 16, 2017

33.    Albucher RC, Griffith C, Jacobs J: Stanford Long Range Planning: Area Steering Group on Our Community. Stanford Student Mental Health and Well-being Review; Stanford University, July 5, 2017

# Ronald Albucher, M.D.
# FEE SCHEDULE
# (800) 458-1261

| DESCRIPTION | SERVICE | FEE |
|---|---|---|
| **RECORD REVIEW, INDEPENDENT MEDICAL EXAMINATION, AND/OR REPORT:** Review medical records and diagnostic studies, conduct physical examination and/or prepare written report based on independent opinion. | Record Review* | **$675 /hour** |
| | Examination* | **$675 /hour** |
| | Report Preparation* | **$675 /hour** |
| *Minimum Charges: IME: Examination - 1 hour. IME report preparation - 1.5 hours. Record Review: Review of records - 1 hour. Report preparation - 1 hour (if written report requested). Supplemental Report: Review of additional records - .5 hour. Report preparation - .5 hour (if written report requested). Total times may exceed these minimum charges based on complexity of case. | | |
| **VERBAL CONSULTATION:** | Consultation | **$675 /hour** |
| **RUSH FEES:** Preparation of expedited report within 20 days from date of examination. (Regular turn-around is 30 days) | 0 - 2 Days | **$500 /flat** |
| | 3 - 5 Days | **$400 /flat** |
| | 6 - 10 Days | **$300 /flat** |
| | 11 - 20 Days | **$200 /flat** |
| **TESTIMONY FEES:** Prepayment of trial and arbitration fees required 24 hours in advance of appearance. (A cancellation fee will be charged if canceled with less than 48hr notice.) It is the responsibility of the client retaining the consultant to have these fees paid. | Deposition | **$900 /hour** |
| | Arbitration/Video Deposition**(2-hr min) | **$1,000 /hour** |
| | Trial-Half Day | **$5,000 /flat** |
| | Trial-Full Day | **$10,000 /flat** |
| | Preparation | **$675 /hour** |
| **NO SHOW / LATE CANCELLATION ON EXAMS:** Scheduled evaluation appointment missed or canceled with less than 5 days notice. (Excludes weekends and holidays) | Late Cancellation Less than 5 Days | **$675 /flat** |
| **NO SHOW / LATE CANCELLATION ON TESTIMONY:** Scheduled testimony missed or canceled with less than 48 hours notice. (Excludes weekends and holidays) | Deposition | **$500 /flat** |
| | Verbal Consultation | **$325 /flat** |
| | Arbitration/Video Depo | **$1,000 /flat** |
| | Trial-Half Day | **$2,500 /flat** |
| | Trial-Full Day | **$5,000 /flat** |
| Research or other services provided by non-MD staff | | **$95 hour** |
| **TRAVEL:** Hourly rate plus actual costs. | | **$100 /hour** |

**Video Deposition fees contemplates preservation of testimony for use in trial.

**All invoices for services are due and payable on receipt**

Deposition and Trial History for Ronald Albucher M.D.

(As of December 10, 2020)

| Date | Case | Law Firm | Plaintiff/Defense | Deposition/Trial |
|---|---|---|---|---|
| **Oct 26, 2007** | Shawnee Underwood v. CA Dept of Corrections (Solano Co Sup Court) | Price And Associates | Defense | Trial |
| **Mar 7, 2008** | Sharon Tjian v. West America Bancorporation | Renne, Sloan, Holtzman, Sakai, LLP | Plaintiff | Deposition |
| **Feb 15, 2010** | Loretta Burns-Knighten v. Orot | Blair, Sterling, Johnson, Martinez & Leon Guerrero | Defense | Deposition |
| **Nov 21, 2012** | Dishman v. Jennings | Law Offices of Michael McKone | Defense | Deposition |
| **Oct 22, 2015** | Gardner v. SF Pride | Law Offices of John A. Biard | Defense | Deposition |
| **Jan 18, 2016** | McCamey v. Moustakas | Huseby | Defense | Deposition |
| **April 28, 2016** | Nelson v. Lowe's | Tharpe & Howell | Defense | Deposition |
| **June 15, 2016** | Burk v. Boeing | Buri Funston Mumford, PLLC | Plaintiff | Deposition |
| **June 29, 2017** | Lennig v. CRST, Inc. | BASSI, EDLIN, HUIE & BLUM | Defense | Deposition x3 (dates: 6/29/17, 3/2/17, 2/2/17) |
| **July 12, 2018** | French v. Steele | STEPHEN M. FUERCH, ATTORNEY AT LAW | Plaintiff | Deposition |
| **March 7, 2019** | Robinson v. Union Pacific Railroad | Union Pacific Railroad Legal Department | Defense | Deposition |

# 3. Steve Papenfuhs

Steve Papenfuhs
3303 Palantino Way
San Jose, CA. 95135
Phone: (408) 621-3955

December 12th, 2020

Mr. Kevin Allen
Attorney at Law
Allen Glaessner Hazelwood Werth
180 Montgomery St., Suite 1200
San Francisco, CA. 94104

Re: Cameron Rocha v. City of Antioch et al.,
Case No. 19-cv-07312-MMC

Dear Mr. Allen,

In accordance with the Federal Rules of Civil Procedure 26(a)(2)(B) [Attachment A], the following report presents my preliminary opinions regarding the above cited case. I understand that additional discovery will be made available to me for further review and analysis, and I will provide a supplement to this report, as necessary.

Sincerely,

Steve Papenfuhs

**<u>Mr. Rocha v. City of Antioch et al.,</u>**
**United States District Court**
**Northern District of California**
**San Francisco Division**
**Case No. 19-cv-07312-MMC**

**Expert Witness Report of Steve Papenfuhs**

## Introduction

My name is Steve Papenfuhs and I have been retained by Mr. Kevin Allen to review the material and information provided in this case, and offer objective opinions concerning the actions of Antioch police personnel regarding the arrest of Mr. Cameron Rocha on March 12th, 2018.

Case documents and other materials considered in this case are listed in Attachment "B" My qualifications as a Police Practices Expert are included in Attachment "G." A list of other cases in which I have testified at trial or by deposition during the previous four years is included in Attachment "H." A list of my publications authored in the previous ten years is included in Attachment "I." A statement of compensation to be paid for study and testimony in this case is included in Attachment "J."

## Methodology Used, and Facts or Data Considered When Forming My Opinion

In forming my opinions in this case, I reviewed the facts and data described in the primary source documents and materials that are specific to this case as listed in Attachment "B". Then, using my knowledge, education, training, and experience, I analyzed the facts and data aggregated from those materials while examining and accounting for obvious alternate explanations for the actions and responses of the parties involved. I then compared the facts gathered from those materials against secondary sources representing generally accepted law enforcement training, practices, and procedures as well as specific departmental policy. Where practicable, peer-reviewed literature and other publications have been used as secondary sources. Such materials are the type upon which I and others in the law enforcement profession rely when examining the events surrounding a police response, and in forming opinions regarding the matters addressed herein. Additionally, my opinions are informed by the totality of the materials I have read and studied, as well as the experiences and instruction I have had and/or provided to law enforcement over the entire course of my career.

To stay current in the field of law enforcement and associated training, practices, and procedures, I maintain memberships in the International Law Enforcement Educators and Trainers Association, the International Association of Chiefs of Police, the National Tactical Officer

Association, the California Association of Tactical Officer, the Illinois Tactical Officer Association, the Peace Officer Research Association of California and the Human Factors and Ergonomics Society.

I research and study law enforcement methods, practices, and tactical issues by accessing academic research and news reports on a regular basis. I frequently engage in discussions and debriefings with officers, law enforcement trainers, managers, and executives about law enforcement policy, procedure, practices, and tactics. I remain current in my field by providing California Commission on Peace Officer Standards and Training (POST) certified Force Option Simulator Training, Field Officer Training, Field Officer Update Training, and have served on POST committees and research projects.

Law enforcement officers are expected to have a working knowledge of the legal issues impacting their profession. During my trainings and consultations with officers in both formal and informal settings, I often discuss legal issues and case decisions that affect how they perform their jobs. As such, in this report and corresponding testimony, I may refer to established law, concepts, principles, and case citations that are pertinent to the facts of this case. I do so only to assist the trier of fact in understanding the body of knowledge expected of an objectively reasonable officer, as well as the reasoning and methods informing my opinions.

This is a preliminary report as I understand discovery in this case continues and I may be provided additional information and documents, which can include expert reports from Plaintiff and expert reports from Defendants. Upon review of further documents, I will supplement my report (possibly even modify or amend my opinions) if requested to consider new information by counsel or the court.

## Incident Summary

Initial Event Information:

On Monday March 12, 2018 at approximately 16:01:36 (4:01 and 36 seconds PM), Antioch Police communications received a 911 call transfer from the Contra Costa Sheriff's Office. The reporting party, Deanna Hix, explained that a hit and run accident had just occurred in the City of Antioch (Bates COA (Rocha)000071).

The traffic collision occurred on Wilbur Ave at the intersection of the northbound onramp to Highway 160 in Antioch, California. This intersection is approximately 180 feet west of Bridgehead Road (COA (Rocha)000070).

Brian Joshua Hix was driving his 2005 Chevy Impala W/B on Wilbur Ave when Cameron David Rocha, driving his 2003 Honda Element E/B on Wilbur Ave, failed to yield and made a left turn, N/B, towards the Highway 160 N/B onramp crossing the path of Brian Hix. The turning movement resulted in an impact between the front of the Honda Element and the left front of the Chevy Impala.

The accident was witnessed by Deanna Hix, the mother of Brian Hix, who was in her

vehicle following behind Brian Hix.

Rather than stop after the collision, Mr. Rocha left the scene of the accident driving his vehicle W/B on Wilbur Ave. Brian Hix and Deanna Hix followed Mr. Rocha W/B on Wilbur Ave with Deanna Hix honking her horn at Mr. Rocha to get him to stop. Mr. Rocha eventually pulled over in the area of 3225 Wilbur Ave, the location of the PG&E Gateway Generating Station. (Google Street View, accessed 11/18/20)

Mr. Rocha exited his vehicle and attempted to get into Deanna Hix's vehicle. Deanna Hix and Brian Hix both noted that Mr. Rocha appeared "drunk," "high," "confused," and/or experiencing a "medical emergency." Mr. Rocha then reentered his Honda Element and drove away without identifying himself or exchanging information with Brian or Deanna Hix. Deanna Hix described the Honda Element as a silver 4-door, bearing license plate 5EPR424. Both Deanna Hix and Brian Hix were able to take a photo of the Honda Element as it left the scene. Additionally, Deanna Hix described the driver of the Honda Element as an HMA, mid-30's, wearing a cream-colored tank top, and having a tattoo on his left shoulder.

Initial Dispatch:

Antioch Police Officer Kristopher Kint #3652 (Unit ID Y22) was dispatched to the event at approximately 16:03, and Zechariah Matis #5214 (Unit ID Y2) was dispatched at approximately 16:04 hours (COA (Rocha)000071). According to reports and testimony, the officers received the following information from the dispatcher:

- "A male subject driving in a Honda Element with license plate number '5EPR424' just collided into the RP (Deanna Hix) and took off W/B on Wilbur Ave."[1]
- The subject was possibly an HMA wearing a cream-colored tank top.[2]
- The subject had tattoos on his shoulder.[3]
- "The responsible vehicle which fled the scene was a silver colored, Honda Element. The CA PL of the vehicle was **5EPR424.**"[4]
- Other party is DUI and taking off. No injuries.[5]
- Silver Honda Element, 4 Door.[6]
- Just left towards 18th St.[7]

Since the officers were provided the license plate and registered owner information for the Honda Element by dispatch personnel, Officer Kint asked Officer Matis to attempt to locate the vehicle at the reported R.O. address of 414 W. 11th St., Antioch, CA. Officer Matis began to drive

[1] Kint report, Bates COA (Rocha)000006.
[2] Ibid.
[3] Ibid.
[4] Matis report, Bates COA (Rocha)000013.
[5] Antioch Police Department Event Report, Bates COA (Rocha)000071
[6] Ibid.
[7] Ibid.

towards the address at approximately 1605.

Officer Matis Observations and Actions:

Officer Matis arrived on W. 11th Street at approximately 1610 hours, while Officer Kint arrived at the Hix's location at 3225 Wilbur Ave at approximately 1610. Officer Matis was driving EB on W. 11th St when he observed the Honda Element driving WB on W. 11th St. He observed the vehicle then make a right (NB) turn and come to a stop in the driveway of 414 W. 11th. St.

Mr. Rocha's wife, Shadi heard Mr. Rocha pull into the driveway. She was alerted to his presence when she heard his tires as he pulled into the driveway: "*I mean, the way he pulled up and the tire -- like, the tire sound, yeah. It did sound a little different, which is why it got my attention to look outside and see that he had arrived*" (Shadi Rocha deposition, P. 58, lines 7-10).

Officer Matis stopped his vehicle directly behind the Honda and activated his emergency forward-facing red light while also "chirping" his siren. As Officer Matis exited his vehicle, Mr. Rocha stepped from the driver's seat of the Honda Element. Officer Matis noticed that Mr. Rocha stumbled from the vehicle and walked with an unsteady gait. Officer Matis instructed Mr. Rocha to sit on the ground,[8] however he did not follow such instructions. Mr. Rocha stumbled to a second vehicle that was parked in the driveway of the residence. Mr. Rocha placed a set of keys on the second vehicle, and then began to lean against that vehicle for support. Mr. Rocha began to fall towards the ground, so Officer Matis quickly moved towards him and assisted him in remaining upright by grasping Mr. Rocha by the arms.

Shadi Rocha described this part of the encounter between her husband and Officer Matis as follows:

> I was inside the house. I looked outside because I heard Cameron's vehicle pull inside the driveway. And as soon as I looked outside -- I want to say within seconds -- I saw the police car followed (Shadi Rocha deposition, P. 18-19, lines 13-2).

> **Q** When you saw Mr. Rocha pull up -- or when you heard him pull up and you saw him in his vehicle, at that point did you see any police officers?
> **A** Not right away. I want to say within a few seconds of his arrival I saw the police officer pull up.
> **Q** And the police officer -- how did you know it was a police officer?
> **A** Well, I saw the car, the police car, and the siren -- well, his lights were on, I think.
> **Q** And when you say the "lights," are you talking about the overhead lights?
> **A** Yes. That's what I mean. Yes.
> **Q** And did you know it was a police vehicle because it was marked with a police logo on the side?
> **A** Yes.
> **Q** Where did the police vehicle stop? Where did it pull up to?
> **A** Right behind Cameron's vehicle (Shadi Rocha deposition, P. 22, lines 17-21).

[8] Depo testimony: "Get on the ground." Page 16, line 8.

Regarding Shadi's initial observations of Mr. Rocha's appearance of intoxication:

**A** He got out of the vehicle, and he was just wobbling. He was wobbling around.
**Q** Was it common for him to wobble around when he walked?
**A** No.
**Q** Okay. What did -- did you believe he was intoxicated?
**A** Absolutely. Yes.
**Q** Was there anything about -- other than his wobbling that led you to believe he was intoxicated?
**A** Just his facial expressions. I just can tell when his face would change.
**Q** And did you notice that -- how long after he got out of the vehicle did you notice him wobbling?
**A** Right away.
**Q** Did he ever, as far as you observed, almost fall to the ground or hit something? Anything like that?
**A** Yes. He was -- yeah.
**Q** What did you observe, just so we're clear?
**A** He was just, like, really falling, like he needed someone to hold him up type of thing (Shadi Rocha deposition, P. 23-24, lines 18-20).

While assisting Mr. Rocha in maintaining his balance, Officer Matis noticed that Mr. Rocha presented objective symptoms associated with being under the influence of an alcoholic beverage including:
- Bloodshot eyes
- Watery eyes
- Slow speech
- Slurred speech
- Unsteady gait
- Leaning against a parked vehicle to maintain balance
- Needing assistance from falling
- Constricted pupils
- Smell of alcohol emitting from him

Officer Matis spoke with Mr. Rocha for a short period of time at which point Shadi Rocha exited the front door of the residence while holding her infant daughter.  Officer Matis described Mr. Rocha's demeanor changing upon seeing his wife.
- "Cameron looked at her and started becoming visibly upset.  His fists clenched and he started to breath (sic) heavier.  He yelled toward the female, 'Shadi'" (Police Report supplement, Bates COA Rocha000014).
- "…when she exited the residence I immediately saw somewhat of a change in Mr. Rocha in his demeanor. I saw that he had a clenched -- he was clenching his fists. He started

breathing heavily. He started yelling out the female's name which was Shadi" (Officer Matis deposition, P. 27, lines 14-18).

Officer Matis' observations are supported by Shadi Rocha:
**Q** When you went outside, did Mr. Rocha appear to notice you?
**A** Yes.
**Q** Why do you say, "Yes"? How do you know?
**A** Because he looked at me, and he had this look of anger and hate (Shadi deposition, P. 29, lines 11-16).
**Q** Was that the first time you had seen a look of anger and hate?
**A** No (Shadi deposition, P. 29-30, lines 25-2).
**Q** Before Mr. Rocha was handcuffed, did he say anything to you?
**A** I'm not sure if it was before or after. I just him screaming and just cursing at me, but I just can't remember if it was during, after (Shadi deposition, P. 31, lines 7-11).

It was at this point, which Officer Matis described as possibly a minute or so after having spotted the Honda Element, that he activated his digital voice recorder (Officer Matis deposition, P. 25, lines 16-18):

**Q** I just wanted to clarify two things, and I'll start with the recording. Can you tell me when exactly it was that you began the recording?
**A** So I started recording, from what I recall, it would have been after Ms. Rocha exited the front door of the residence. That was part of the reason which prompted me to start recording due to me seeing the elements somewhat, and I felt that I needed to start recording audio-wise (Officer Matis deposition, P. 44-45, lines 23-3).

Officer Matis' recorded interview begins with him asking Mr. Rocha what had happened, to which Mr. Rocha reportedly replied, "This sucks." Officer Matis then asked Mr. Rocha how much he had to drink. Mr. Rocha replied, "Not that much, dude." Officer Matis described Mr. Rocha as confrontational and upset with him at a point where Officer Matis was attending to radio traffic from the dispatcher. Mr. Rocha went on to state that he was trying to get food for his daughter and wife (See Attachment D for transcript of conversation).

Officer Matis reported that he decided to detain Mr. Rocha in handcuffs: "I wanted to place Cameron in handcuffs before he became more upset. I did this for his safety and mine." Officer Matis reported that he applied the handcuffs at approximately 1620 hours (Bates COA (Rocha)000014).

Officer Matis variously testified in his deposition that he handcuffed Mr. Rocha because:

…that the situation was from my perspective was, for one, I was investigating a hit and run, at that point misdemeanor or felony was unknown from my recollection depending on

whether there were potentially injuries with the victims, and at that point, I was not sure (Officer Matis deposition, P. 31, lines 8-12).

…I had the hit and run which I saw the vehicle which had the matching license plate, matching description of the vehicle, matching subject who reportedly fled from the scene and, therefore, from that alone would give me the reasonable suspicion to properly detain Mr. Rocha in handcuffs (Officer Matis deposition, P. 31, lines 13-18).

…I suspected he was under the influence of alcohol due to his objective signs and symptoms which is also a misdemeanor. That would also give me the reason to place handcuffs on him (Officer Matis deposition, P. 31, lines 20-23)

…the changing of Mr. Rocha's demeanor when he saw Ms. Rocha exit to potentially more elevated. What my goal was for that third reason was to make sure I put handcuffs on in an even more timely manner even though I was a solo officer because I did not want the incident to elevate to a possible fight or even more combative nature. I wanted to make sure I put handcuffs on him for his safety and my safety and also potentially the safety of the unknown female at that time since obviously I did not know who she was at that time and she was holding a child. Also, I wanted to make sure I made the situation safer than it was (Officer Matis deposition, P. 31-32, lines 25-110).

**Q** Let me rephrase or let me clarify. You have stated one of the reasons for handcuffing Mr. Rocha was because of his combative nature or his potential to be combative. This is in your police report. I am wondering if you can elaborate on that.
**A** Sure. So I mentioned earlier how he had the clenched fists, he was breathing heavily and he was yelling out the name Shadi. Those were the changes that I saw that were of concern to me (P. 34, lines 12-20).

After placing the handcuffs on Mr. Rocha, Officer Matis reported that he "checked for proper fit and double locked" them (Bates COA (Rocha)000014).

Officer Matis described during deposition testimony how he checked the handcuffs for proper application, after which he engaged the double locking mechanism:

… when I placed handcuffs on Mr. Rocha, I checked for proper fit and double lock after checking for proper fit. The way I checked for proper fit was making sure there was enough distance between Mr. Rocha's wrists and the cuff collars. I made sure there was enough distance so that there would be enough blood flow from his arm, his wrist and his hands so that there would be enough circulation for the blood to flow. I also made sure that the ratchet system on the handcuffs were appropriately applied so as to prevent possible escape

from the handcuffs as well as making sure that they were properly fitted (Officer Matis deposition, P. 29-30, lines 22-8).

During deposition testimony, Mr. Rocha confirmed that Officer Matis had double locked the handcuffs:

**Q** Okay. So my question to you, Mr. Rocha, is -- and you may not know -- but do you know whether or not the handcuffs, at some point while they were on your wrist, tightened by you moving them just because they did, or were they always the same, I guess, diameter? Does that make sense?
**A** No. They stayed the same. I believe he double locked them.
**Q** Okay. And so you know what double locking is, it sounds like?
**A** I do.
**Q** What is double locking?
**A** Double locking is you lock it after you get a good fit to keep it from tightening.
**Q** And after he placed the handcuffs on you, did you feel him insert a pin key or a finger in between your skin and the metal?
**A** No.
**Q** But you remember him double locking the handcuffs?
**A** I believe so. Yes (Rocha deposition, Page 86, lines 2-22).

During deposition testimony, Officer Matis explained how he checked the handcuffs for proper fit:

**Q** Let me rephrase. When you checked for proper fit, how do you do that? Do you stick your pinky finger in there to make sure your pinky finger can go through, or what do you do exactly?
**A** It's by visually and physically inspecting the handcuff, moving it around slightly. If a handcuff has too much space on it, that can be problematic. Of course, if it has not enough space, then that's problematic as well. The handcuffs that I placed on Mr. Rocha were properly applied with the specific spacing by physically and visually inspecting the handcuffs before double locking them (Officer Matis deposition, P. 30-31, lines 16-1).

**Q** What did you physically do? I know you kind of spoke to what you would do normally, but what did you physically do at that time to ensure that the handcuffs were a proper fit and double locked?
**A** As I stated, visibly and physically inspecting moving the handcuffs around in such a way that it showed that it was not cutting off circulation to the arm, wrist and hand, being able to stick a portion of my finger through the handcuffs to make sure that there was enough space and also of note is at no point during my contact with Mr. Rocha was there a complaint of the handcuffs.

**Q** You mentioned that you stuck your finger in there to make sure there was room. Which finger?
**A** I don't specifically recall which finger I used for this incident (Officer Matis deposition, P. 35-36, lines 22-11).

**Q** What I think I heard you say earlier was there are two components to inspecting whether or not there is a proper fit, the first one being visual and the second one being a physical component. Is that correct?
**A** Yes.
**Q** As far as the visual component goes, is there a certain -- what cues are you looking for to make sure that visually the handcuffs are proper?
**A** So one of the visual cues would be to see that there is a certain gap from the wrist and the cuff collar. Also would be to see specifically where on the wrists the handcuff is placed. Those are the typical visual cues (Officer Matis deposition, P. 46, lines 5-16).

**Q** So I want to talk about the second component which is the physical component of handcuffing. Can you describe what that entails?
**A** Yes. So making sure that the handcuffs are of a proper fit, looking to see -- there is a ratchet system where handcuffs have teeth, making sure that those are applied properly, and physically being able to move the handcuff in a certain way so that if it were too loose that would potentially be a way for someone to escape the handcuffs or if it is too tight, making sure that it is not cutting off circulation to the subject. Also trying to -- you could potentially stick a finger through the handcuff to kind of see if there is -- to affirm that visual inspection, if you will. So if you are visually looking at the handcuff and you see that there is a gap, you can physically inspect the handcuff as well, if that answers your question.
**Q** Thank you. So can you describe the ways you do it? You mentioned that there are physical things you can do to move the handcuffs around. What are those things?
**A** So if you are looking at the handcuff, there is a handcuff chain that attaches to the other handcuff. Just the handcuff in general, you can move it sliding it from kind of around the wrist so that you can see that there is a bit of movement, but if it is too much movement that could actually cause problems as well, if it is too much movement so it's actually moving around their wrists. So it needs to be in place but enough room. And then also by checking in a circular motion but then you can also check in a motion that would be trying to see -- making sure it's not sliding down the forearm or up the hand. So those are really the two motions that you would be checking handcuffs.
**Q** For Mr. Rocha specifically, can you describe in detail the visual component that you performed to ensure that his handcuffs were properly fit?

**A** Yes. From my recollection, when I placed the handcuffs on him, I visibly checked by looking at the -- that there was a gap that was enough gap for the wrist and the cuff collar, also checking to see that the ratchet system was applied appropriately and physically checking by seeing that there was the hole between the wrist and the cuff collar, physically moving the handcuff in both ways that I described right now, the circular motion and also the up and down motion, to make sure that was properly fit and then also placing a finger between the cuffs to make sure that there was a bit of distance in the handcuffs.

**Q** Which finger did you place in Mr. Rocha's handcuffs to make sure they were properly fit?

**A** Counsel, I believe you asked me that question just prior to us taking a break, and I believe my answer was that I do not recall which finger specifically (Officer Matis deposition, P. 48-50, lines 15-17).

After Officer Matis had Mr. Rocha secured in handcuffs, Officer Matis reported that Mr. Rocha "began yelling and swinging his body around" (Police Report, Bates COA (Rocha)000014). Officer Matis used his police radio to request an additional unit to respond to his location for assistance. Officer Matis believed that Officer Gerber was the first officer to arrive. Records appear to indicate that Officer Gerber was the first officer on-scene with Officer Matis, arriving at approximately 16:17 hours.

Once the backup officer arrived, Mr. Rocha was placed into the rear seat of Officer Matis' marked police SUV unit. However, during that process, Officer Matis described Mr. Rocha's behaviors as: "Cameron continued yelling "Shadi" and kept telling me to let him go" (Police Report, Bates COA (Rocha)000014).

Officer Matis described Mr. Rocha's behaviors during his deposition testimony as:

**Q** So in your police report it states that after you handcuffed Mr. Rocha he began swinging his body around. Can you explain that?

**A** Sure. So at that point when he started swinging his body around, his hands were to the rear, and he was handcuffed. As I was walking him to my patrol vehicle, he was moving his body from side to side, pulling away from the path that we were walking towards which was towards my patrol vehicle. It wasn't a simple cooperative. We were walking step in step to the vehicle. It was moving around and somewhat of a pulling while in handcuffs (Officer Matis deposition, P. 38, lines 7-17).

Shadi Rocha testified as to her observations of Mr. Rocha's behaviors at this time:

**Q** Did Mr. Rocha appear to resist in any way, fight back in any way?

A Yeah. It seemed that way. Like I said, I can't remember the exact moment that -- it happened so quickly. He was really good at getting him restrained, but I don't remember the details. But I'm sure he was resistant (Shadi deposition, P. 32, lines 9-15).

**Q** Did Mr. Rocha appear to resist in any way being placed inside of the police vehicle?
**A** Yeah. I can't remember that moment, but I know he was screaming and yelling and telling him to let him go or something (Shadi deposition, P. 34-35, lines 24-3).

**Q** Okay. And so he gets handcuffed, and then he gets placed in the car. You're saying that he was resisting getting placed in the car. Can you explain how he was resisting?
**A** He was trying to push -- I think he was trying to resist getting into the car. Like, he was -- Officer Matis was trying to guide him into the car, and he was trying to resist getting into the car (Shadi deposition, P. 62, lines 6-13).

After securing Mr. Rocha in his patrol vehicle, Officer Matis reported that he inspected the Honda Element as follows:

- Opened the doors
- He did not observe bottles of alcohol or drug paraphernalia
- He grabbed the keys that Mr. Rocha had placed on top of the vehicle parked next to the Honda and was able to start the Honda Element by placing the keys into the ignition
- He took photos of the vehicle which were placed into evidence

After conducting the search of the Honda Element, Officer Matis contacted and interviewed Shadi Rocha who was at the front door of the residence (See Attachment E for a transcript of that interview).

During the interview with Shadi, Mr. Rocha began kicking the interior of the patrol vehicle. Officer Matis reported this behavior as follows:

While I was interviewing Shadi, Cameron began kicking the interior door to my patrol vehicle. I could see the patrol vehicle rocking back and forth. I could hear Cameron yelling inside the vehicle. I rolled down the window to my patrol vehicle. I told Cameron to stop kicking my patrol vehicle. Cameron stated, “Fuck you” multiple times and said, “Let me out” (Police Report, Bates COA (Rocha)000015).

Officer Matis described Mr. Rocha’s behaviors during his deposition testimony as:

**Q** But while you were interviewing Ms. Rocha you write in your police report that you saw Mr. Rocha kicking the interior of this vehicle. Can you describe exactly how you saw that and what you did see?

**A** When I was interviewing Ms. Rocha, I saw that my patrol vehicle was moving from side to side. When I went to check to see what was causing my vehicle to rock from side to side, I was able to see Mr. Rocha actively kicking with his feet my patrol vehicle from the inside.
**Q** And what was he kicking?
**A** From what I recall, it was the patrol door from the inside.
**Q** So then, just so I am clear, how is he positioned then inside the car?
**A** From what I recall, he would have still have been handcuffed and he would have been with his hands behind him. He would have been leaning on top of his handcuffs and somewhat on his back in active kicking motion, if you will, by leaning right on the handcuffs and kicking at the door multiple times if that makes sense, Counsel.
**Q** But you only observed that when you walked to the car to roll down the window?
**A** From what I recall, yes.
**Q** So during your interview with Ms. Rocha, you did not observe -- you didn't say what Mr. Rocha was doing.
**A** I saw that the vehicle was moving, and I don't recall if I was able to see through the patrol vehicle from where I was standing, but as I was approaching it I could see what was going on, and there was no one near the patrol vehicle to have any other way of making the vehicle rock back and forth (Officer Matis deposition, P. 54-56, lines 25-7).

Shadi Rocha testified as to her observations of Mr. Rocha's behaviors at this time:

I know for a fact, when he was sitting in the car, the vehicle -- the police vehicle, he was shaking the vehicle. He was shaking and screaming, and the car was literally shaking. And that's what I remember from that (Shadi deposition, P. 31, lines 11-15).

**Q** How long after Mr. Rocha was placed in the back of the vehicle did you see it rocking back and forth?
**A** Almost immediately.
**Q** When the officer placed Mr. Rocha inside of the vehicle, did he -- what did the officer do at that point, if you remember?
**A** He started walking towards me to, you know, ask me questions and kind of let me know what's going on.
**Q** Other than the car rocking back and forth, did you see Mr. Rocha doing anything else that caught your attention?
**A** Just cursing and yelling my name.
**Q** Okay. Were the windows down?
**A** I can't remember that.
**Q** But you heard it; right?
**A** I heard him. Yes.

**Q** When he yelled your name, was he yelling you first name? your full name? your middle name?
**A** Just my first name.
**Q** And you said he was cursing. It's okay to say, you know. You got to say what he said. Okay? So if you remember, what was he saying when he was cursing?
**A** Just saying, "Fuck you, Shadi. You bitch," from what I remember. I mean, the usual.
**Q** Okay. Did he say it once? Did he curse multiple times?
**A** He was cursing pretty much the whole time that Officer Matis, I believe it was, and I were having the conversation.
**Q** Was the -- okay. He was cursing the whole time. What about the car was --
**A** The car was -- he was kicking the car. Like, he was kicking the car really hard. And at one point I just -- I remember Officer Matis went back to the car and said, "Stop kicking my patrol car." That's what he told him.
**Q** When this was going on, could you see what Mr. Rocha was doing with his body? You said that he was kicking. What else was he doing with his body, if you know?
**A** I'm sure he was trying to get out of his restraint. I mean, I couldn't really see or make out exactly what he was doing. But from the way the car was shaking, I could just see he was trying to get out.
**Q** How much time passed between when the officer came to talk to you to when he went back to the vehicle and said, "Stop kicking my vehicle"?
**A** I think it was a couple of minutes (Shadi deposition, P. 35-37, lines 11-11).

In-Field Show-Up:

While Officer Matis was engaged with Mr. Rocha and Shadi Rocha, Officer Kint had responded to the scene of the accident and contacted Victim/Diver Hix, Brian Joshua, and his mother, Witness Hix, Deanna Carol. After investigating the accident scene, Officer Kint had Brian and Deanna follow him to Officer Matis' location to conduct an in-field show-up. It is unclear what time the show-up took place as the police records (Event report, Bates COA (Rocha)000071-000075) do not depict a status change for Officer Kint that places him on W. 11th St. However, it is likely that Officer Kint arrived with the victim and witness on 11th street after 1617 (Officer Gerber's arrival time) and before 1629 (the time of the application of the WRAP).[9]

Officer Matis reported that he opened his vehicle door to have Mr. Rocha step from the patrol vehicle. At that time, he observed Mr. Rocha, "ringing both of his wrists around in circles, as if to escape the handcuffs which were placed on him" (Bates COA (Rocha)000015).

Officer Matis provided deposition testimony reference this time frame as follows:

[9] However, Sgt. Koch was present at the time of the WRAP application, and his status shows an arrival time of 1634 hours.

As he was exiting the car and I was standing with him, I saw that he was, as you stated in the report, you know, doing that with his wrists and to me it appeared as if he was trying to escape the handcuffs.
**Q** Did you check the tightness at this point?
**A** From what I recall, I looked down to see what he was doing with the handcuffs and to me they appeared to be in the same condition that I had left them which was properly applied and double locked (Officer Matis deposition, P. 57, lines 15-23).

**Q** So when Mr. Rocha exited the vehicle, how many officers assisted him out of the vehicle?
**A** I don't recall.
**Q** At that point, that's when you noticed he was wringing around his wrists.
**A** Yes.
**Q** Can you show us what that looks like with your own hands?
**A** I suppose if the hands are to the rear, it could be moving them around in this all sorts of directions and just pulling on them and just moving them all around in different directions; I suppose, just kind of pulling on them (Witness Indicates) (Officer Matis deposition, P. 58-59, lines 16-3).

Officer Matis had Mr. Rocha exit his vehicle to conduct the in-field show-up. The victim and witness positively identified Mr. Rocha as the driver, and positively identified the Honda Element as the vehicle involved in the collision (Kint Police Report, P. 7-8 of 21; Bates COA (Rocha)000007-000008).

Officer Matis reported that during the in-field show-up, "Cameron continued pulling his body away from me and was yelling" (Bates COA (Rocha)000015).

Officer Matis provided deposition testimony regarding this as follows:

**Q** When he was doing that, was he walking away, attempting to walk away? What was he doing other than wringing his wrists?
**A** I don't recall specifically what he was doing the entire time. However, after the in-field show-up was completed and he was positively identified as the responsible party in the hit and run, he started again swinging his body and pulling away again at that point (Officer Matis deposition, P. 59, lines 4-11).

**Q** So your observations that he's pulling his body away from you and he's yelling. Can you explain exactly what you observed?
**A** Sure. So we were standing next to my patrol vehicle near the door which he had exited, and he was pulling his body away from me as I was having to hold on to his arms so that

he would not leave where we were currently standing, and he was yelling (Officer Matis deposition, P. 61, lines 17-24).

Officer Matis was asked during his deposition questions regarding the fit of the handcuffs on Mr. Rocha during the timeframe of the in-field show-up. He testified as follows:

**Q** Earlier you testified that you checked for proper fit at that time. Can you explain exactly how you did that? It sounded like you only made a visual inspection is what I heard you say; is that correct?
**THE WITNESS**: Counsel, which time are you talking about?
**MR. KIM**:
**Q** This second time, the time that Mr. Rocha is outside of the vehicle for the lineup -- or for the identification.
**A** So for this second time I recall doing a visual inspection and, as he was moving his hands around, from what I recall, I was doing the visual inspection of the wrists. I don't recall doing a further, as I did the first time, inspection of the handcuffs.
**Q** So what I am hearing you say is that you did not do the physical component of the inspection at that time.
**A** Not as thorough as the first one was done. However, by looking at them and partially manipulating the handcuffs in such a way as with the movement, they appeared from me looking at them that they were in the same status as I had properly fit them and double locked them from the first time.
**Q** Because this deposition is not being video recorded, can you explain in words what that physical manipulation was exactly? As part of your inspection during the lineup to ensure that the handcuffs were a proper fit.
**THE WITNESS**: Moving them around the wrists to make sure they were not too loose or too tight and also moving them, trying to see if they would move too far up and down, and they still appeared to be in the same proper fitting as I had when he was originally placed in the vehicle.
**Q** Did you hear Cameron complain about his handcuffs, the tightness of his handcuffs?
**A** There was no point during my contact with Mr. Rocha that he once complained of his handcuffs (Officer Matis deposition P. 59-61, lines 12-2).

At the conclusion of the in-field show-up, Mr. Rocha was placed back into the rear seat of Officer Matis' patrol vehicle. Officer Matis testified during his deposition that he believed he had probable cause to arrest Mr. Rocha for the hit and run and for DUI:

After the in-field show-up occurred, after that, I had the -- since he was positively identified I knew that I had the probable cause for his arrest for the hit and run since he was identified

by both victims to be the responsible driver in the hit and run. I believe one, if not both victims, identified the vehicle as well which I observed him driving so probable cause for the hit and run and also the DUI probable cause as well which I observed. So for those reasons what my goal to do was going to be to put him back in the rear of my patrol vehicle and for me to personally drive him to the Martinez Detention Facility for the probable cause (Officer Matis deposition, P. 62-63, lines 23-9).

WRAP Application:

Officer Matis documented in his report that Mr. Rocha was placed in the WRAP:

"While the in-field show up was being conducted, Cameron continued pulling his body away from me and was yelling. With Sgt. Koch and other APD officers on scene, Cameron was placed in the WRAP. The WRAP was placed on Cameron for his own safety. I took photos of Cameron at this time. I also digitally recorded the contact with Cameron during the WRAP process. I attached the photos and audio to this case. Cameron was placed in the rear of my patrol vehicle (Police report, P. 15 of 21; Bates COA (Rocha)000015).

Officer Matis testified during his deposition on the reason why Mr. Rocha was placed into the WRAP for transport to jail:

So after he was pulling his body around I was able to put him back in the patrol vehicle and close the door. However, shortly after placing him back in the rear of the patrol vehicle he again began kicking from the inside of the patrol vehicle much in the same manner as I described from the first time and so -- and after telling him to again stop and for him not doing so and now doing it a second time, I had a general concern for his well-being in the sense of if I were to start driving to the Martinez Detention Facility while he was doing something such as kicking the patrol vehicle I was concerned that he would possibly injure himself or hurt himself from doing so considering, you know, I would be driving from Antioch to Martinez which would entail me driving on the freeway. So at those speeds, if he were to be doing something to hurt himself, I wanted to make sure that that would not happen from him kicking inside of the vehicle. So that is where, when I opened the door, basically he stops kicking and that's when I decided again to pull out my digital recorder to start recording the contact that we just heard because a decision was made that he would be placed in a WRAP device. That was me patiently explaining for him to exit the patrol vehicle (Officer Matis deposition, P. 63-64, lines 10-7).[10]

[10] See Attachment F for transcript of audio.

When Officer Matis opened the door to his vehicle, and unknown officer advised, "Watch his cuffs, he's trying to pull out of them." Officer Matis then told Mr. Rocha, "Ok, Cameron. Stop trying to pull out of the cuffs." Officer Matis, in cooperation with Sgt. Koch, Officer Kint, and Officer Hynes, was able to remove Mr. Rocha from the patrol vehicle and place him in the WRAP restraint device.[11]

According to the Event Report (CAD), Mr. Rocha was placed into the WRAP at approximately 1629. It appears that this information was supplied to Dispatch by Officer Hynes assigned to Unit Y21 (Police Event Report, Bates COA (Rocha)000073).

<u>Transport to Martinez Detention Facility:</u>

Officer Matis began driving to the MDF at approximately 1700 hours (Event Report, Bates COA (Rocha)000074). Dispatch personnel advised MDF staff of the use of the WRAP (Bates 000074). Officer Matis arrived at MDF at approximately 1727 (Bates 000074). Officer Matis documented in his police report: "Once I arrived at the MDF sally port, multiple MDF deputies removed Cameron from the rear of my patrol vehicle and removed him from the WRAP. He was taken into the MDF booking area" (Police report P. 16 of 21, Bates COA (Rocha)000016).

Officer Matis provided deposition testimony:

> So I had no part in removing Mr. Rocha from the rear of my patrol vehicle. Every time that I have brought a subject in a WRAP device to MDF, I have seen it where the deputies as well as one of their supervisors, and it's multiple, multiple deputies, they will come out of the booking area and the deputies themselves are the ones that open the door to my patrol vehicle, speak to Mr. -- to the subject that is in a WRAP and remove the subject from the WRAP. That is exactly what happened for this case (Officer Matis deposition, P. 86, lines 9-19).

> I observed the deputies take Mr. Rocha out of the patrol vehicle while he was in a WRAP, and I observed them take him while he is still in the WRAP into the booking area of the Martinez Detention Facility which is from the sally port where I was located with my patrol vehicle. That is an area where they went to where I no longer had eyes on Mr. Rocha because at that point he was in the custody of the Sheriff's Department for the booking process and WRAP process so I did not see the deputies remove the WRAP or the handcuffs from Mr. Rocha (P. 87, lines 3-12).

<u>Transport to Contra Costa County Regional Medical Center (CCCRMC):</u>

At approximately 1803 hours (Matis deposition, P. 88, lines 8-9), Officer Matis was

[11] It is possible that Officer Gerber had already departed as the CAD report indicates he cleared the event at approximately 1620 hours.

advised by the jail nurse (unidentified) that Mr. Rocha was medically rejected from MDF. According to Matis' police report (Bates 000016), he was rejected for high blood pressure and a high pulse rate. The unnamed nurse advised Officer Matis that she had called a doctor at CCCRMC, and that the doctor had advised that Mr. Rocha should be transported to the hospital via ambulance to be medically cleared.

Officer Matis had AMR (ambulance company, likely "American Medical Response") meet at the MDF sally port where they loaded Mr. Rocha for transport to CCCRMC. Officer Matis departed MDF at approximately 1830 hours (Event report, Bates COA (Rocha)000074), and arrived at CCRMC at approximately 1857 hours (Rocha document production: CCCRMC medical records- "ED Records," Bates Rocha000022). Officer Matis reported that, "Once at CCCRMC, medical staff placed restraints on Cameron's arms and legs."

During deposition testimony, Officer Matis provided further clarification:

**Q** From MDF to CCRMC, your report states that once you arrived at CCRMC medical staff placed restraints on Cameron's arms and legs. Do you remember that?
**A** Yes.
**Q** Is that the first time the handcuffs were removed from Mr. Rocha?
**THE WITNESS**: So, from what I recall -- well, I should say I don't recall if when Mr. Rocha was taken -- after he was medically rejected and an ambulance arrived and when he was placed on the ambulance, I don't recall if handcuffs were on him at that point. I suspect that handcuffs may have not been, but I don't recall. Potentially, the AMR ambulance staff may have had him in similar soft restraints on the gurney, but I don't recall.
**Q** You just said earlier you -- I'm not going to say it correctly, but you said you might have thought he wouldn't be in handcuffs. Why is that?
**A** If he is being transported -- typically when a subject is being transported on an ambulance, sometimes the medical staff of AMR, instead of having a subject in handcuffs and sitting on the gurney, they will at times put leg and wrist restraints on them on the gurney instead. That is typically the process that can happen, but I don't recall specifically in this case what occurred (Officer Matis deposition, P. 89-90, lines 8-9).

**Q** Yes. Earlier I asked if you remember at any point taking off the handcuffs, and you said not -- or at least I thought you said -- not at Martinez Detention Facility, but I'm wondering what about the Regional Medical Center.
**A** No. Again, I don't recall at the Regional Medical Center if it would have been handcuffs taken off while being transported from the AMR medical bed to the CCRMC medical bed or if it was just the soft restraints being taken off of the ambulance bed and being transported to the medical bed, if that makes sense (Officer Matis deposition, P. 91, lines 4-13).

## Expert Opinions: Analysis, Basis, and Reasons Thereof

In the tense, uncertain and ambiguous, rapidly evolving, complex and often directly or potentially threatening environments in which officers find themselves, such as in the instant case, reported facts can often be inconsistent between victims, witnesses, suspects, and officers. Additionally, human beings are generally unable to attend to all details of occurrences, and memory for events is rarely perfect for a variety of reasons. While witness credibility is ultimately the decision of the factfinder, I have considered the statements of the involved officers and subjects and compared them to the available facts to inform my opinions. This "sense-making" exercise is based upon my general knowledge as well as the expertise I have developed from my training, education, and experience over the course of my lifetime and career. When there exists conflicting facts, evidence, and statements, I attempted to reconcile the inconsistencies and determine the most probable course of events.

I offer the following opinions related to my areas of police practice and expertise in response to the general life-experience, education, and common sense possessed by society at large; by the material reviewed, information considered, and the totality of my knowledge, training, and experience.

## Foundational Law of Detention and Arrest Training for California Peace Officers

### Detention

A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe they are *not free to leave*. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer.

A detention of a person is limited in scope, intensity, and duration. It is less than an *arrest* and more substantial than a *consensual encounter*.

A lawful **detention** requires *reasonable suspicion* of criminal activity (LD 15, p. 3-3).

### Reasonable suspicion

Reasonable suspicion is when a peace officer has enough facts and circumstances present to make it reasonable to suspect that criminal activity is occurring and the person detained is connected to that activity.

Reasonable suspicion of criminal activity must exist to make a detention lawful.

Reasonable suspicion may be based on observation, personal training and experience, or information from eyewitnesses, victims, or other officers (totality of the circumstances).

Reasonable suspicion cannot be based on a hunch or instinct. If reasonable suspicion is not properly established in a court of law, the case against the defendant may be dismissed or any evidence seized may be excluded from trial (LD 15, p. 3-6).

Some factors that *contribute* to establishing reasonable suspicion are:

- appearance or condition of a person (intoxicated, resemblance to wanted person)
- actions (hiding objects, furtive movements, running from a crime scene)
- driving behaviors
- knowledge of the person's "history" (criminal record or conduct)
- demeanor (non-responsive, nervous)
- time of day (unusualness)
- location of the stop (near crime scene, known criminal activity in area)
- officer training and experience (modus operandi, expertise in certain area such as narcotics or gang activity) (LD 15, p. 3-6 to 3-7).

**Use of Force/Physical Restraint During a Detention**

Sometimes officers may have to use force or physical restraints to detain a person. The reasonableness of the use of force will determine whether the detention is elevated to an arrest or remains a detention.

If a person attempts to leave during a detention, officers may use reasonable force and/or physical restraints to compel the person to remain. The use of force does not necessarily elevate the detention to an arrest. Uncooperative individuals may be:

- handcuffed, and/or
- placed in a patrol vehicle

Any use of force during a detention must be in accordance with *Penal Code Section 835a* (LD 15, p. 3-16).

California Penal Code §835a

Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.

A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

**Arrest**

**Arrest** is taking a person into custody, in a case and in the manner authorized by law. *(Penal Code Section 834)* The arrest must be based on probable cause (LD 15, p. 4-4).

**Probable Cause**

Probable cause for an arrest is a set of facts that would cause a person of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is guilty of a crime. Probable cause is required before an arrest is made and is based on the totality of the circumstances.

Facts required to establish probable cause may include, but are not limited to:

- direct investigation or reports
- circumstantial evidence
- second-hand statements from reliable sources (LD 15, p. 4-4).

**Foundational Use of Force Training for California Peace Officers**

Peace officers in California are trained that every use of force must be was objectively reasonable, and must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake without regard for the officers' underlying intent or motivations." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

*"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officer are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."*

Peace officers are trained that every use of force is measured by examining three primary factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the subject is actively resisting arrest or attempting to evade arrest by flight. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

Objective for Use of Force

The objective for the use of force by peace officers is to gain and maintain control of an individual and the situation.

Peace officers are required to:

- use the type of force which is objectively reasonable under the totality of the circumstances
- use only the amount of force objectively reasonable to overcome resistance and to gain or maintain control of a subject
- conform to agency policy and federal and state law (LD 20, p. 2-3).

The propriety of an officer's use of force depends upon whether that force is found to have been objectively reasonable under the totality of the circumstances of the particular situation confronting the officer. The immediate threat to the safety of the officer or others is the most significant factor in determining reasonableness.

The subject's actions and the practical considerations involved in a situation are major factors in determining the type of force the officer may lawfully use in order to gain or maintain control of the subject or the situation (LD 20, p. 2-6).

Unreasonable Force

An officer will be found to have used unreasonable force when the type, degree, or duration of the force which was used is found to have been greater than that which was objectively reasonable under the totality of the circumstances confronting the officer at the time that the force was used.

There is no legal requirement that an officer choose the "best" or "most" reasonable force option as long as the officer's conduct falls within the range of conduct that is objectively reasonable under the totality of the circumstances (LD 20, p. 6-4).

**Opinion One- The Detention and Initial Restraint of Mr. Rocha**

**An objectively reasonable officer conforming to his training, experience, and policy and practice would understand that the people in the community expect peace officers to ensure their safety (LD 3, p. 1-23). As such, the people in the community would expect an objectively reasonable officer to locate and detain a suspect involved in a reported Driving Under the Influence (23152(a)) and Hit and Run accident (20002(a)).**

**An objectively reasonable officer who has properly been trained regarding the law of detentions will employ his training regarding the totality of the circumstances when he detains and restrains a suspected intoxicated motorist in the community. Such officer would reasonably believe Mr. Rocha's mental state, appearance, physical actions, and speech patterns, indicated him to be a significant threat, and would take immediate action to contain**

**and control him to prevent the need for a greater use of force. As such, a reasonable officer would consider handcuffing Mr. Rocha and placing him into a patrol car to contain and restrict his movements.**

At the time of the incident, Officer Matis was on duty, was in full police uniform, was operating a marked Antioch SUV patrol vehicle, and was acting within his official authority as a sworn law enforcement officer in the State of California.

The following objective facts and circumstances were known by Officer Matis at the time of his response to and arrival at the registered address of the hit and run vehicle:

- The outstanding suspect vehicle was a Silver Honda Element bearing license plate 5EPR424.
- The vehicle was registered to Cameron Rocha at 414 W. 11th St., Antioch CA. 94509.
- The driver of the vehicle was described as an HMA, mid-30's, tattoo on left shoulder, wearing a cream-colored tank-top.
- The registered owner address is within approximately 3 miles of the scene of the accident.
- As Officer Matis was driving EB on W. 11th St., he observed a silver Honda Element that was WB on W. 11th St turn into the driveway of 414 W. 11th. St.
- When Officer Matis pulled in behind the Honda Element and activated his forward-facing red light and chirped his emergency siren, the driver of the vehicle immediately exited the car.
- Upon seeing Mr. Rocha, Officer Matis noted that he fit the description of the driver provided by the reporting party.
- For officer safety purposes, Officer Matis ordered Mr. Rocha to take a seat on the ground. Mr. Rocha failed to comply with that command.
- Officer Matis is intimately familiar with the neighborhood and has responded to violent crimes in the areas nearby to Mr. Rocha's residence.
- Officer Matis recognized quickly that Mr. Rocha displayed objective symptoms associated with being under the influence of an alcoholic beverage including loss of balance, unsteady gait, leaning on a vehicle for support, failing to follow directions, falling, an odor of an alcoholic beverage about his person, bloodshot and watery eyes, slow and slurred speech, and constricted pupils.
- Officer Matis observed Mr. Rocha display behaviors associated with anger and potential loss of control often associated with intoxicated individuals when he saw his wife, Shadi, including: Heavy breathing, balling his hands into fists, and calling out her name.

Citizen safety, officer safety, and detainee safety is vital when confronting a suspect who just fled the scene of an accident, is displaying significant objective symptoms of intoxication, is

not following an officer's verbal directions, and is becoming increasingly agitated. Danger is increased when the contact takes place at the offender's residence and has significant potential for intensifying when a spouse is present or becomes involved.

Opinion Summary

Officer Matis acted as would an objectively reasonable peace officer following generally accepted law enforcement practices, procedures, and training, and facing the same or similar circumstances as he perceived when he:

1. Notified communications of his observations and the location of the outstanding suspect.
2. Initiated a vehicle stop and contact on the suspect violator.
3. Requested assistance from another officer.
4. Approached, contacted, and detained the subject.
5. Handcuffed the subject as a temporary means of restraint for officer safety, suspect safety, and citizen safety based upon the totality of the circumstances.
6. Secured the detained subject into a secured patrol vehicle to limit the individual's mobility and to ensure the safety of all involved.
7. Continued the investigation to determine whether probable cause for an arrest exists.

## Opinion Two: The Arrest and Enhanced Restraint of Mr. Rocha

**An objectively reasonable officer who has properly been trained regarding the law of arrest and conforming to his training, experience, and policy and practice, would employ his training regarding the totality of the circumstances when he assesses the probable cause necessary to arrest a suspect for Driving Under the Influence (23152(a)) and Hit and Run accident (20002(a)). Probable cause in an event such as this, is established by citizen reports, direct observation, and citizen identification of an involved suspect.**

**An objectively reasonable officer conforming to his training, experience, and policy and practice, who responds to an event comprising the totality of the circumstances as those faced by Officer Matis, would reasonably believe Mr. Rocha's physical behaviors demonstrated that he presented a significant threat to his own safety and the safety of the officers and community as well as potentially significant damage to property as he kicked violently while contained in the patrol vehicle, and would apply enhanced restraint procedures in order to mitigate that threat.**

The Arrest of Mr. Rocha

Officer Matis detained Mr. Rocha at his residence at approximately 1610 hours. Mr. Rocha was then placed into Officer Matis' patrol vehicle while Officer Matis continued his preliminary investigation.

Officer Kint, who was dispatched to the scene of the accident, followed appropriate investigative procedures by providing an admonishment to the witnesses, escorting the witnesses to the scene of the stop, and presenting an in-field show-up.

Once witnesses positively identified both the Honda Element and Mr. Rocha as the vehicle and driver involved in the Hit and Run accident, Officer Matis arrested Mr. Rocha for the violation of the Hit and Run as well as for Driving Under the Influence based upon probable cause under the totality of the circumstances, including:

- The initial call information indicating the vehicle description, license plate, address, and registered owner.
- Officer Matis' direct observation of the vehicle being operated on a city street.
- Officer Matis' direct observation of the vehicle being driven into the driveway of the indicated registered address.
- Officer Matis' direct observation of Mr. Rocha exiting the driver seat of the vehicle.
- Officer Matis' direct observation of Mr. Rocha failing to follow his verbal commands.
- Officer Matis' direct observation of Mr. Rocha presenting objective symptoms consistent with being under the influence of an alcoholic beverage and/or a controlled substance.
- The positive identification of Mr. Rocha by the witnesses during the in-field show-up.

<u>The Restraint of Mr. Rocha</u>

A relevant issue regarding the use of the handcuffs is whether Officer Matis conformed with accepted industry standards regarding the application, position, fit and tightness, and the double-locking of the handcuffs when he applied the handcuffs to Mr. Rocha's wrists.

Throughout his report and testimony, Officer Matis states that he applied the handcuffs to the wrist area just below the palm, and between the palm and the forearm. He asserted that he checked for appropriate tightness both visually and physically. Finally, Officer Matis indicated both in his report and on several occasions during his deposition that he double locked the handcuffs after their application to Mr. Rocha.

Officer Matis' descriptions and explanations are consistent with the generally accepted practices of handcuffing, fit testing, and double locking. Additionally, I do not see evidence in any record that Mr. Rocha ever told Officer Matis or other officers that the handcuffs were overly tight while at the scene, in transit to the jail, at the jail, or in transit to the hospital. On the other hand, Mr. Rocha does make a claim that he informed Officer Matis, and medical staff were aware, that the handcuffs were causing him pain when at the hospital:

> **Q** When you say that you were -- you know, I know it's tough to get specific for a few years ago, but do you remember saying anything to the hospital staff, specific things, for example, "I'm in a lot of pain." "My cuffs are too tight"?
> **A** Oh, yeah. The entire time (Cameron Rocha deposition, P. 134, lines 2-7).

> The thing that stands out the most that really bothers me, because I was 100 percent there at this point and I was in the hospital, that -- and the officer, I was just telling him, like, "I can't feel my hands. Like, I feel like they're going to explode," you know. I was pleading with him, "Can you take them off or at least move them or something?" And he goes, "No. No. Oh, well," the whole time. And it just -- that really just -- I felt totally helpless. There's nothing I could have done. I was just stuck in that situation. The nurse was trying to tell him to loosen them up, at least. He just refused (Cameron Rocha deposition, P. 185, lines 1-14).

However, as will be illustrated in the next section, Mr. Rocha's claim about the handcuffs applied overly tight for an extended period do not match the documentary evidence depicted in the hospital records as he was reported as restrained in Velcro 4-point restraints within approximately 18 minutes of arrival to the emergency department.

A second relevant issue to this case is the timeframe involving the application and removal of the restraints from Mr. Rocha. The best-informed timeframes gathered from the documentation are as follows:

| | | |
|---|---|---|
| 1620 | Mr. Rocha handcuffed | Matis supplemental report, Page 14 of 21 |
| 1629 | WRAP applied | Event Report (CAD), Bates- COA (Rocha)000073 |
| 1727 | At MDF, (WRAP removed) | Event Report (CAD), Bates- COA (Rocha)000074[12] |
| 1830 | Begin transport to hospital | Event Report (CAD), Bates- COA (Rocha)000074 |
| 1857 | Arrived at hospital | Bates- Confidential Rocha 151[13] |
| 1915 | In Velcro 4-pt restraints | Bates- Confidential Rocha 154 |
| 2030 | Restraints discontinued | Bates- Confidential Rocha 156 |
| 2033 | Blood draw taken | Bates- COA (Rocha)000078 |

Hospital medical records indicate the purpose of restraining Mr. Rocha with Velcro 4-point restraints:

> 19:15
> Reason for Restraint/Seclusion:
> Violent or self destructive behavior that jeopardizes the immediate safety of self or others
> Observed Behaviors:
> Struggling in restraints (Bates- Confidential Rocha 154)
>
> 19:30
> Violent Restraint and/or Seclusion:
> CONTINUED
> Observed Behaviors:

[12] Matis supplemental report, Page 16 of 21 (Bates COA (Rocha)000016): Matis reports that jail personnel removed Rocha from patrol vehicle and removed Rocha from the WRAP.

[13] Source: Rocha document production: ROCHA000121-281 (CC Regional Medical Center report).

Refusing medical care, agitated (Bates- Confidential Rocha 154)

19:45
Violent Restraint and/or Seclusion:
CONTINUED
Observed Behaviors:
Refusing care, irritable (Bates- Confidential Rocha 155)

20:00
Violent Restraint and/or Seclusion:
CONTINUED
Observed Behaviors:
Refusing Labs (Bates- Confidential Rocha 156)

20:30
Violent Restraint and/or Seclusion:
DISCONTINUED
Observed Behaviors:
Calm (Bates- Confidential Rocha 156)[14]

Mr. Rocha is not helpful in narrowing the time frame. In his deposition, Mr. Rocha stated that the handcuffs were not removed from his wrists until that time that the blood technician drew his blood. The blood draw was conducted at approximately 2033 hours (Bates- COA (Rocha)000078), which is one hour and 18 minutes after the time documented on the medical report indicating that Mr. Rocha was restrained in the 4-point Velcro restraints.

**Q** When were the handcuffs eventually either removed or loosened?
**A** When they came to take blood.
**Q** When who came to take blood?
**A** The nurse.
**Q** And who loosened the handcuffs at that point?
**A** The officer had to. The officer was still there.
**Q** And do you know where -- let's clarify. When you say "take blood," you're referring to them drawing blood?
**A** Blood test. Yeah (Mr. Rocha deposition, P. 131-132, lines 23-9).

These timeframes indicate that Mr. Rocha was potentially restrained in Officer Matis' handcuffs from 1620 to 1915, or a total of approximately 2 hours and 55 minutes. However, Officer Matis suggests the possibility that Officer Matis' metal handcuffs were removed from Mr.

---

[14] I see no evidence in the medical records which informs me as to who restrained Mr. Rocha in the 4-point Velcro restraints and when. It is unclear if the restraints were applied at 19:15, or if Mr. Rocha was already in the restraints prior to that time.

Rocha by MDF jail personnel shortly after arriving at the facility at 1727 hours (Depo, P. 9, lines 4-13). If that were the case, then Mr. Rocha would have been restrained in the handcuffs from 1620 until shortly after 1727, or approximately 1 hour and 7 minutes.

In either case, the evidence suggests that Mr. Rocha was continually under the observation of either police, jail, ambulance, or medical personnel. The evidence indicates that Mr. Rocha was agitated from the point of initial contact with Officer Matis (approximately 1610 hours), until approximately 2030 hours when he was deemed "calm" enough by medical personnel to remove the 4-point Velcro restraints at the hospital.

An objectively reasonable officer confronting the same situation and considering the totality of the circumstances faced by Officer Matis, and conforming to his training and experience, understands the threat posed by an intoxicated and agitated subject; and such officer recognizes that he or she must act with the safety of all personnel in mind including law enforcement, ambulance, and hospital personnel, while at the same time considering the health and welfare of the arrestee.

An objectively reasonable officer would defer to medical personnel responsible for patient treatment for guidance as to when an agitated subject could be safely transferred from handcuffs to a 4-point restraint within the hospital environment. Facts indicate that Mr. Rocha was documented as restrained in the Velcro 4-point restraints within approximately 18 minutes after arriving at the Emergency Department at the Contra Costa Regional Medical Center.

A third relevant issue is whether Officer Matis, Officer Kint, and Sergeant Koch conformed with accepted industry standards regarding the use of a total-appendage restraint system such as the WRAP. Officer Matis asserts that they applied the WRAP due to Mr. Rocha's behaviors involving kicking the car door while in the patrol vehicle. Such a use of the WRAP is consistent with Antioch policy 301.6 which explains:

> **301.6 APPLICATION OF LEG RESTRAINT DEVICES**
> Leg restraints, such as the WRAP, may be used to restrain the legs of a violent or potentially violent person when it is reasonable to do so during the course of detention, arrest or transportation. Only restraint devices approved by the Department shall be used
> In determining whether to use the leg restraint, officers should consider:
> (a) Whether the officer or others could be exposed to injury due to the assaultive or resistant behavior of a suspect.
> (b) Whether it is reasonably necessary to protect the suspect from his/her own actions (e.g., hitting his/her head against the interior of the patrol unit, running away from the arresting officer while handcuffed, kicking at objects or officers).
> (c) Whether it is reasonably necessary to avoid damage to property (e.g., kicking at windows of the patrol unit).

Antioch Police Department policy 301.6.1(a) informs officers:

If practicable, officers should notify a supervisor of the intent to apply the leg restraint

> device. In all cases, a supervisor shall be notified as soon as practicable after the application of the leg restraint device.

In this event, Sergeant Koch was on scene and took over direct supervision of the application of the WRAP restraint. At one point he can be heard stating, "As tight as you can get it. It's not going to hurt him." During his deposition he explained his remark (Koch deposition, P. 106, lines 14-21):

> **Q** So there is somebody who said something to the effect of, "Put it on tight, as tight as you can get it. It's not going to hurt him." Did you hear that?
> **A** Yes.
> **Q** Who is that?
> **A** That is myself.
> **Q** What were you referring to?
> **A** The leg buckles along the -- on the legs.

Law enforcement use of the WRAP device is supported in circumstances consistent with the instant case to mitigate potential detrimental effects associated with total appendage restraint procedures:

> When properly applied, The WRAP does not permit the restrained person to remain in a prone position, thus eliminating or minimizing positional asphyxia concerns. After proper application, the person's final restrained position may be upright and seated; lying on the side; standing; or supine.[15]

<u>Officer Training</u>

The California Commission on Peace Officer Standards and Training oversees the training and certification of peace officers. Training mandates for law enforcement officers include: Basic Academy Training, Field Training, Continuing Professional Training, and Perishable Skills Training.

A review of Antioch Police training records indicates that the department is in conformance with the required training mandates, specifically the POST Perishable Skills Arrest and Control requirements as documented in the "Hood memo" and detailed in Antioch Police Arrest and Control training outline (COA (Rocha) 000126-128).[16]

[15] Peters, John; Berman, A. David. The WRAP Restraint System: A Descriptive, Field-Setting Study. Institute for the Prevention of In-Custody Deaths, Inc. Kindle Edition, (location 261 of 1780).

[16] Antioch Police Department, Arrest and Control (Perishable Skills PSP), 5 Hour Presentation, POST Control Number 2690-29503.

Opinion Summary

Officer Matis, Officer Kint, and Sergeant Koch collectively acted during their investigation as would objectively reasonable peace officers following generally accepted law enforcement practices, procedures, and training, and facing the same or similar circumstances when they:

1. Performed an in-field show-up with witnesses to confirm the identify of a suspect hit and run and DUI subject.
2. Effected an arrest based upon probable cause under the totality of the circumstances.
3. Applied an enhanced restraint based upon the observed violent behavior presented by the subject.
4. Followed department policy regarding supervision of the use of the WRAP restraint.
5. Seat belted the subject into the secure compartment of a patrol vehicle.
6. Directed a measure of attention to the subject during transport to ensure his or health and safety.
7. Transported the subject to a secure jail facility.
8. Obtained medical evaluation from the jail nurse prior to booking.
9. Obtained medical examination and treatment as recommended or required by the jail nurse and doctor.
10. Obtained a blood sample from the arrestee, via a signed search warrant based upon probable cause and upon oath and affidavit.

## Conclusion

It is my conclusion that Officers Matis and Kint, and Sergeant Koch responded as would objectively reasonable peace officers following generally accepted law enforcement practices, procedures, and training, when they collectively responded, investigated, contacted, detained, arrested, and transported Mr. Rocha after he was involved in a DUI and Hit and Run accident and behaved in a violent and potentially destructive manner.

Steve Papenfuhs
December 12th, 2020

**ATTACHMENT "A"**

Federal Rules of Civil Procedure 26(a)(2)(B)

(B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

**ATTACHMENT "B"**
**Material Reviewed and Exhibits**

1. Cover letter from Kevin Allen dated November 9, 2020
2. Complaint (Complaint[64509])
3. Defendant's document production
   3.1. Police Report (COA - Rocha - 000001-000021 [Police Report])
   3.2. (COA - Rocha - 000022-000023 [Criminal Complaint])
   3.3. Audio Recordings
      3.3.1. COA - Rocha - 000024 [CONFIDENTIAL - Cameron Initial Contact]
      3.3.2. COA - Rocha - 000025 [CONFIDENTIAL - Cameron WRAP Contact]
      3.3.3. COA - Rocha - 000026 [CONFIDENTIAL - Shadi Contact]
   3.4. Photos
      3.4.1. COA - Rocha – 000027 (Photo) [Computer screen, Matis, 3/12/18]
      3.4.2. COA - Rocha – 000028 (Photo) [Rear view of Honda Element]
      3.4.3. COA - Rocha – 000029 (Photo) [Passenger side view of Honda Element]
      3.4.4. COA - Rocha – 000030 (Photo) [Front view of Honda Element]
      3.4.5. COA - Rocha – 000031 (Photo) [Driver side view of Honda Element]
      3.4.6. COA - Rocha – 000032 (Photo) [View of keys on covered vehicle]
      3.4.7. COA - Rocha – 000033 (Photo) [Close up of keys on covered vehicle]
      3.4.8. COA - Rocha – 000034 (Photo) [Interior view of Honda Element]
      3.4.9. COA - Rocha – 000035 (Photo) [Interior of Honda Element- tire]
      3.4.10. COA - Rocha – 000036 (Photo) [Front view of Rocha in WRAP]
      3.4.11. COA - Rocha – 000037 (Photo) [Front view of Rocha in WRAP]
      3.4.12. COA - Rocha – 000038 (Photo) [View of Rocha's handcuffed hands]
      3.4.13. COA - Rocha – 000039 (Photo) [View of left hand secured to gurney]
      3.4.14. COA - Rocha – 000040 (Photo) [View of right hand secured to gurney]
      3.4.15. COA - Rocha – 000041 (Photo) [Picture of Vans brand shoes]
      3.4.16. COA - Rocha – 000042 (Photo) [Side view of Vans brand shoes]
   3.5. COA - Rocha - 000043-000066 [Police report- 24 pages]
   3.6. COA - Rocha - 000067-000070 [Traffic Collision report- 4 pages]
   3.7. COA - Rocha - 000071-000075 [Event Report (CAD)- 5 pages]
   3.8. COA - Rocha - 000076-83 [Lab documents- 8 pages]
   3.9. COA - Rocha – 000084 [Copy of Citation]
   3.10. COA - Rocha - 000085-87 [DMV Form DS367- 3 pages]
   3.11. COA - Rocha - 000088-92 [Warrant, Affidavit, Return- 5 pages]

3.12. COA - Rocha - 000136-000158 [Koch Training Records- 23 pages]
3.13. COA - Rocha - 000159-000163 [Koch EDI- 5 pages]
3.14. COA - Rocha - 000164-000528 [Koch FTO Records- 365 pages]
3.15. COA - Rocha - 000648-000660 [Kint Training Records- 13 pages]
3.16. COA - Rocha - 000661-000664 [Kint EDI- 4 pages]
3.17. COA - Rocha - 000665-000883 [Kint FTO Records- 219 pages]
3.18. COA - Rocha - 000884-000934 [OIS IA Investigation- 51 pages]
3.19. COA (Rocha) 000093-95 [Policy 301- Handcuff/Restraints- 3 pages]
3.20. COA (Rocha) 000096-100 [Policy 702- Vehicle Use- 6 pages]
3.21. COA (Rocha) 000101-116 [WRAP Manual- 16 pages]
3.22. COA (Rocha) 000117-125 [Policy 414- Crisis Intervention- 9 pages]
3.23. COA (Rocha) 000126-128 [ACT PSP Outline- 3 pages]
3.24. COA (Rocha) 000129-135 [Policy 300- Use of Force- 7 pages]

4. Depositions
4.1. Cameron Rocha – Transcript [228 pages]
4.2. Sergeant Matthew Koch – Transcript [151 pages]
4.3. Officer Kristopher Kint – Transcript [133 pages]
4.4. Officer Zechariah Matis – Transcript [132 pages]
4.5. Shadi Rocha – Transcript [87 pages]

5. Rocha discovery responses
5.1. P's Resp to RPD, set 1
5.2. P's Resp to S. Roggs, set 1
5.3. P's Resp to S. Roggs, set 2 (Brooks)
5.4. P's Resp to S. Roggs, set 2 (Kint)
5.5. P's Resp to S. Roggs, set 2 (Koch)
5.6. P's Resp to S. Roggs, set 2 (Matis)

6. Rocha document production
6.1. ROCHA 794-795 (Antioch Urgent Care Billing Records) CONFIDENTIAL
6.2. ROCHA 796-829 (Pittsburg Health Center Current to 6-17-20) CONFIDENTIAL
6.3. ROCHA 830-903 (Pittsburg Behavioral Health Current to 7-27-20) CONFIDENTIAL
6.4. ROCHA 904-910 (EMG Report) CONFIDENTIAL
6.5. ROCHA000001-000019
6.6. ROCHA000020-000080 Case File
6.7. ROCHA000081
6.8. ROCHA000082
6.9. ROCHA000083
6.10. ROCHA000084-000110

6.11. ROCHA000111-114 (Antioch Urgent Care)
6.12. ROCHA000115-120 (BASS Medical Group)
6.13. ROCHA000121-281 (CC Regional Medical Center)
6.14. ROCHA000282-299 (James Edwards MD)
6.15. ROCHA000300-306 (Mauricio Kuri MD)
6.16. ROCHA000307-379 (Pittsburg Behavioral Health)
6.17. ROCHA000380-558 (Pittsburg Health)
6.18. ROCHA000559-712 (Sutter Delta)
6.19. ROCHA000713-726 (UCSF)
6.20. ROCHA000727-741 (BASS)
6.21. ROCHA000742-742 (CC Regional)
6.22. ROCHA000743-746 (CC Regional)
6.23. ROCHA000747-759 (Pittsburg Behavioral Health)
6.24. ROCHA000760-779 (Pittsburg Health)
6.25. ROCHA000780-789 (Sutter Delta Medical Center)
6.26. ROCHA000790-793 (UCSF)

7. Rule 26 disclosures
   7.1. First Suppl. Rule 26 disclosure (Defendants)
   7.2. First Suppl. Rule 26 disclosures (Pltf)
   7.3. Rule 26 Initial Disclosures (Pltf)
   7.4. Rule 26 Initial Disclosures (Defendants)
8. Safe Restraints website (www.saferestraints.com)
9. AELE Handcuff webinar

**Case Law Decisions:**

1. Graham v Connor, 490 U.S. 386 (1989)

**Literature Review:**

1. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series- Learning Domain 00: Becoming an Exemplary Peace Officer,* Version 1.1.
2. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 3: Policing in the Community,* Version 4.3.
3. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 15: Laws of Arrest,* Version 4.12.
4. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 16: Search and Seizure,* Version 4.8.
5. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 20: Use of Force,* Version 4.2.

6. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 23: Crimes in Progress,* Version 4.0.
7. California Commission on Peace Officer Standards and Training, *Basic Course Workbook Series – Learning Domain 33: Arrest and Control,* Version 4.1.
8. The WRAP Restraint System: A Descriptive, Field-Setting Study . Institute for the Prevention of In-Custody Deaths. Kindle Edition. 2013. Peters, John; Berman, A. David.
9. POST PSP- Hood memo

**List of Exhibits:**

Handcuffs

Handcuff key

Wrap Device

Video of suspect jumping out of moving patrol car:
https://www.youtube.com/watch?v=wG0zNMSP0QQ

# ATTACHMENT "C"

## Timeframes

| Time | Unit | Ofc. | Status | Dispatcher | Pos. | Supp. | Comment | Location |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| 16:01:36 | Receive Time | | | Scott | CAD5 | | | |
| 16:02:24 | Call Time | | | Scott | CAD5 | | | |
| | | | | | | | | |
| 16:03:27 | Y22 | Kint | Dispatched | Giovannucci | CAD3 | | | |
| 16:03:47 | | | | Scott | CAD5 | RP has pic | | |
| 16:03:49 | Y22 | Kint | Enroute | | | | | |
| 16:04:21 | | | | Scott | CAD5 | Son has pic | | |
| 16:04:28 | Y2 | Matis | Dispatched | Giovannucci | CAD3 | | | |
| 16:04:47 | Y22 | Kint | ECOMM | | | | Lic: 5EPR424 | |
| 16:04:52 | | | | Scott | CAD5 | S-Description | | |
| 16:05:20 | Y2 | Matis | Enroute | | | | | CL 414 W. 11th |
| 16:05:43 | Y2 | Matis | Enroute | Scott | CAD3 | | | CL 414 W. 11th |
| 16:06:23 | Y22 | Kint | ECOMM | | | | Nam: Rocha, K | |
| 16:10:06 | Y2 | Matis | Enroute | Giovannucci | CAD3 | | With Vehicle | CL 414 W. 11th |
| 16:10:13 | Y2 | Matis | On Scene | Giovannucci | CAD3 | | With Vehicle | CL 414 W. 11th |
| 16:10:36 | Y2 | Matis | On Scene | Giovannucci | CAD3 | | Out w/ 1 | CL 414 W. 11th |
| 16:10:54 | Y22 | Kint | On Scene | | | | | |
| 16:13:08 | Y2 | Matis | On Scene | | | | Needs cover unit | CL 414 W. 11th |
| 16:14:03 | Y5 | Gerber | Dispatched | Giovannucci | CAD3 | | | |
| 16:14:13 | Y5 | Gerber | Dispatched | Giovannucci | CAD3 | | | CL 414 W. 11th |
| 16:14:32 | Y5 | Gerber | Enroute | Giovannucci | CAD3 | | | CL 414 W. 11th |
| 16:14:56 | Y2 | Matis | ECOMM | Giovannucci | CAD3 | | Name check-Rocha | CL 414 W. 11th |
| 16:17:35 | Y5 | Gerber | ECOMM | | | | Nam: Johnson, Marlon | 414 W. 11th |
| 16:17:40 | Y5 | Gerber | ECOMM | | | | Name ID: 25104828 | 414 W. 11th |
| 16:20:21 | Y21 | Hynes | Dispatched | Giovannucci | CAD3 | | | |
| 16:20:21 | Y5 | Gerber | Clears event | | | | | |
| 16:20:24 | Y21 | Hynes | Enroute | | | | | |
| 16:24:28 | Y21 | Hynes | Enroute | Giovannucci | CAD3 | | | 414 W. 11th |
| 16:23:29 | Y21 | Hynes | On Scene | | | | | 414 W. 11th |
| 16:29:18 | Y2 | Matis | On Scene | Giovannucci | CAD3 | | | E St/W 11 |

| 16:29:22 | W7 | Koch | Dispatched | Giovannucci | CAD3 | | | |
|---|---|---|---|---|---|---|---|---|
| 16:29:28 | W7 | Koch | Dispatched | Giovannucci | CAD3 | | | E St/W 11 |
| 16:29:58 | Y21 | Hynes | On Scene | Giovannucci | CAD3 | | Putting subj in WRAP | E St/W 11 |
| 16:31:17 | W7 | Koch | Enroute | | | | | E St/W 11 |
| 16:33:46 | Y21 | Hynes | ECOMM | | | | Nam: Roc ha, C | E St/W 11 |
| 16:33:59 | Y21 | Hynes | ECOMM | | | | Nam: Rocha, C | E St/W 11 |
| 16:34:02 | Y21 | Hynes | ECOMM | | | | Name ID: 504720 | E St/W 11 |
| 16:34:42 | W7 | Koch | On Scene | | | | | E St/W 11 |
| 16:52:30 | W7 | Koch | Clears event | | | | | |
| 16:52:34 | Y21 | Hynes | Clears event | | | | | |
| 17:00:22 | Y2 | Matis | Enroute | Chavarria | CAD6 | | Bad tech/RAP | MDF w/ 1 |
| 17:02:06 | | | | Giovannucci | CAD2 | MDF notified of WRAP | | |
| 17:02:29 | | | | Chavarria | CAD6 | Blood tech req to MDF | | |
| 17:05:30 | Y22 | Kint | Clears event | | | | | |
| 17:27:55 | Y2 | Matis | On Scene | Chavarria | CAD6 | | | MDF |
| 18:03:00 | | | | | | Jail Nurse rejected Rocha | | Matis depo, P88/ lines 8-9 |
| 18:06:43 | | | | Chavarria | CAD6 | Req Amb Sally Port | | |
| 18:09:00 | | | | Chavarria | CAD6 | Blood tech adv to 22 | | |
| 18:30:42 | Y2 | Matis | On Scene | Meads | CAD4 | | BAD tech | Follow AMR to hospital |
| 18:31:53 | | | | Chavarria | CAD6 | Blood Tech update-hospital | | |
| 18:57:00 | | | 97 hospital | | | | | [Hospital form, Bates Rocha000022] |
| 19:15:00 | | | | | | In 4-point restraints | | CONFIDENTIAL ROCHA 154 |
| 20:00:00 | | | | | | Warrant signed | | |
| 20:01:17 | | | | Giovannucci | CAD2 | BAD tech ETA 25-30 | | |
| 20:30:00 | | | | | | 4-point restraints removed | | CONFIDENTIAL ROCHA 156 |
| 20:33:00 | | | | | | Blood draw | | DMV DS367 form |
| 20:48:49 | Y2 | Matis | Clears event | | | | | |

**ATTACHMENT "D"**
**Transcript**

**Audio: COA - Rocha - 000024 [CONFIDENTIAL - Cameron Initial Contact]**

**(2:15)**

Rocha: "This really sucks."
Matis: "What sucks?"
Rocha: "This."
Matis: "What? Having a cop behind you?"
Rocha: "Well, yeah. That too."
Matis: "Ok, what else sucks though?"
Rocha: "Well, I'm just trying to hang out with my wife and my new daughter."
Matis: "Ok, what just happened right now, Cameron? Before you answer I would just recommend that you be honest."
Rocha: "I'm trying to go around…I'm…dude, I'm…(sighs)… I don't know dude."
Matis: "Ok, I'm gonna ask you something, ok?"
Rocha: "Yeah."
Matis: "How much have you had to drink today, Cameron?"
Rocha: "Not that much, dude."
Matis: "If you were to guess."
Rocha: "I'm trying to… actually get my wife and my mom on the same page, that's my goal."
Matis: "How much have you had to drink?"
Rocha: "Not that much."
Matis: "If you were to guess."
Rocha: "Uh, probably I don't know… not that much… (unintelligible)
Matis: "That was my dispatch in my ear."
Rocha: "Ok."
Matis: "Cuz I'm investigating something right now."
Rocha: "I'm just staying that (unintelligible)
Matis: "Ok, so you had just… you said how much to drink?"
Rocha: "Not much."
Matis: "Not much, ok. What did you have to drink, Cameron?"
Rocha: "I'm just trying to get…."
(Baby heard in background)
Matis: "What did you drink, Cameron?"
Rocha: "Nothing."
Matis: "Nothing?"
Rocha: "Nothing. I'm honestly trying to get food for my daughter and my wife.
Matis: "Ok."
Rocha: "And that, actually, really getting frustrating."
Matis: "Ok."
Rocha: "Do you get it?"
Matis: "Are you diagnosed with anything?"

Rocha: “No, I’m not. Why is this a problem?”
Matis: “Cuz you were just involved in a collision, Cameron.”
Rocha: “A collision?”
Matis: “Yeah, with another vehicle.”
Rocha: “(unintelligible) a collision?”
Matis: “Yeah, that’s why I’m here.”
Rocha: “Can I see it?”
Matis: “Well, you drove away from it.”
Rocha: “I drove way fr…. Wow”
Matis: “Yeah, why don’t you do me a favor, turn around real quick, put your hands behind your back.”
Rocha: “Really?”
Matis: “Put your hands behind your back.”
Rocha: “Wow, yeah but you.”
Female: “What’s you doing there?” (Possible only, not clear)
Rocha: “I don’t know, Shadi.”

**ATTACHMENT "E"**

**Audio Transcript**
**COA - Rocha - 000026 [CONFIDENTIAL - Shadi Contact]**

Matis: "Ok, so Ms. Rocha. Is this your guys address right here?
Shadi: "Yes."
Matis: "414 W. 11th St.
Shadi: "My husband."
Matis: "Your husband? Cameron is your husband?"
Matis: "When did you last see Cameron?"
Shadi: "A couple of hours ago."
Matis: "Ok, where was he?"
Shadi: "He was here."
Matis: "Did he drive away in that car?"
Shadi: "Yes."
Matis: "Was he drinking alcohol inside of the house?"
Shadi: "No."
Matis: "Does he typically drink alcohol?"
Shadi: "No."
Matis: "Where did he say he was going?"
Shadi: "He was going to go get my tire fixed. My tire was blown out."
Matis: "Oh, for this other car over here?"
Shadi: "Yes, and, and he went to go get the tire fixed and get some food for us for lunch."
Matis: "That was a few hours ago?"
Shadi: "Yes, a couple of hours ago?"
Matis: "Does he have like, uh, problems with drinking, honestly?"
Shadi: "No, he doesn't have any problems with drinking.
Matis: "But he does drink though?"
Shadi: "No, he doesn't, he has some, we just had a baby and I… couple of years back I was.. kissed a guy and I told him the other day, and he's just really upset about it. He's sound like he was over it.. unclear."
Matis: "Has he been drinking recent that you've seen?"
Shadi: "No, he's not a drinker."
Matis: "But, he was upset cuz about a week ago you told him that you kissed a guy a while ago, is that what you're saying? Ok."
Shadi: "But he maybe just….What's going on is he gonna.."
Matis: "There was a car accident that I haven't seen yet. My partner's over there contacting the other parties that were apparently involved in the collision that got his license plate and as I drove over here I saw him driving into your, um, into your guys parking area right there, ok."
Rocha: Sounds like Rocha yelling in the background.
Tape ends.

**ATTACHMENT "F"**

**COA - Rocha - 000025 [CONFIDENTIAL - Cameron WRAP Contact] Transcript**

Unk: "Watch his cuffs, he's trying to pull out of them."
Matis: "Ok, Cameron. Stop trying to pull out of the cuffs."
Rocha: "I'm not trying to do….. (unclear).."
Matis: "Cameron, Cameron listen."
Rocha: "Dude, what the fuck are you doing?"
Matis: "Cameron, here's what I need you to do. Are you listening? Ok"
Rocha: "I'm trying."
Matis: "Ok, What I need you to do is.."
Rocha: "You're a dick."
Matis: "Ok, thank you for that, Cameron. I appreciate that. Look, stop trying to get out of the cuffs."
Rocha: "Shadi! Stop!"
Matis: "What I need you to do, Cameron, I need you to get out of the patrol vehicle so we can get you out of it. Ok? So, what can we do to help you to get out of the car?"
Rocha: "I don't want to deal with this.
Matis: "Cameron, what can I do to help you get out of the car? Cause I don't want you to hurt yourself."
Rocha: "Shadi. What the fuck?"
Matis: "All right. Come on, Cameron. Let's go, get up. Get out of the car."
Rocha: "My goal is… can I tell you what my goal is? Not this."
Matis: "Ok, I need you to get out of the car tho, Cameron."
Rocha: "Can, can.."
Matis: "Otherwise we're going to have to force you out of the car, and I don't want to have to do that."
Rocha: "Can you break her? Can you break that? Behind me. Can you break that?"
Matis: "Come on."
Rocha: "Not, not that hard."
Matis: "Stop trying to get out of the cuffs."
Unk: "Kick your feet out."
Rocha: "Break, just break."
Matis: "Get this foot out right here."
Rocha: "Dude, I'm trying to break these."
Matis: "Give me the other foot."
Rocha: "Oh my God. Break."
Matis: "Come on."
Rocha: "What's going on behind me?"
Matis: "Get out of the car."
Rocha: "I don't have anything…."
Matis: "Come on, there you go."

Unk: "There ya go."
Matis: "There ya go."
Rocha: "What's going behind me is breaking. I don't like that. I don't like that."
Matis: "Ok, let's get you over here."
Rocha: "That's not right. Wow dude, really?"
Unk: "Put your knees down right here."
Rocha: "Really?"
Matis: "Here, put your knees down. Put your knees down, Cameron."
Rocha: "Really!"
Matis: "Put your knees down. There you go. Good job."
Rocha: "Wow, what a dick."
Unk: "Let's just lower him down."
Rocha: "Good job, wow."
Rocha: Unclear
Unk: "Let's pull him back a little bit, Matis."
Matis: "Yep, I got it right here."
Rocha: "Wow."
Unk: "… straps.
Rocha: "Alright, dude. Let me go. Let me go."
Rocha: "You know that…. Wow."
Unk: Unclear
Sound of straps being pulled
Unk: Unclear
Unk: "….. put the back on him too?"
Unclear recording
Koch: "As tight as you can get it. It's not going to hurt him."
Rocha: "That's not right, dude. I'm so confused" (sounds like)
Rocha: "Leave me alone."
Matis: "Cameron, this is so that you don't hurt yourself, ok?"
Rocha: "Dude.."
Matis: "1-2-3."
Rocha: "Hey, get it? Please leave me alone"
Matis: "Put the feet in…"
Rocha: "Please, stop. Dude, I really don't want this. I really don't want to deal with this."
Unk: "All right."
Rocha: "I have a daughter. Wow." (Sounds like)

**ATTACHMENT "G"**
**Qualifications**

I retired from the San Jose, California Police Department with the rank of sergeant in January, 2010. Prior to that, I had been a full-time peace officer since 1981.

I was promoted to sergeant in 1994 and had been assigned to the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the Training Coordinator, the Bureau of Investigations as a supervisor in the Family Violence Unit and the Narcotics and Covert Investigations Unit, the Field Training Unit (FTO), and the Bureau of Administration Training Division. As a police sergeant, I supervised, investigated, and documented numerous criminal investigations, detentions, arrests, and force responses by officer, whether as a matter of routine or due to citizen complaints and/or inquiries.

Prior to 1994 I was a police officer and my assignments included patrol, Special Operations: Street Crimes, Mobile Emergency Response Unit and Equipment (MERGE), and Bureau of Investigations: Auto Theft, and Sexual Assaults Investigations- Child Exploitations.

While working as a supervisor in the Training Division (2005-2009), I supervised the in-service training team and the California Peace Officer Standards and Training (P.O.S.T.) Force-options Simulator (FOS) program, which was implemented in 1999 to the fulfill P.O.S.T. "perishable skills" requirements. In this program, my staff and I delivered training to the sworn members of the San Jose Police Department as well as other peace officer within Santa Clara County. Additionally, our facility was designated as a "Regional Skills Training Center" and we also provided the instructor training to other police agencies throughout the State of California.

The FOS program concentrates on teaching the state and constitutional laws regarding the use of force by peace officer, as well as decision making involved in employing various types of force, up to and including deadly force.

I developed the Defense and Arrest Tactics program that was adopted by and is currently in use at the San Jose Police Department's police academy and in-service training program; and at the South Bay Regional Public Safety Training Consortium's Police Academy at the Monterey Peninsula College in Monterey, California. I have also designed and delivered the 80-Hour Arrest and Control and Baton Instructor course as mandated by California P.O.S.T. and in such capacity have provided instructor certifications.

I served as the lead instructor and supervisor for the San Jose Police Department's Officer Safety and Survival, Firearms and Arrest and Control (perishable skills program), and Immediate Action and Rapid Deployment tactics programs. I have instructed and supervised staff for the in-service and Basic Academy TASER program. I have served as an instructor and scenario evaluator in Learning Domain 19- Vehicle Operations, Learning Domain 20- Use of Force, Learning Domain 21- Patrol Techniques, Learning Domain 22- Car Stops, Learning Domain 23- Crimes in Progress, Learning Domain 33- Arrest and Control and Baton, and Learning Domain 35- Firearms.

In my role as Training Unit supervisor and law enforcement instructor, I have had the opportunity to design, develop, deliver, supervise, and evaluate POST certified training courses; and in such roles have had contact with POST regional managers and POST executive staff. I have served on committees and contributed to the LD-33 Arrest and Control and Baton Learning Domain and the LD-19 Vehicle Operations Learning Domain. In addition, I contributed to the development of the San Jose Police Department's policies for Pursuits, Force Response Reporting, and Excited Delirium.

Since 1998 I have served as an adjunct instructor for the South Bay Regional Public Safety Training Consortium. In this capacity, I have trained officer in Santa Clara, Monterey, Santa Cruz, and San Mateo Counties in a variety of topics including: Force Options Simulator (perishable skills program), Search and Seizure, Use of Force Law, Vehicle Stops, Defense and Arrest Tactics, Baton, Emergency Vehicle Operations, Special Operations, Patrol Techniques, Crimes in Progress, Building Searches, and Active Shooter Response.

I have served as a consultant to local SWAT teams with regards to Rapid Deployment and Building Clearing tactics. I am a member of the International Association of Law Enforcement Firearms Instructors, the International Law Enforcement Educators and Trainers Association, the Illinois Tactical Officer Association, the California Association of Tactical Officer, the National Tactical Officer Association, and the Human Factors and Ergonomics Society.

During my law enforcement career, I have been trained in, have trained and supervised others in the use of, and have personally used various tactics, tools and techniques in order to control subjects in field situations. This has included uses of batons, chemical agents (both CS and OC sprays), the TASER, extended-range impact munitions, and various weaponless measures. I have also controlled or supervised the control of numerous violent subjects in the field and have used total-appendage restraint methods including the "hobble" and "The Wrap®."

I am a graduate of the Force Science Research Center's "*Force Analyst Certification*," and the California Training Institute's "*Human Factors: Threat and Error Management*," and "*Force Encounters Analysis: Understanding Human Performance During Critical Incidents*" courses. I have studied, been trained in, researched, and have delivered training to officers, the instructors of officers, and attorneys in physical skills learning theory, attention, perception and reaction times, decision making, memory, and physiological and psychological reactions that manifest during force encounters.

I have been certified as a defensive tactics instructor through the FBI, and have designed and delivered training, supervised, and certified other instructors in POST accredited Defense and Arrest Tactics and Baton training. I am extremely familiar with the methods of restraint, takedown, and defense currently taught and applied by U.S. law enforcement. I have been certified as a TASER instructor for both the M26 and X26 TASERS. I have also completed TASER International's Evidence Collection and Analysis Certification, and Taser Technician Certification Courses.

**ATTACHMENT "H"**

**STEVE PAPENFUHS**
**Four-Year Testimony History**

2020 Yolanda Banks-Reed vs. Bay Area Rapid Transit.
United States District Court- Northern District of CA. No. 4:18-cv-05755-YGR
(Defense) (Expert Report) (Trial)
Use of Deadly Force, Tactics
Dale Allen: Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2018 Ramon Cortesluna v. City of Union City.
United States District Court- Northern District of CA. No. 3:17-cv-05133-JSC.
(Defense) (Expert Report) (Deposition)
Tactics, De-Escalation, Less-Lethal Use of Force, Use of Restraints

2018 Tan Lam vs. City of Los Banos.
United States District Court- Eastern District of CA. No. 2:15-CV-00531-MCE-KJN
(Defense) (Expert Report) (Deposition) (Trial)
Use of Deadly Force, Tactics
Phillip Downs: Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2016 Estate of Charles Salinas vs. County of Fresno, et al.,
United States District Court- Eastern District of CA. No. 1:13-CV-00586-AWI-SAB
(Defense) (Expert Report) (Deposition) (Trial)
Use of Deadly Force, Tactics
Dale Allen: Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2015 Kong Meng Xiong v City of Merced, et al.
United States District Court- Eastern District of CA. No. 1:13-cv-00083-LJO-SKO
(Defense) (Expert Report) (Deposition) (Trial)
Use of Deadly Force, Tactics
Dale Allen: Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2015 Meeker v Life Care Centers of America, et al.
United States District Court- District of Colorado. No. 14-cv-02101-WYD-BNB
(Plaintiff) (Expert Report) (Deposition)
Law Enforcement Scenario Training Protocols and Practices
Christina Habas: Keating Wagner Polidori Free, P.C. 1290 Broadway, Suite 600, Denver, CO. 80203

**ATTACHMENT "I"**
**STEVE PAPENFUHS**
**10-Year Publication History**

- "3 Alternative Ways of Considering Tactical Thinking," article, PoliceOne.com. July 31, 2015. (Edited by PoliceOne editor Doug Wylie from original submission: "A Tactical Refresher")
- "Be Dangerous- Maintaining street smarts off duty," article, PoliceOne.com. January 3, 2014.
- "The OODA loop, reaction time, and decision making," article, PoliceOne.com. February 23 2012.
- "Addressing cops confusion over the public duty doctrine," article, PoliceOne.com. January 5, 2012.
- "Training recruits the tactical M&M's," article, PoliceOne.com. November 30, 2011.
- "Wired to kill: Are we innate murderers?" article, PoliceOne.com. October 26, 2011.
- "Teaching Recruits Real World Survival Skills," article, PoliceOne.com. September 28, 2011.
- "SWAT Tactics: Formations Don't Win Football Games or Fights," article, PoliceOne.com. August 2nd, 2011.
- "Tactical Cornering During Foot Pursuits," article, PoliceOne.com. June 16th, 2011.
- "Understanding the Dynamics of Stress, Memory, and Decision Making," article, PoliceOne.com. May 5th, 2011.
- "Ethical Dilemmas Cops Face Daily," article, PoliceOne.com. April 6th, 2011.
- "Using "MAPS" to Describe the Threat," article, PoliceOne.com. Feb. 24th, 2011.
- "Safety in Law Enforcement Training is an Attitude, Not an Action," article, PoliceOne.com. Feb. 3rd, 2011.
- "Defeating the 'Tactical Error Defense,'" article, PoliceOne.com. January 13th, 2011.
- "Policy, Procedure, and the Prosecutor," article, LawOfficer.com. January 7th, 2011.
- "Ask-Tell-Taser: A Review of a Recently Released Video," article, PoliceOne.com. November 18th, 2010.
- "Want to be a Leader? Do a gut-check first," article, PoliceOne.com. October 21, 2010.
- "Search First or Handcuff First? Neither!" article, PoliceOne.com. September 23rd, 2010.
- "Are You Training Your Recruits How to Think?" article, PoliceOne.com. August 19th, 2010.
- "Lessons Learned: Dissecting a Dangerously Close Call," PoliceOne.com. June 23rd, 2010.

**ATTACHMENT "J"**
**FEE SCHEDULE**
January, 2020

**RETAINER** – In advance to begin work on a case

- $1,500.00 (credited toward final invoice).

**DEPOSITION/TESTIFYING** (Four-hour minimum for court testimony)

- $300.00 per hour.

**READING, CONSULTATION, RESEARCH & REPORTS**

- $300.00 per hour.

**TRAVEL (Does not include travel expenses)**

- $150 per hour.

**WAITING TO TESTIFY**

- $300.00 per hour.

**FILING/BILLING/OFFICE SUPPLY FEE (One-time fee per case)**

- $150.00

**CASE-RELATED RESEARCH OR OTHER EXPENSES**

- **To be paid for/reimbursed by client (any amount over $100.00 requires prior authorization by client or representative). Receipts will be provided for any amount spent for case-related research.**

---

Mileage will be charged at the current IRS rate.
After 45 days a 10 percent late fee will be charged.
Expenses will be billed as incurred.
Invoices may be issued every 30 days when the case is active.
The hiring firm/organization is responsible for ensuring that all fees are paid in full and in a timely manner.

**Payment to be made within 45 days of receipt of invoice to:** **Steve Papenfuhs**
**EIN: 45-3791587**

_______________________________

# 4. John Panagotacos, M.D.

***John J. Panagotacos, M.D.***
***General Neurology and Stroke Specialist***

November 5, 2020

Kevin P. Allen, Esq.
Allen, Glaessner, Hazelwood and Werth, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

**NEUROLOGICAL INDEPENDENT MEDICAL EXAMINATION**

**CASE NAME:** Cameron Rocha vs. City of Antioch et. al.
**CLAIM NUMBER:** 01128-51274
**CLAIMANT:** Cameron Rocha
**DOB:** 02/02/1978
**DOI:** 03/12/2018

Dear Mr. Allen,

I had the pleasure performing a neurological independent medical examination of Mr. Cameron Rocha and a review of records in the case of Cameron Rocha vs. City of Antioch et. al. The examination was performed through telemedicine via Zoom. I was connected by Zoom as well as the claimant, Mr. Cameron Rocha and separately connected via Zoom was the claimant's attorney Mr. Chan Kim. The examination commenced at 10:02 a.m. and concluded at 10:52 a.m. on 10/21/2020. There were no notable audio or visual technical difficulties.

**HISTORY OF INCIDENT:**
Mr. Rocha was 40-years-old when he was arrested for driving under the influence and a potential hit and run violation. He was arrested in front of his house, placed in handcuffs and placed in a police squad car. Mr. Rocha was noted to be extremely agitated and violent and was noted to be thrashing and kicking the police car. Given the violent movements, he was further restrained with a WRAP device.

The claimant reports that he was in handcuffs for approximately 4-5 hours. He states that this was quite painful and he initially had swelling felt through his hands. He felt like they were going to explode. He also states that he had redness in his hands for a few weeks that eventually resolved.

He continues to have intermittent significant sensory symptoms including intense burning in the 3rd, 4th, and 5th digits of his hands, left greater than right. He also experiences an intense itching in the middle of his palm that does not seem to go away. He also reports cramps in the hands and sudden loss of strength in the hands where he will be holding an item and then suddenly drop it due to an immediate loss of strength. He also has had curling of the 4th and 5th digits of his hands bilaterally that was not present prior to the 03/12/2018 incident.

After the incident, the claimant had multiple visits with family practice physician Dr. James Edwards. At a visit on 03/15/2018 Mr. Rocha complained of numbness on the dorsum of the hands as well as severe tingling on the palms and up the dorsum of his forearms to the elbows. On examination he was noted to have severe abrasions on both wrists, moderate to severe swelling of both hands. His grip strength was 2/5 bilaterally with flexion and extension at the elbow 5/5 bilaterally. Wrist flexion was 2/5 bilaterally and wrist extension was 4+/5 bilaterally. In subsequent visits he was noted to show improvement of both the skin lesions as well as improved strength but still with deficits. Mr. Rocha was referred for an electromyography/nerve conduction study (EMG/NCS).

On 05/04/2018, an EMG/NCS was performed by Dr. Leslie Gillum of the Neurology Medical Group of Diablo Valley. This study demonstrated moderate to severe sensory motor demyelinating and axonal neuropathy in the bilateral median nerves, localizing across the wrist. There was severe sensory motor axonal neuropathy in the left ulnar nerve. Moderate to severe sensory motor axonal neuropathy was seen in the right ulnar nerve distal to the nerve branch supplying the flexor carpi ulnaris muscle. There was severe sensory axonal neuropathy seen in the bilateral radial nerves. Suprasegmental weakness was seen in the left extensor digitorum communis muscle. This finding can be seen in a setting of upper motor neuron weakness, pain, and limited effort. No evidence of left C5-C6 motor radiculopathy or myopathy. In the report, Dr. Gillum noted that she was referring the patient to the UCSF nerve injury clinic for further evaluation.

On 06/12/2018 a neurological consultation was performed by Dr. Brian Warmus and Dr. John Engstrom at UCSF. Also, on that date, an EMG/NCS was performed at UCSF.  The EMG showed improvement in the bilateral median and ulnar neuropathies but persistent severe superficial radial sensory neuropathy. The focal slowing of conduction and the ulnar nerves at the elbows and median nerves at the wrists suggested possible carpal tunnel syndrome and mild ulnar neuropathies that might have been present prior to the 03/12/2018 incident. MR neurography was ordered, however the claimant did not get this study done as he reported that he no longer had health insurance. It was recommended that he begin physical therapy for his hands with a referral from his primary care provider.

On 12/12/2018 he saw neurologist Dr. Rauf Shaista who planned to performed the ordered EMG/NCS, however only an NCS was completed because the claimant declined EMG. This was performed at Pittsburgh Health Center and this study was noted to be abnormal. Evidence of multiple neuropathies including bilateral superficial sensory radial nerve at the wrist, bilateral median sensory and motor neuropathy. He appeared to be primarily demyelinating at the wrist. Likely entrapment and carpal tunnel. Also has a right ulnar nerve entrapment across the elbow and sensory ulnar neuropathy on the left side. Compared to the previous study at UCSF, there was some improvement. Radial sensory nerve responses were present but reduced compared to previously being absent. CMAP

amplitudes are now normal in bilateral median and ulnar motor nerves. Slowing across the left ulnar motor nerve has improved. There is more severe entrapment of the right ulnar nerve across the elbow as it is now a conduction block.

On 05/05/2019 he presented to Sutter Delta Medical Center in Antioch complaining of left hand pain. He stated that 5 days prior, he had a fall from a unicycle and struck his hand. He was found to have a fracture of the distal 5th metacarpal, a boxer's fracture.

He was examined by a plastic surgeon Dr. Kuri Mauricio on 10/29/2019 at the Pittsburgh Health Center for the fracture of the 4th metacarpal bone of his left hand. He was noted to have full range of motion of the fingers, 3/5 strength for adduction and abduction and 5/5 for grip strength. He was felt to be doing better since his previous visit with improved dexterity and resolved claw hand.

He returned to see a neurologist Dr. Rauf Shaista on 01/15/2020. EMG was completed. The repeat nerve conduction study showed persistence of damage to the sensory nerves affecting bilateral median, ulnar, and radial nerves. There was possible overlapping carpal tunnel syndrome on the right affecting only sensory fibers. Entrapment of the ulnar nerve previously noted had improved.

He saw plastic surgeon Dr. Kuri Mauricio for follow-up on 02/18/2020. He was noted to be doing better since his previous visit. He had improved dexterity and resolving claw hand. The plastic surgeon noted the paradoxical presentation of his symptoms including semi-claw hand but no evidence of visible intrinsic muscle atrophy of the first dorsal interosseous muscle or motor amplitude denervation on the nerve conduction study.

On 04/07/2020 he again saw Dr. Kuri Mauricio who noted no intrinsic muscle atrophy of the first dorsal interosseous muscle. His assessment was that the claimant was doing better since his previous visit with improved dexterity and claw hand. They discussed releases of carpal tunnel syndrome/Guyon's canal and cubital tunnel syndrome if he did not continue to improve. The plan was for a repeat EMG with needle EMG.

Multiple psychiatry visit notes were reviewed. These included multiple progress notes from 2019 and 2020 written by psychiatrist Dr. Jonathan Terry. The primary diagnosis which appears on the notes is major depressive disorder, recurrent episode, severe.

In a primary care progress note from 06/10/2020, Dr. Nathan Brooks wrote that overall Mr. Rocha felt his mental health was stable, that he was feeling some low-level anxiety and depression but nothing too severe.

The claimant had a repeat EMG completed by neurologist Dr. Rauf Shaista on 06/17/2020. This study showed persistence of damage primarily affecting the sensory nerves of the bilateral median, ulnar, and radial nerves. There was mild bilateral carpal tunnel syndrome on the left affecting only the sensory fibers.

Additional records reviewed include records from Sutter Delta Health Medical Center in Antioch from 2016 and 2017. These records pertained to emergency department visits for severe alcohol intoxication determined to be due to alcohol abuse.

**PAST MEDICAL HISTORY:** (according to records)
Bilateral radial, medial, ulnar neuropathy.
Cubital tunnel syndrome, bilateral upper extremities.
Major depressive disorder with psychotic features.
Gastroesophageal reflux disease.
4th metacarpal fracture, left hand – May 2019.
Hypertension.
Insomnia.
ADHD.
Tourette's syndrome – swallowing, blinking.

**MEDICATIONS:** (currently, according to claimant)
Duloxetine 60 mg daily.
Pantoprazole 40 mg b.i.d.
Quetiapine 50 mg q.p.m.

**PAST MEDICATIONS**: (no longer taking)
Neurontin 600 mg t.i.d.
Lyrica 150 mg b.i.d.
Sonata 10 mg q.h.s.p.r.n. insomnia.
Nortriptypine 10 mg nightly for insomnia.
Buspirone 5 mg t.i.d.
Sucralfate 1 g 4 times daily.
Mirtazapine 15 mg nightly.
Zolpidem 5 mg nightly.
Prazosin 1 mg nightly.
Hydrocodone-acetaminophen 5-325 mg q.6 hours p.r.n. pain.
Celecoxib 200 mg daily.
Amlodipine 5 mg daily.
Trazodone 50 mg 1-2 tablets nightly.

**ALLERGIES:**
Meperidine – rash.
Nortriptyline – intolerance.

**SOCIAL HISTORY:**
History of alcohol abuse. Has history of DUI. Smokes marijuana and history of cigar smoking. Most recent job was prior to the incident and he was a meat manager at Whole Foods. He worked there for a couple of years and prior to that he worked as a meat cutter or butcher for 21 years. He is currently not working and states that he is disabled.

**PHYSICAL EXAMINATION:**
**General:** Overweight male, sitting. Appears comfortable.

**NEUROLOGIC EXAMINATION:**
**Mental Status:** Alert, pleasant, does not appear anxious or depressed. Normal language.

**Cranial Nerves:** EOMI, no ptosis, reports normal sensation in the face bilaterally, symmetric smile, no dysarthria, no facial or vocal tics. Tongue is midline bilaterally, shoulder shrug equal.

**Motor:** No obvious atrophy of the hands. There was flexion in the 4th and 5th digits of the hands bilaterally that did not change when distracted. No involuntary movements of the hands. When asked to make fist they appeared to be slightly weak bilaterally. Normal flexion and extension at the elbow as well. Has good supination and pronation of the wrist.

**Sensory:** Sensory testing in the right hand: 5th digit: dysesthesias. 4th digit: dysesthesias. 3rd digit: paresthesias. Ulnar aspect of 2nd digit and entire 1st digit: numbness.

Sensory testing in the left hand: 5th digit: dysesthesias. 4th digit: dysesthesias. 3rd digit: dysesthesias. 2nd digit: dysesthesias. 1st digit: numbness.

Numbness bilaterally on the dorsum of the hands near the 1st and 2nd digits.

**Coordination:** Normal finger nose finger bilaterally. Impaired rapid alternating movements of the 4th and 5th digits of the hands bilaterally.

**Station and Gait:** Normal station, appear to demonstrate good balance.

**RECORDS REVIEWED:**
Deposition of Cameron Rocha - 09/30/2020
Contra Costa Medical Center
James Edwards, M.D.
Neurology Medical Group of Diablo Valley
Sutter Delta Medical Center
UCSF Medical Center
Pittsburgh Behavioral Health
Pittsburgh Health Center

**DIAGNOSTIC IMPRESSION:**
1. Neuropathy involving superficial branch of the radial nerve bilaterally.
2. Ulnar claw hand bilaterally.
3. Carpal tunnel syndrome.
4. Cubital tunnel syndrome.
5. Major depression disorder with psychotic features.
6. History of alcohol abuse.

**SUMMARY AND CONCLUSIONS:**
From the physical examination and review of the records in this case, it does appear as though Mr. Rocha experienced a minimal degree of nerve injury as a result of handcuffs being placed on him on 03/12/2018. This nerve injury due to the handcuffs is limited to the superficial branch of the radial nerve bilaterally and was likely self-inflicted. There was no record of the handcuffs being placed on extremely tightly or adjusted by the officers.

The other abnormalities noted on his EMG/NCS testing, including median and ulnar neuropathies, were pre-existing and consistent with repetitive use injuries from his

occupation as a butcher for several years prior to the incident on 03/12/2018. Specifically, he had pre-existing carpal tunnel syndrome as well as ulnar nerve entrapment at the elbow. These conditions would predispose him to median and ulnar neuropathies which can result in tingling, pain, weakness of the hands. Additionally, long-standing pre-existing ulnar neuropathy would predispose him to develop the flexed position of his 4th and 5th digits called ulnar claw hand, which was seen on his examination.

In summary, Mr. Rocha sustained an injury to the superficial branch of the radial nerve bilaterally due to handcuffs compressing of the nerve at the wrist. This appears to have been self-inflicted due to claimant's well-documented violent movements while intoxicated. At most, injury to the superficial branch of the radial nerve would cause sensory changes including numbness and discomfort on the back of his hands mostly involving the regions near his thumb and index finger bilaterally. The claimant's improvement of symptoms has been documented subjectively and with objective improvement through repeated EMG/NCS studies.

The other nerve abnormalities and resulting symptoms are not related to the placement of handcuffs and instead were due to repetitive use injuries from his occupation as a butcher with the added insult of alcohol abuse contributing to pre-existing impaired nerve function.

Thank you for allowing me to participate in the evaluation of this claimant and please contact me if I may be of further assistance.

John J. Panagotacos M.D.
Board-certified Neurologist

***John J. Panagotacos, M.D.***
***General Neurology and Stroke Specialist***

December 11, 2020

Kevin P. Allen, Esq.
Allen, Glaessner, Hazelwood and Werth, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

**NEUROLOGICAL INDEPENDENT MEDICAL EXAMINATION - ADDENDUM**

| | |
|---|---|
| **CASE NAME:** | Cameron Rocha vs. City of Antioch et. al. |
| **CLAIMANT NUMBER:** | 01128-51274 |
| **CLAIMANT:** | Cameron Rocha |
| **DOB:** | 02/02/1978 |
| **DOI:** | 03/12/2018 |

This is an addendum to my Neurological Independent Medical Examination report for Cameron Rocha from November 5, 2020. In that report I gave my neurological assessment of Mr. Rocha and explained the likely causes of his neurologic conditions.

Given Mr. Rocha's neurologic impairments, he will likely remain partially disabled. I expect him to have long-term disability for the use of both hands. This will result in him having at least moderate difficulty performing fine motor tasks with his hands.

With regard to future ability to work, Mr. Rocha is now certainly able to work in any position that does not require frequent use of hands. In instances where he would need to use his hands, adaptive devices can be used to accommodate him. Therefore, he has the ability to be employed in a wide variety of occupations.

It is not advised for him to return to work as a butcher as this occupation was the primary insult to his nervous system causing repetitive-use injuries to the hands.

Once again, thank you for allowing me to participate in the evaluation of this claimant and please contact me if I may be of further assistance.

John J. Panagotacos, M.D.
Board certified Neurologist

***87 Scripps Drive, Suite 114***
***Sacramento, CA 95825***
***916-273-7449***

# CURRICULUM VITAE

## John J. Panagotacos, M.D.

**Licensure/ Certification**

**Neurology** – Board Certified, American Board of Psychiatry & Neurology, June 2008

**Vascular (Stroke) Neurology** - Board Certified, American Board of Psychiatry & Neurology, April 2009

**Licensed physician** – State of California

**Professional Memberships**

**American Academy of Neurology**, Member since 2004

**American Stroke Association**, Member since 2008

**Education**

**UCLA David Geffen School of Medicine, Los Angeles, California, 2007- 2008**
Clinical Fellow, Comprehensive Stroke and Vascular Neurology

**UCLA David Geffen School of Medicine, Los Angeles, California, 2004- 2007**
Resident, Department of Neurology

**Saint Mary's Medical Center, San Francisco, California, 2003-2004**
Intern, Department of Medicine

**New York Medical College, Valhalla, New York, 1999-2003**
Doctor of Medicine, May 2003

**Georgetown University, Washington, DC, 1998-1999**
Masters of Science, Physiology, July 1999

**University of California, Berkeley, California, 1992-1996**
Bachelor of Arts, December 1996
Major: Molecular & Cell Biology – Neurobiology

**Experience**

**Marin General Hospital, Greenbrae, CA, 2008-Present**
Chief of Neurology, November 2017-Present
Medical Director of the Spine & Brain Institute, June 2011-November 2015
Medical Director of the Stroke Program, June 2011-November 2015

Staff Neurologist, November 2008-Present

**Neurology Medical Practice, Greenbrae, California, 2008-Present**
Sole proprietor of medical practice in Neurology
• Large private practice for general and stroke neurology
• Staff Privileges at Marin General Hospital, Greenbrae, CA

**San Quentin Correctional Facility, California, September 2010-Present**
Staff Neurologist
• On-site neurology clinic for inmates
• Phone consultation as needed for other staff physicians.

**California Department of Corrections – Telehealth Program, 2014-Present**
Staff Neurologist
• Active telehealth/teleneurology clinic for inmates throughout California

**National Institutes of Health, Bethesda, Maryland, 1998-1999**
Research Assistant in the Cognitive Neuroscience Section of the Medical Neurology Branch of the National Institute of Neurological Disorders and Stroke (NINDS)
• Examined representational knowledge associated with the prefrontal cortex
• Administered neurocognitive assessments to neurologically impaired patients and normal controls

**Presentations** *Recognition, Prevention, and Treatment of Stroke*, Community Stroke Lecture at Marin General Hospital, May 2013 and May 2014.

*How Community Pharmacists Can Promote Improved Stroke Prevention and Outcomes*, Lecture for community pharmacists at Marin General Hospital, January 2013.

*Acute Management and Stroke Prevention*, Department of Medicine Lecture, Olive View Medical Center, October 2007.

*Alexia without agraphia – a case presentation*. Poster presentation at the UCLA School of Medicine, May 2007.

Liebeskind DS, Kim LI, **Panagotacos JJ**, Sayre JW, Starkman S, Saver JL.  Acute Ischemic Stroke Trials in the STAIR Era: 2000-2005.  Oral presentation at the 2007 International Stroke Conference.  San Francisco, CA.

*Friedreich's Ataxia*, UCLA Medical Center, Los Angeles, California. March 2006

Liebeskind DS, Kim LI, **Panagotacos JJ**, Kim D, Starkman S, Saver JL.  Hemodynamic and Physiologic Variables in Acute Stroke Trials Over 50 Years.  Poster presentation at the 2006 International Stroke Conference.  Kissimmee, FL.

*Case Presentation of Nutritional Polyneuropathy*, Olive View Medical Center, Sylmar, California, August 2005

*Tuberous Sclerosis*, Olive Medical Center, Sylmar, California, May 2005

*Case Presentation of Glomus Jugulare*, Olive View Medical Center, Sylmar, California, April 2005

*Posterior Reversible Encephalopathy Syndrome*, Sepulveda VA Medical Center, North Hills, CA, December 2004

*The Olfactory System: A Review*, West LA VA Hospital, Los Angeles, California, October 2004

**Research**    Co-Investigator, ALIAS, Albumin In Acute Stroke Trial. National Institute of Health (NIH)/National Institute of Neurological Disorders and Stroke (NINDS), 2007.

Co-Investigator, IMS III, Interventional Management of Stroke. NIH/ NINDS, 2007.

Co-Investigator, MR RESCUE, MR And Recanalization of Stroke Clots Using Embolectomy.  NIH/ NINDS, 2007.

Co-Investigator, SWISS, Siblings With Ischemic Stroke Study. NIH/ NINDS, 2007.

Co-Investigator, ABC's of Stroke, Acute Biomarker and Clinical Study of Stroke. NIH/ NINDS, 2007.

Co-Investigator, PRoFESS,  Prevention Regimen For Effectively Avoiding Second Strokes. Boehringer Ingelheim Pharmaceuticals, Inc., 2007.

Co-Investigator, RESPECT, Randomized Evaluation Of Recurrent Stroke Comparing PFO Closure To Established Current Standard Of Care Treatment. AGA Medical Corp., 2007.

Co-Investigator, Carneros, Catheter-directed Alfimeprase for Restoration of Neurologic Function and Rapid Opening of Arteries in Stroke. Nuvelo, 2007.

Co-Investigator, AVAIL Trial, Adherence Evaluation After Ischemic Stroke Longitudinal Registry. Bristol-Myers Squibb/Sanofi, 2007.

Co-Investigator, SENTIS, Safety and Efficacy of NeuroFlo Technology in
Ischemic Stroke. CoAxia, Inc., 2007.

Co-Investigator, Flo-24, Safety and efficacy of NeuroFlo in 8-24 hour stroke
patients. CoAxia, Inc., 2007.

Co-Investigator, ILLUMINATE, Investigation of Lipid Level Management to
Understanding its Impact in Atherosclerotic Events.  Iris Cantor-UCLA Women's
Health Center, 2007.

Co-Investigator,VASTT, The V10153 Acute Stroke Thrombolysis Trial. Vernalis,
2007.

Co-Investiagtor, NEST-2, NeuroThera Effectiveness and Safety Trial.
PhotoThera, Inc., 2007.

Co-Investigator, A randomized, double-blind, placebo-controlled study of
Viprinex (Ancrod Injection) in subjects beginning treatment within 6 hours of
the onset of acute, ischemic stroke. Neurobiological Technologies, 2007.

**Awards**   American Neurological Association Travel Fellowship Research Award, 2008
AAN Medical Student Prize for Excellence in Neurology, 2003
Dr. Anthony P. Bagatelos Medical Scholarship 2002
Dr. Anthony P. Bagatelos Medical Scholarship 2001

# John J. Panagotacos, M.D.
## Schedule of Fees

| | | | | |
|---|---|---|---|---|
| **Independent Medical Exam** | | | | |
| Examination | $ | 950 | per hour | ( $ 1,200 minimum charge - first hour) |
| Review of Records | $ | 950 | per hour | |
| Preparation of Report | $ | 950 | per hour | ( $ 1,200 minimum charge - first hour) |
| **Record Review Service** | | | | |
| Review of Records | $ | 950 | per hour | |
| Preparation of Report | $ | 950 | per hour | ( $ 1,200 minimum charge - first hour) |
| **Testimony** | | | | |
| Deposition | $ | 1,000 | per hour | |
| Video Depo. | $ | 1,500 | per hour | |
| Arbitration/Trial - Half Day | $ | 7,000 | ** | |
| Arbitration/Trial - Full Day | $ | 12,000 | | |
| Preparation | $ | 950 | per hour | |
| **Consultation** | $ | 950 | per hour | |
| **Rush Fees** | | | | |
| 0 to 5 days | $ | 750 | | (from later of exam date or receipt of records) |
| 6 to 20 days | $ | 500 | | (from later of exam date or receipt of records) |
| **Late Cancellation Fees** | | | | |
| Independent Medical Exam | $ | 950 | | (Less than 5 business days) |
| Deposition | $ | 1,000 | | (Less than 5 business days) |
| Arbitration/Trial - Half Day | $ | 4,000 | *** | (Less than 5 business days) |
| Arbitration/Trial - Full Day | $ | 7,000 | | (Less than 5 business days) |
| **Travel Fees** | $ | 500 | per hour | (plus out-of-pocket) |

** A full day trial is charged when testimony time, plus travel, would necessitate reserving an entire day away from clinical practice.

*** A full day cancel is charged when anticipated testimony time, plus travel, would necessitate reserving an entire day away from clinical practice.

# 5. Vina Spiehler, Ph.D.

*Vina Spiehler, Ph.D., F-ABFT*
*Spiehler & Associates*
*422 Tustin, Newport Beach, CA 92663*
*tel. (949)642-0574*
*spiehleraa@aol.com*

November 20, 2020

Kevin Allen
Allen Glassener Hazelwood Werth
180 Montgomery St. Suite 1200
San Francisco, CA 94104

**RE: Rocha vs. City of Antioch, et al.**
**Case No. 3:19-CV-07312-MMC,**
**United States District Court, Northern District of California,**
**Oakland Division**

Dear Mr. Allen,

**Summary: In my opinion at the time of the traffic collision and subsequent encounter with police officers on March 12, 2018, Mr. Rocha was suffering a psychotic episode caused by ingestion of high concentrations of cannabis. Mr. Rocha also had a high blood alcohol concentration which resulted in his loss of memory of the events but which did not counter the psychotic effects of the cannabis.**

Qualifications

I am a forensic pharmacologist who is board certified in Forensic Toxicology by the American Board of Forensic Toxicology (ABFT) administered by the American Academy of Forensic Sciences. I received my Ph.D. in pharmacology and toxicology from the medical school at the University of California, Irvine in 1978 and my board certification from the American Board of Forensic Toxicology in 1984 while working for the Orange County Sheriff-Coroner. I am currently a Fellow of the ABFT. I qualified for and received a Forensic Alcohol Analyst and a Forensic Alcohol Supervisor licenses from the State of California Department of Health while working for the Orange County Sheriff-Coroner Crime Laboratory. I have testified numerous times in Superior and Federal Court. I have been called as a witness by both the prosecution and defense. A copy of my complete curriculum vitae and a list of recent cases in which I have testified are attached.

Documents Reviewed

I have reviewed the deposition transcript of C Rocha (228 pages), the deposition transcript of S Rocha (87 pages), the deposition transcript of Officer Z Matis (132 pages), deposition transcript of Officer K Kint (133 pages), the deposition transcript of Officer M Koch (151 pages), medical records of C Rocha from Contra Costa Medical Center (175 pages), UCSF (17 pages), Pittsburgh Health Center (34 pages), Pittsburgh Medical Center Adult Mental Health (74 pages), Sutter

Health Center (184 pages), Edwards MD (8 pages) ; traffic collision report 18002492 (26 pages), a Report of Laboratory Examination from Contra Costa Office of the Sheriff, Forensic Services Division including results, chain of custody and warrant (16 pages). I listened to three audio files (COA (Rocha) 000024/81 (2.15 min), 000025/82 (3.57 min.), 000026/83 (2.19 min) and reviewed 45 photographs.

Findings

Blood drawn from Cameron Rocha by Joseph Young, phlebotomist, under search warrant P17307 at 2030 hours on March 12, 2018 was tested by Forensic Services Division of the Contra Costa County Office of the Sheriff and found to contain 0.23 g% w/v ethanol, 10.5 ng/ml THC, 5.69 ng/ml OH-THC and 123 ng/ml 11-carboxy-THC. The blood was tested for other volatiles, and for methamphetamine, amphetamine, MDMA, MDA, cocaine and cocaine metabolite, opiates (codeine, morphine), and benzodiazepines and no additional drugs were found.

Mr. Rocha has a history of drinking alcohol to high levels and passing out. He was treated for alcohol intoxication and altered state of consciousness at Sutter Health on 8 December 2016. His plasma alcohol concentrations were 466 mg/dL at 1810 hours and 387 mg/dL ethanol at 2036 hours which is equivalent to blood alcohol concentrations of 0.39 g% and 0.32 g% BAC. This is a burnoff rate for Mr. Rocha of 0.0286 g%/hour. His toxicology urine screen was positive for cannabinoids. On January 12, 2017 he was again seen at Sutter Health with a 356 mg/dL plasma blood alcohol concentration (approx. 0.30 g% BAC), and positive urine cannabinoids toxicology test.

On March 12, 2018 at about1630 hours, Mr. Rocha shouldered and kicked the windows and interior of the Antioch Police Department's SUV causing bruising to his body and rocking of the vehicle which was noted by Mrs. Roche, Officer Matis and Sgt. Koch. Mr. Rocha was observed "wringing his wrists" in an apparent attempt to escape his handcuffs to the extent of abrading the skin and causing bleeding.

Mrs. Shadi Rocha said that she thought that Mr. Rocha is bipolar but did not have symptoms of Tourette 's syndrome. Mr. Rocha has been diagnosed with severe recurrent major depressive disorder with no psychotic features Severe 296.33 (F33.2).

Marijuana Pharmacology

Delta-9-tetrahydrocannabinol (**THC**) is the major active ingredient of marijuana (cannabis sativa.) Delta-9-THC peaks during smoking of marijuana, then disappears rapidly from the blood. THC blood concentrations fall to less than 5 ng/mL in three to four hours after smoking a joint and are no longer detectable within 12 hours (1., 2.) The major active metabolite of THC is 11-hydroxy-delta-9-THC (**OH-THC**). This metabolite appears rapidly after smoking of marijuana and reaches a peak concentration in blood in less than an hour. It is no longer detectable in blood within 8 hours. Because it may be equally effective in the driving impairment of cannabis users, OH-THC is commonly tested and frequently summed together with the THC level in forming opinions on the impairment of the intoxicated driver.

The major inactive metabolite of THC is 11-carboxy-delta-9-THC **(THC-COOH.)** 11-Carboxy-delta-9-THC has a long half-life in the body and can be detected in blood up to 24 to 38 hours after use of marijuana and in urine for up to a week after a single use.

THC impairs cognitive and performance tasks including memory, reaction time, learning, perception, motor coordination and attention, and can cause hallucinations, temporal distortion, panic reactions and paranoia (ref. 1., 2.) Marijuana intoxication lasts from four to eight hours after use. Six States have a *per se* driving limit. The *per se* limit is 2 ng/ml THC in blood in Nevada and Ohio. (Ref. ghsa.org) and 5 ng/ml in blood in Colorado, Washington, Illinois and Montana. The International Committee on Alcohol Drugs and Traffic Safety (ICADTS) recommends a *per se* limit for driving of 5.0 ng/ml THC in blood.

Mr. Rocha's blood concentrations of **10.5 ng/mL THC** and **5.69 ng/ml OH-THC** are twice the recommended driving *per se* limits and are consistent with use of potent marijuana shortly before the incident. The ratio of **THCA/THC**, (124 ng/mL/10.5 ng/mL = 11.7) predicts use two hours (range one to four hours) before his encounter with the officers (Huestis Model II, ref. 2.) Mr. Rocha said that he used marijuana before leaving the house about 1400 hours on the day of the incident March 12, 2018 . Mr. Rocha told hospital caregivers that he vapes cannabis.

Delta-9-THC and 11-hydroxy-THC can cause psychotic and schizophrenic episodes including hallucinations, temporal distortion, panic reactions and paranoia (1. – 16.) Frequent users of high potency cannabis have a higher risk of developing psychosis (1., 9.) Mr. Rocha admits frequent cannabis use, which was confirmed by Mrs. S. Rocha and the positive cannabis urine toxicology at Sutter Health on two occasions. Moulin et al (8) and Miller et al (11) report that cannabis is a significant risk factor for violent behavior in the early phase psychosis. Mr. Rocha's violent behavior and struggles to escape custody are consistent with panic reaction and paranoia encountered in cannabis triggered schizophrenic-like behavioral episodes.

Pharmacology: Ethanol

Ethanol or ethyl alcohol is the active ingredient in alcoholic beverages. Ethanol is a central nervous system depressant that affects judgment, alertness, sensory perception and muscular coordination. An adult person can metabolize or eliminate from his/her body approximately one drink per hour (average elimination rate 0.015 g%/hour; range 0.01 to 0.04 g%/hour (1. 17.)) Alcoholics often have an induced alcohol metabolism or burnoff rate with an average of 0.030 g%/hour.

On December 9, 2016 at Sutter Health Delta Medical Center, Mr. Rocha had an alcohol burn-off rate of 0.0286 g%/hour. If his burnoff rate on the day of the incident was 0.0286 g%/hour, he would have burned off approximately ten shots between the incident at 1601 and the forensic blood draw at 2033 hours. His estimated blood alcohol concentration at 1601 hours was 0.35 g% with a range of 0.32 to 0.39 g% (see Calculations Section below.)

A 80.6 kg man, such as Mr. Rocha, with a blood alcohol content of 0.35 g% has 196.5 grams alcohol or the equivalent of more than seventeen standard drinks in his body.

A person with a blood alcohol content of 0.35 g% who is tolerant to alcohol is in the upper end

of the confusion stage of alcohol intoxication (0.18 to 0.30 g%) approaching the stupor stage of alcohol intoxication (0.25 to 0.40 g%) (17., 18.) The confusion stage of alcohol intoxication is characterized by emotional instability, loss of critical judgement, impairment of perception, memory and comprehension, decreased sensatory response, increased reaction time, reduced visual acuity, reduced peripheral vision, sensory-motor incoordination, impaired balance, slurred speech, mental confusion, disorientation, vertigo, increased muscular incoordination, staggering gait and ataxia. Persons in the stupor stage of acute alcohol intoxication have loss of motor functions, decreased response to stimuli, marked muscular incoordination, inability to stand, and impaired consciousness. Mr. Rocha has a history of drinking to blood alcohol concentrations in excess of 0.30 and losing consciousness resulting in hospitalization. First responders have noted empty bottles of vodka in his possession during these episodes.

Alcohol Calculations

Metabolism rates for alcohol can be induced by chronic alcohol abuse so that burnoff rates for alcoholics may be significantly higher than those of a social drinker. Mr. Rocha's burnoff rate at the time he was seen at Sutter Health, Delta Medical Center on 8 December, 2016 was calculated from his blood alcohol concentrations at two different times during the evening. Blood drawn at 1810 hours had a plasma alcohol concentration of 466 mg/dL or 0.395 g% whole blood. Blood drawn 2.34 hours later at 2036 hours had a plasma alcohol concentration of 387 mg/dL or 0.328 g% whole blood. 0.395-0.328g%/2.34 hours = 0.0286 g%/hour metabolism or burnoff.

To calculate the estimated blood alcohol concentration at the time of the traffic collision and incident (1601 hours March 12, 2018), the burn off rate is multiplied by the time elapsed between the incident and the blood draw (approximately 4.5 hours) and added to the blood alcohol concentration at the time of the blood draw. For example, for a social drinker: 4.5 hours x 0.015 g%/hour (range 0.010 to 0.030 g%/hour) = 0.0675 g% (range 0.045 to 0.135 g%/hr) + 0.230 g% = 0.2975 g% (range 0.275 to 0.365 g%). Using the burnoff rate of 0.0286 g%/hour determined at Sutter Health on 8 December 2016 for Mr. Rocha, his blood alcohol concentration at the time of the incident was 0.358 g% (range 0.32-0.38 g%). (4.5 hours x 0.0286 g%/hour = 0.128 + 0.23 = 0.358 g% blood alcohol concentration.)

A male weighing 80.6 kg has a total body water content of 54.8 L (80.6 kg x 0.68 L/kg = 54.808 L TBW.) Because alcohol rapidly distributes to all the body water, a blood alcohol concentration of 0.35 g% or 3.5 grams/liter corresponds to a body alcohol content of 3.5 g/L x 54.808 liters = 196.56 grams. 196.56 grams ethanol is equivalent to over seventeen standard drinks containing 0.5 oz. v ethanol or 11.32 grams alcohol per drink. (196.56 g /11.32 g = 17.36 std drinks). A fifth of 80 proof vodka or tequila contains about seventeen shots. A standard drink is 1.25 oz. of 80 proof (40 percent) alcohol: 1.25 oz. v x 0.4 x 0.8 = 0.4 oz. w x 28.3 g/oz. w = 11.32 grams ethanol per drink. A single shot of 80 proof tequila or vodka in a man who weighs 80.6 kg pounds is equivalent to 0.0206 g% blood alcohol concentration. Mr. Rocha testified that he was drinking shots of tequila on March 2, 2018. Mr. Rocha had approximately a fifth of 80 proof tequila or other 80 proof alcoholic beverage in his system at the time of the incident.

Conclusions

In my opinion at the time of the traffic collision and subsequent encounter with police officers on March 12, 2018, Mr. Rocha was suffering a psychotic episode brought on by ingestion of high concentrations of cannabis. Mr. Rocha testified that he used cannabis before leaving his house in the afternoon of March 12, 2018. Mr. Rocha's blood levels of THC and its active metabolite OH-THC are above those seen four to five hours after recreational use of marijuana even in persons who use marijuana daily. Mr. Rocha told hospital caregivers that he vapes cannabis products. Unregulated and illegal cannabis vaping cartridges have been reported to contain unpredictably high levels of active ingredients.

Cannabis is associated with violent behavior, panic reactions and paranoia. Approximately one in five persons will have adverse effects and a unpleasant or even dangerous reaction to cannabis similar to a schizophrenic episode (References 1. to 16. ) Miller et al (11.) cite 14 specific high profile cases of "marijuana induced paranoia (exaggerated, unfounded distrust) and marijuana induced psychosis (radical personality change, loss of contact with reality)." Frequent users of high potency cannabis have a higher risk of developing psychosis (1., 9.) Persons with pre-schizophrenic conditions are especially susceptible to the psychotic effects of cannabis. Mr. Rocha's violent behavior and self-harm in an otherwise cooperative person are consistent with a panic reaction, paranoia or psychosis as defined above by Miller et al (11.)

Mr. Rocha also had a high blood alcohol concentration which resulted in his loss of memory of the events (blackout) but which did not counter the psychotic effects of the cannabis (12. -15.) Cannabis and alcohol act in different parts of the brain on different neurotransmitters and synaptic receptors. When combined, they can disable additional brain functions making driving impairment worse but do not counter or antagonize each other's effects. Dharmawardee and Menkes (15.) report increased violence and self- harm in cases in which both cannabis and alcohol are abused. Mr. Rocha has been diagnosed and treated subsequent to the incident for alcohol misuse and depression.

The findings in the incident between Mr. Cameron Rocha and the Antioch police officers are consistent with Mr. Rocha suffering a cannabis-induced psychotic episode compounded by alcohol abuse.

In the event that I receive additional evidence to review, I will amend this report.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and accurate to the best of my knowledge.

Best regards,

Vina Spiehler 11/20/2020

Vina Spiehler, Ph.D., DABFT

References

1. Baselt, R. *Disposition of Toxic Drugs and Chemicals in Man*, Twelfth Edition, BioMedical Publishers, Poster City, CA. 2020; pp2041-2045.

2. Huestis, MA. Cannabis (Marijuana) Effects on Human Behavior and Performance; ***Forensic Sci. Rev.*** **14:**15: 2002.

3. Moore, THM, et al. Cannabis use and risk of psychotic or affective mental health outcomes. *The Lancet*, **370**: 319-328. 2007.

4. Volkow, ND, et al. Effects of cannabis use on human behavior including cognition, motivation and psychosis. *JAMA Psychiatry,* **73**(3):292-7. 2016.

5. Marconi, A et al. Meta-Analysis of the association between the level of cannabis use and risk of psychosis. *Schizophr. Bull.* **42**(5):1262-9. 2016.

6. Ksir, C and Hart CL. Cannabis and Psychosis: A critical overview of the relationship. *Curr. Psychiatry Res.* **18**(2):12. 2016.

7. Hamilton I. Cannabis, psychosis and schizophrenia. *Addiction* **112**(9):1653-1657. 2017. Hamilton I and Monaghan R. Cannabis and Psychosis. *Curr. Psychiatry Res.* **21**(7)48. 2019.

8. Moulin, V et al. Cannabis: Significant risk factor for violent behavior in the early phase psychosis. *Frontiers in Psychiatry,* **9**:294 pp 1-10. 2018.

9. Ortiz-Medina, MB et al. Cannabis consumption and psychosis or schizophrenia development. *Int. J. Soc. Psychiatry,* **64**(7):690-704. 2018.

10. Pearson NT and Berry JH. Cannabis and Psychosis through the Lens of DSM-5. *Int. J. Environ. Res. Public Health.* **16**:4149-4165. 2019.

11. Miller, R, R Ipeku and T Oberbarnscheidt. A Review of Cases of Marijuana and Violence. *Int. J. Environ Res Public Health* Feb 29, 2020; **17**(5):1578, 2020.

12. Hana, RC et al. Cannabis and development of dual diagnosis. *Am. J. Drug Alcohol Abuse.* **43**(4):442-455. 2017.

13. Auther, AM, et al. Alcohol confounds relationship between cannabis misuse and psychosis conversion in a high-risk sample. *Acta Psychiatr. Scand.* 132(1):60-8. 2015.

14. Katz, g. et al. Cannabis and alcohol abuse among first psychotic episode inpatients. *Isr. J. Psychiatry Relat Sci*. **53**(3):10-15. 2016.

15. Dharmawadene, V and Menkes, DB. Violence and self-harm in severe mental illness: inpatient study of associations with ethnicity, cannabis and alcohol. ***Australas Psychiatry***. **25**(1):28-31. 2017.

16. Pinto, JV et al. The prevalence and clinical correlates of cannabis use and cannabis use disorder among patients with bipolar disorder. *Neurosci. Biobeha.v Rev*. **101**:78-84. 2019.

17. Garriott, J. *Garriott's Medicolegal Aspects of Alcohol*. 5th Ed. Lawyers & Judges Publishing Company, Inc. 2008; pp 47-155.

18. Dubowski, K. *Stages of Acute Alcoholic Influence/Intoxication*. 2012. (attached)

Appendix: Vina Spiehler Ph.D. Curriculum Vitae and Case List
Dubowski, K. Stages of Acute Alcohol Intoxication/Influence

# STAGES OF ACUTE ALCOHOLIC INFLUENCE/INTOXICATION

| BLOOD-ALCOHOL CONCENTRATION grams/100 mL | STAGE OF ALCOHOLIC INFLUENCE | CLINICAL SIGNS/SYMPTOMS |
|---|---|---|
| **0.01-0.05** | **Subclinical** | Behavior nearly normal by ordinary observation<br>Influence/effects usually not apparent or obvious<br>Impairment detectable by special tests |
| **0.03-0.12** | **Euphoria** | Mild euphoria, sociability, talkativeness<br>Increased self-confidence; decreased inhibitions<br>Diminished attention, judgment and control<br>Some sensory-motor impairment<br>Slowed information processing<br>Loss of efficiency in critical performance tests |
| **0.09-0.25** | **Excitement** | Emotional instability; loss of critical judgment<br>Impairment of perception, memory and comprehension<br>Decreased sensatory response; increased reaction time<br>Reduced visual acuity and peripheral vision and slow glare recovery<br>Sensory-motor incoordination; impaired balance; slurred speech<br>Vomiting; drowsiness |
| **0.18-0.30** | **Confusion** | Disorientation, mental confusion; vertigo; dysphoria<br>Exaggerated emotional states (fear, rage, grief, etc.)<br>Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions<br>Increased pain threshold<br>Increased muscular incoordination; staggering gait; ataxia<br>Memory loss<br>Apathy; progressive lethargy |
| **0.25-0.40** | **Stupor** | General inertia; approaching loss of motor functions<br>Markedly decreased response to stimuli<br>Marked muscular incoordination; inability to stand or walk<br>Vomiting; incontinence of urine and feces<br>Impaired consciousness; sleep or stupor; deep snoring |
| **0.35-0.50** | **Coma** | Complete unconsciousness; coma; anesthesia<br>Depressed or abolished reflexes<br>Subnormal temperature<br>Impairment/irregularities of circulation and respiration<br>Possible death |
| **Mean,Median=0.36<br>90%=0.21-0.50** | **Death** | Death from respiratory or cardiac arrest |

**KURT M. DUBOWSKI, Ph.D., DABCC, DABFT**
The University of Oklahoma
Department of Medicine
Oklahoma City, Oklahoma

Copyright© 2012 by Kurt M. Dubowski, Ph.D.
All Rights Reserved

Dr. Vina R. Spiehler
422 Tustin, Newport Beach, CA 92663
phone (949) 642-0574

**CURRICULUM VITAE**
**VINA R. SPIEHLER, Ph.D., F-ABFT**

EDUCATION:

| | | | |
|---|---|---|---|
| 1961-64 | | Chemistry | University of Chicago, Illinois |
| 1965-68 | B.A. | Chemistry | California State University, Fullerton |
| 1968-69 | | Languages | University of Uppsala, Uppsala, Sweden |
| 1969-74 | M.A. | Analytical Chemistry | California State University, Fullerton |
| 1974-78 | Ph.D. | Pharmacology & Toxicology | University of California, Irvine School of Medicine |

LICENSES, CERTIFICATION:

Diplomate of the American Board of Forensic Toxicology, 1984, Certificate N° 158.
Fellow of the American Board of Forensic Toxicology, 2014, Certificate N° 1298.
Forensic Alcohol Supervisor, 11/07/83, State of California, Dept. of Health Services
Forensic Alcohol Analyst, 4/02/81, State of California, Dept. of Health Services

EMPLOYMENT:

1993-Present President, Spiehler & Associates, Newport Beach, CA

1989-2014 Lab Inspector, HHS SAMHSA National Laboratory Certification Program, ABFT Forensic Toxicology Laboratory Accreditation Program and College of American Pathologists, Laboratory Certification Program

1995-2010 Lecturer, California State University Extension, Forensic Sciences Certificate Program, Fullerton, CA; California Criminalistics Institute, Sacramento, CA and Los Angeles, CA.

1994-2014 Consultant, Cozart Ltd Abingdon, Hamps. UK.

1988-1993 Technical Director, Drugs of Abuse Products, Diagnostic Products Corporation, Los Angeles, CA

1988-2000 Adjunct Research Associate, Psychiatry and Human Behavior, University of California, Irvine

1986-1987 Fulbright Fellow, Drugs and Toxicology, Central Research Establishment, Home Office Forensic Science Service, Aldermaston, U.K.

1981-1986 Senior Forensic Toxicologist, Forensic Science Service, Office of the Sheriff-Coroner, County of Orange, Santa Ana, CA

1980-1982 Assistant Research Psychobiologist, Lecturer, Dept. of Psychobiology, University of California, Irvine, CA

1978-1979 Fogharty Fellow and Guest Researcher, Pharmacology, Central Research and Control Laboratories of the National Corporation of Swedish Pharmacies, Solna, Sweden

1976-1978 Research Assistant, Medical Pharmacology and Therapeutics, and Dept. of Psychobiology, University of California, Irvine

1969-1976 Applications Chemist, Scientific Instruments Division, Beckman Instruments, Inc., Fullerton, CA

1964-1968 Research Assistant, Chevron Oilfield Research Corporation, La Habra, CA

PROFESSIONAL SOCIETIES:

American Academy of Forensic Sciences; Editor, Toxicology Section Newsletter, 1984-86; Fellow 1989-present; Faculty, Student Academy 1987-2001.
American Association for Clinical Chemistry; Editor, TDM/Toxicology Division Newsletter, 1989-1995.
The International Association of Forensic Toxicologists: Secretary 1990-1996; Editor, TIAFT Bulletin, 1990-1996; United States Regional Representative, 1996-present, President and Chair 1998 Annual Meeting, Albuquerque, New Mexico.
The International Council on Alcohol, Drugs and Traffic Safety, 1999- present, Member
National Committee for Clinical Laboratory Standards; Chair, Toxicology Area Committee 1990-1994; Chair, Subcommittee on Immunoassays in Toxicology; Advisor, Subcommittee on Urine Drug Analysis.
Society of Forensic Toxicologists; Past President, 1996; President, 1995; Vice-President, 1994; Secretary, 1992-1993; Board of Directors, 1990-1991, Guest Editor SOFT Special Edition, Journal of Analytical Toxicology 1990; Editor, Proceedings 1994, 1998, 2004.
California Association of Toxicologists: Recording Secretary 1982-84, Vice President 1984-85; President, 1985-86; Immediate Past President, 1986-87, Member-at-Large, 1988-91.
London Toxicology Group, Life Member 1998
Western Pharmacology Society

JOURNAL EDITORIAL BOARDS

Clarke's Isolation and Identification of Drugs, 3rd Edition, Editorial Board, 2000-2018.
Journal of Forensic Sciences, Editorial Board, 1990-2010.
Clinical Chemistry, Reviewer, 1994-2014.
Journal of Analytical Toxicology, Editorial Advisory Board, 1991-2007.
Editor, TIAFT Bulletin, 1990-1996.
Editor, AACC, TDM/Toxicology Newsletter, 1989-1995.

FELLOWSHIPS, AWARDS

| | |
|---|---|
| 2009 | Alan Curry Award for outstanding services to the Association and to forensic toxicology, The International Association of Forensic Toxicologists |
| 2007 | Outstanding Speaker Award 2007, American Association of Clinical Chemistry |
| 2004 | Rolla N. Harger Award for Outstanding Contributions to Forensic Toxicology, American Academy of Forensic Sciences, Toxicology Section |
| 2000 | Elected to the International Council on Alcohol, Drugs and Traffic Safety |
| 1996 | USA Regional Representative for the International Association of Forensic Toxicologists |
| 1986-87 | Fulbright Grant in Aid, US-UK Fulbright Commission |
| 1986 | Orange County Woman of Achievement Award |
| 1984 | General Section Award in Toxicology, American Academy of Forensic Sciences |
| 1978-79 | Swedish Medical Research Council, Fogharty International Post-Doctoral Fellowship |
| 1977-78 | Hoffman-LaRoche Predoctoral Fellowship |
| 1974 | Election to Phi Kappa Phi |
| 1970-74 | Dean's List, California State University, Fullerton |
| 1968-69 | California State University International Exchange Scholar |
| 1968 | Dean's List, California State University, Fullerton |
| 1961-64 | E.B. White Scholarship, University of Chicago |
| 1961 | California State Scholar at the University of Chicago |
| 1961 | National Merit Scholarship Finalist |

BIBLIOGRAPHY

1. Spiehler, V. 1971. A newly-developed system for measuring oxygen in gas-flushed flexible packages. Food Product Development 5: 42-44.

2. Spiehler, V. 1971. Evaluation of oil stability. Food Engineering 34: 77-79.

3. Spiehler, V. 1972. Gauging residual headspace oxygen. Modern Packaging 45:46-54.

4. Miller, J., V.R. Spiehler, and C.W. Keller. 1972. Clinical procedures for drug screening. Procedures Manual, Beckman Instruments, Inc.

5. Helman, E.Z. and V.R. Spiehler, 1974. Lead acetate as a density increaser in liquid scintillation counting of gamma emitters. Clinical Chemistry 20: 516-517.

6. Jordon, W.C., V.R. Spiehler, R. Heaendinges, and E.Z. Helman. 1974. Evaluation of alternate counting methods for radioimmunoassay of hepatitis-associated antigen (HBAg). Clinical Chemistry 20: 733-739.

7. Helman, E.Z., V.R. Spiehler, and S. Holland. 1974. Elimination of error caused by hemolysis- and bilirubin-induced color quenching in clinical radioimmunoassays. Clinical Chemistry 20: 1187-1193.

8. Spiehler, V.R. 1974. Differential Pulse Polarographic Determination of Digitoxin and Digoxin, Master's Thesis, California State University, Fullerton.

9. Spiehler, V.R. 1975. Drugs of abuse radioimmunoassay directory. Clinical Toxicology 8: 257-265.

10. Spiehler, V.R., D. Reed, R.H. Cravey, W.P. Wilcox, R. Shaw and S. Holland. 1975. Comparison of results for quantitative determination of morphine by radioimmunoassay (RIA), enzyme immunoassay (EMIT) and spectrofluorometry. J. Forensic Sciences 20: 647-655.

11. Kadish, K. and V.R. Spiehler. 1975. Differential pulse polarographic determination of digoxin and digitoxin. Analytical Chemistry 47: 1714-1716.

12. Spiehler, V.R., L. Sun, D. Miyada, S. Sarandis, E.R. Walwick, M. Klein, D. Jordan and B. Jessen. 1976. Radioimmunoassay, enzyme immunoassay, spectrometry and gas liquid chromatography compared for determination of phenobarbital and diphenylhydantoin. Clinical Chemistry 22: 749-753.

13. Sun, L. and V.R. Spiehler, 1976. Comparison of enzyme immunoassay with radioimmunoassays for the determination of digoxin. Clinical Chemistry 22: 2029-2031.

14. Elliott, H.W., V.R. Spiehler, and G. Navarro. 1976. Effect of naloxone on the antinociceptive activity of phenoxybenzamine. Life Sciences 19: 1637-1643

15. Selesky, M., V.R. Spiehler, R.H. Cravey and H.D. Elliott. 1977. Digoxin concentrations in fatal cases. J. Forensic Sciences 22: 409-417.

16. Reed, D., V.R. Spiehler, and R.H. Cravey. 1977. Suicide due to intravenous narcotism: a report of two cases. Forensic Science (Copenhagen) 9: 49-52.

17. Spiehler, V.R., A.S. Fairhurst and L.O. Randall. 1978. The interaction of phenoxybenzamine with the mouse brain opiate receptor. Molecular Pharmacology 14: 586-595.

18. Spiehler, V.R. 1978. Antinociceptive Properties of Phenoxybenzamine, Doctoral dissertation, University of California, Irvine.

19. Spiehler, V.R., R.H. Cravey, D. Richards, and H.W. Elliott. 1978. Morphine distribution in the brain in heroin-related deaths. J. Analytical Toxicology 2: 62-67.

20. Spiehler, V.R. and L.O. Randall. 1979. Agonist-antagonist properties of phenoxybenzamine in antinociception and opiate dependence tests. European J. Pharmacology 5: 389-397.

21. Spiehler, V.R. and L.P. Paalzow. 1979. Naloxone antagonism of phenoxybenzamine antinociception in the mouse tail stimulation test. Life Sciences 24: 2125-2132.

22. Spiehler, V.R., ed. 1979. Proceedings of the California Association of Toxicologists, Symposium Issue, Clinical Toxicology 14.

23. Messing, R.B., R.A. Jensen, J.L. Martinez, Jr., V.R. Spiehler, B.J. Vasquez, B. Soumireu-Mourat, K.C. Kiang and J.L. McGaugh. 1979. Naloxone enhancement of memory. Behavioral and Neural Biology 27: 266-275.

24. Messing, R.B., B.J. Vasquez, V.R. Spiehler, J.L. Martinez, Jr., R.A. Jensen, H. Rigter, and J.L. McGaugh. 1980. 3H-dihydromorphine binding in brain regions of young and aged rats. Life Sciences 26: 921-927.

25. Jensen, R.A., R.B. Messing, V.R. Spiehler, J.L. Martinez, Jr., B.J. Vasquez, and J.L. McGaugh. 1980. Memory, opiate receptors and aging. Peptides 1 (Supplement 1): 197-201.

26. Jensen, R.A. R.B. Messing, J.L. Martinez, Jr., B.J. Vasquez, V.R. Spiehler, and J.L. McGaugh. 1981. Changes in brain peptide systems and altered learning and memory processes in aged animals. In Endogenous Peptides and Learning and Memory Processes (J.L. Martinez, Jr., R.A. Jensen, R.B. Messing, H. Rigter and J.L. McGaugh, eds.) New York: Academic Press, 463-477.

27. Sedgwick, P. V.R. Spiehler, and R.H. Cravey. 1981. Use of digoxin RIA in forensic investigations of tissue distribution. Clinical Toxicology 18: 887-893.

28. Spiehler, V.R., P. Sedgwick and R.G. Richards. 1981. The use of brain digoxin concentrations to confirm blood digoxin concentrations. J. Forensic Sciences 26: 645-650.

29. McGaugh, J.L., J.L. Martinez, Jr., R.A. Jensen, T.J. Hannan, B.J. Vasquez, R.B. Messing, K.C. Liang, C.B. Brewton, and V.R. Spiehler. 1982. Modulation of memory storage by treatments affecting peripheral catecholamines. In Neuronal Plasticity and Memory Formation (A. Marsan and H. Mathies, eds.) New York: Raven Press.

30. Sedgwick, P., V.R. Spiehler, and R. Lowe. 1982. Toxicological findings in amoxapine

overdose.  J. Analytical Toxicology 6: 82-84.

31.  Spiehler, V.R. 1982. Regional distribution of digoxin in the human brain: implications for neurotoxicity.  Proceedings of the Western Pharmacology Society 25: 79-82.

32.  Spiehler, V.R. and R.I. Fukumoto. 1984. Another fatal case involving hydroxyzine.  J. Analytical Toxicology 8: 242-243.

33.  Spiehler, V.R. 1985. Pharmacokinetics. In Methods in Analytical Toxicology, Vol. 3 (I. Sunshine, ed.) Chemical Rubber Company, Baton Rouge. Louisiana.

34.  Spiehler, V.R. 1985. Predicting antemortem digoxin blood concentrations from postmortem brain distributions of digoxin. Proceedings of the 21st International Meeting of the International Association of Forensic Toxicologists.

35.  Spiehler, V.R., W.G. Fischer, and R.G. Richards. 1985. Digoxin-like immunoreactive substance in the post-mortem blood and tissues of infants and children.  J. Forensic Sciences 30: 86-91.

36.  Spiehler, V.R. and P. Sedgwick. 1985. Radioimmunoassay screening of whole blood samples for drugs of abuse. J. Analytical Toxicology 9: 63-70.

37.  Spiehler, V.R. and D. Reed. 1985.  Brain concentrations of cocaine and benzoylecgonine in fatal cases.  J. Forensic Sciences 30: 1003-1010.

38.  Spiehler, V.R. 1986.  Cocaine and metabolites.  Clinical Chemistry News. July.

39.  Spiehler, V.R. and R. Brown. 1987. Unconjugated morphine in blood by radioimmunoassay and gas chromatography/mass spectrometry. J. Forensic Sciences 32: 906-916.

40.  Spiehler, V.R., E.J. Spiehler, I.W. Evett, and M.D. Osselton. 1987. Rule induction in forensic sciences. Proceedings of the International Congress on Expert Systems, London, 1987.

41.  Spiehler, V.R., E.J. Spiehler, and M.D. Osselton. 1988. Application of expert systems analysis to amitriptyline-involved fatal cases. I. Expert 4. II. Rule Induction. J. Analytical Toxicology 12(4): 216-224.

42.  Spiehler, V.R., C.M. O'Donnell, and S. Gokale. 1988. Certainty and confirmation in toxicology screening. Clinical Chemistry 34: 1535-1539.

43.  Spiehler, V.R. 1988.  Confirmation in forensic urine drug testing. CAP/AACC FUDT Newsletter 1(1), March p 1-6.

44.  Spiehler, V.R. 1988. Computer-assisted interpretation of morphine-involved cases: comparison of three software programs.  Proceedings of the 25th International Meeting of the International Association of Forensic Toxicologists, p 65-70.

45.  Spiehler, V.R. 1989. Computer-assisted interpretation in forensic toxicology: morphine-involved deaths. J. Forensic Sciences 34(5): 1104-1115.

46.  Spiehler, V.R. 1989. Comparison of immunoassay and gas chromatography/mass

spectrometry results in toxicology. J. Clinical Immunoassay 12(4): 219-223.

47.  Rasmussen, S., R. Cole, and V.R. Spiehler. 1989. Methamphetamine in antemortem blood and urine by radioimmunoassay and GC/MS.  J. Analytical Toxicology, 13: 263-267.

48. Spiehler, V.R., Ragsdale, S., and L. Reilly, 1989. Pharmacognosy Today.  An illustrated wall poster published by Diagnostic Products Corporation, Los Angeles, CA.

49.  Spiehler, V.R. 1990.  Certainty in Toxicology Screening. In-Service Training and Continuing Education, AACC, Washington, D.C.

50.  Osselton, M.D., M. Japp, S.I. Weston, E.A. Mather, V. Spiehler, R. Barlow and A. Moore. 1990. Whole blood quality assurance control samples for forensic toxicology. J. Analytical Toxicology 14:318-319.

51.  Spiehler, V.R., and R.A. Moore, 1990. Drugs of Abuse Testing. A slide show with 70 slides and script,  Published by Diagnostic Products Corporation, Los Angeles, CA.

52. Spiehler, V., 1990. ROC Curve Analysis for Selecting the Optimum Cutoff in Urine Drug Testing. Proceedings of the 27th International Meeting 19-23 October 1990, Perth Australia.

53.  Wimbish, G., J. Shores, and V.R. Spiehler. 1991.  A comparison of three computer models for prediction of dose in acute amitriptyline overdose. J. Forensic Sciences 36(1): 153-165.

54.  Hand, C.W., K.E. Ryan, R.A. Moore and V.R. Spiehler. 1991. Performance characteristics of a kinetic immunoassay system for cocaine and metabolites. Proceedings of the International Association of Forensic Toxicologists, International Meeting, Copenhagen, 1991.

55.  Spiehler, V.R., Chapter 7. Statistical approaches to accuracy in drug screening. in Recent Developments in Therapeutic Drug Monitoring, ed. I. Sunshine. Marcel Dekker, Inc. New York, NY, 1992.

56. Spiehler, V.R.. Buprenorphine, the case of the dancing cow. Clinical Chemistry News, 18(1): January 1992.

57. Collins, C., J. Muto and V.R. Spiehler. 1992. Whole blood deproteinization for drug screening using automatic pipettor. J. Analytical Toxicology. 16:340-342.

58.  Spiehler, V.R., H. Wilson, K. Pregger, and R. Harris. 1993. Elimination of interferences from ephedrine and related compounds in the Coat-A-Count Methamphetamine Radioimmunoassay.  Clinical Chemistry 39(1):172-173.

59.  Hand, C.W., S.A. Miller, J.M. Ellis, V.R. Spiehler and S. ElShami. 1993. Application of a kinetic EIA to the measurement of THCA in whole blood. Proceedings of the 31st International Meeting of the Association of Forensic Toxicologists, Fukuoka, Japan., p 471-474.

60.  Cassani, M. and V.R. Spiehler.1993.  Analytical requirements, perspectives and limits of immunological methods for drugs of abuse in hair. Forensic Science, International, 63:175-184.

61.  Spiehler, V.R. 1993. Detecting "crack" babies by meconium analysis. Clinical Laboratory Science. 6(6):334-335.

62. Spiehler, V.R. Immunoassays in Toxicology, Chapter 8 in Training Methods in Toxicology, ed. I. Sunshine, Chemical Rubber Company. 1994.

63. Spiehler, V.R., K. Maugh and S. El Shami. 1993. "Elimination of ephedrine cross-reactivity in the Coat-A-Count Methamphetamine Radioimmunoassay " J. Analytical Toxicology, 17:125-126.

64. Spiehler, V.R.. 1994. Sweat as a mechanism for entry of drugs into hair. Proceedings of the 2nd International Meeting on Clinical and Forensic Aspects of Hair Analysis.

65. Spiehler, V.R. ed. Proceedings of the 1994 Joint TIAFT/SOFT International Meeting, Tampa Florida, TIAFT, Newport Beach, CA, 1995.

66. Spiehler, V.R. 1995. Immunological methods for drugs in hair, Hair Analysis in Forensic Toxicology ed R.A. de Zeeuw et al, Abu Dhabi.

67. Spiehler, V.R., J. Fay, R. Fogerson, D. Schoendorfer, and R.S. Niedbala. 1996. Enzyme immunoassay validation for qualitative detection of cocaine in sweat, Clinical Chemistry 42(1):34-38.

68. Spiehler, V.R. 1996. Sensitivity, Specificity and Predictive Value in Quality Assurance, chapter in Quality Assurance Issues in Therapeutic Drug Monitoring and Clinical Toxicology, ed. Shirley L. Welch, AACC Press, Washington DC.

69. Spiehler, V.R., R. Fogerson, D. Schoendorfer, J. Fay and R.S. Niedbala. 1996. Validation of an EIA for qualitative detection of cocaine in sweat, J. Analytical Toxicology 20:72-73.

70. Fay, J., V.R. Spiehler, R. Fogerson, D. Schoendorfer and R.S. Niedbala. 1996. Detection of methamphetamine in sweat by EIA and GC/MS, J. Analytical Toxicology 20:398-403.

71. Spiehler, V.R. 1997. Detecting drugs of abuse in sweat. Therapetuic Drug Monitoring and Toxicology 18(2):35-52.

72. Schneider, M, D. Hambrick, J. Booher, S. Carp, D. Schoendorfer, J. Miller, P. Lo and V.R. Spiehler, Monitoring patient compliance in alcohol abstinence with a new non-invasive test, JAMA, submitted.

73. Spiehler, V.R., Editor, Collected Case Notes from the TIAFT Bulletin, 1990-1996, 1997 http://www.cbft.unipd.it/tiaft/members/.

74. Fogerson, R., D. Schoendorfer, J.Fay and V.R. Spiehler 1997. Validation of an EIA for qualitative detection of opiates in sweat, J. Analytical Toxicology, 21(6):451-458.

75. Collison, I., Spiehler, V.R., Guluzian, S. and P.R. Sedgwick, 1998. Setting cutoff concentrations for immunoassay screening of post-mortem blood. J. Forensic Sciences, 43(2):390-394.

76. Spiehler, V., Sedgwick, P.R., Collison, I., Perez, S., Le, S.D. and Farnin, D.A. 1998. Validation of an automated enzyme immunoassay for drug screening of post mortem blood. J. Analytical Toxicology, 22(7):573-579.

77. Spiehler, V.R.  Application of Pharmacokinetics and Pharmacodynamics to Forensic Toxicology, Chapter in B. Levine, Ed.  Principles of Forensic Toxicology, AACC Press, 1998.

78. Fendrich, M., Johnson T., Sudman, S., Wislar, J. and Spiehler, V. 1999.  Validity of drug use reporting in a high-risk community sample: a comparison of cocaine and heroin survey reports with hair tests. American Journal of Epidemiology, 149(10):955-962.

79. Spiehler, V.R. 1999. ed. Proceedings of the 1998 Joint SOFT/TIAFT International Meeting, Albuquerque, New Mexico, TIAFT, Newport Beach, CA.

80. Spiehler, V.R. Pharmacology of drugs of abuse in saliva, Cozart Rapiscan Launch Seminar, Birmingham, UK, January 13, 1999, Melbourne, Australia March 9, 1999.

81. Spiehler, V.R. 2000. Hair analysis by immunological methods from the beginning to 2000, Forensic Science International 107:249-259.

82. Spiehler, V.R. 1999.  Is Dilute Urine a Crime? Bulletin of the International Association of Forensic Toxicologists, July 1999. XXIX No. 3:8-10.

83. Spiehler, V.R., D Baldwin and C. Hand, 2000.  Cutoff concentrations for drugs of abuse in saliva for DUI, DWI or other driving-related crimes.  Proceedings of the 1999 TIAFT Meeting, Cracow, Poland. Z. Zagadnien Nauk Sadowych, XLII p160-168.

84. Spiehler, V.R. 2000.  Must Workplace Tests Meet Forensic Standards? Bulletin of the International Association of Forensic Toxicologists, January 2000, XXX No. 1: 24-25.

85. Spiehler, V.R, C. Hand and D. Baldwin. 2001.  On-site Saliva Testing for Drugs of Abuse in Onsite Testing for Drugs of Abuse, eds. A. Jenkins and B. Goldberger, Humana Press, 2002. Pp 95-109.

86. A. Jehanli, S. Brannan, L. Moore, and V. Spiehler.  2001.  Blind Trials of an Onsite Saliva Drug Test.  J. Forensic Sciences. 46(5): 1214-1220.

87. V.R. Spiehler, D. Baldwin, A. Jehanli and L. Moore.  2001.  Validation of Cozart Rapiscan cutoff concentrations for drugs of abuse in saliva.  I. Rasanen, Ed., Proceedings of the 2000 TIAFT Meeting, Helsinki, Finland,  pp 95-105.

88. V.R. Spiehler.  2003. Drugs in Saliva, Chapter 7 in *Clarke's Analysis of Drugs and Poisons*. Third Edition, eds. A Moffat et al., Pharmaceutical Press, London, UK.

89. L. Moore, J. Wicks, V. Spiehler,  R. Holgate.  2001.  Gas Chromatography/Mass Spectrometry confirmation of Cozart RapiScan saliva methadone and opiate tests. J. Analytical Toxicol. 25:520-524.

90. V. Spiehler. 2002.  Roadside Saliva Drug Tests.  Proceedings of the California Association of Toxicologists, Vol 30 No 1, February, 2002.

91. P. Kemp, G. Sneed, T Kupiec, and V. Spiehler. 2002.  Validation of a microtiter plate ELISA for screening of post-mortem blood for opiates and benzodiazepines. J. Analytical Toxicology. 26:504-512.

92. T. Kupiec, L. DeCicco, V. Spiehler, G. Sneed and P. Kemp. 2002. Choice of an ELISA Assay for Screening Post-Mortem Blood for Amphetamine and/or Methamphetamine. J. Analytical Toxicology 26:513-518.

93. V. Spiehler, D. Isenschmidt, P. Matthews and T. Kupiec. 2003. Performance of a Microtiter Plate ELISA for Screening of Postmortem Blood for Cocaine and Metabolites. J. Analytical Toxicology. 27:587-591.

94. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C. Hand and V.R. Spiehler. 2003. Validation of the Cozart Microplate ELISA for Detection of Opiates in Hair. J. Analytical Toxicology, 27:581-586.

95. V. Spiehler, L. DeCicco, T. Kupiec, J. Rod McCutcheon and P. Kemp. 2004. Screening Post-Mortem Whole Blood for Oxycodone by ELISA Response Ratios. J. Forensic Sciences 49(3):621-626.

96. M. Fendrich, T. Johnson, A. Hubbell, J. Wislar and V. Spiehler. 2004. The utility of drug testing in epidemiological research: Results from an ACASI general population survey. Addiction. 99:197-208.

97. V Spiehler. 2004. What is the Gold Standard in Forensic Toxicology? The Bulletin of the International Association of Forensic Toxicologists. January 2004; 34(1): 18-19.

98. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C Hand, and V Spiehler. 2004. Analysis of cocaine and cocaine metabolites in oral fluid by Cozart microplate EIA and GC/MS. J. Analytical Toxicology. 28(6): 498-503.

99. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C. Hand, and V. Spiehler. 2005. Analysis of opiates in oral fluid by Cozart microplate EIA and GC/MS. Forensic Science International. 154:240-246.

100. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C Hand, and V Spiehler. 2005. Comparison of GC/MS and EIA Results for analysis of methadone in oral fluid. Journal of Forensic Sciences. 50(4):928-932.

101. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C Hand, and V Spiehler 2005. Validation of an EIA microtiter plate assay for amphetamines in oral fluid. Forensic Sci. Intl. Online at http:/./dx.doi.org/10.1016/j.forsciint.2005.06011.

102. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C. Hand, and V Spiehler 2005. Comparison of Cozart® Microplate ELISA and GC/MS detection of methadone and metabolites in human hair. J. Anal. Toxicol. 29(7):678-681.

103. Spiehler, V.R. 2005. Editor, Proceedings of the 2004 Joint SOFT/TIAFT/FBI International Conference, Washington DC.

104. Spiehler, V. R. 2005. Forensic Certainty of Evidence of DWID (Driving While Intoxicated by Drugs) Proceedings of the 2005 TIAFT Conference, Seoul, Korea.

105. G. Cooper, L. Wilson, C. Reid, D. Baldwin, C Hand, and V Spiehler 2006. Validation of an EIA microtiter plate assay for amphetamines in oral fluid. Forensic Sci. Intl. 159:104-112.

106. Spiehler V and G Cooper. 2007. Chapter: Saliva and Oral Fluid in *Drugs of Abuse Testing: Methods in Alternative Biological Matrices*, ed A. Jenkins. Humana Press.

107. P Kintz, V Spiehler, and A Negruz, Chapter: Alternative Specimens. In *Clarke's Analytical Forensic Toxicology*, eds S Jickells and A Negrusz, Pharmaceutical Press, London, UK 2008.

108. V.R. Spiehler. 2011. Drugs in Saliva, Chapter 7 in *Clarke's Analysis of Drugs and Poisons*. Fourth Edition, eds. MD Osselton, Brian Widdop et al., Pharmaceutical Press, London, UK.

109. V.R. Spiehler and D. Baldwin. Immunoassay in Forensic Toxicology, Then and Now. April 2013. TIAFT 50th Anniversary, London, UK.

**2020 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

People v A. Caliz, Superior Court Los Angeles County, Pomona, CA
Winter v McKeague, Orange County Superior Court, Santa Ana, CA
Jones v. Garda, et al., Superior Court County of San Diego, San Diego, CA
Williams v. Kohls, et al., United States Central District Court, Los Angeles, CA

**2019 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Zavrukha v Aguilar, Superior Court County of Riverside, Riverside, CA
Jackson v Park, Superior Court Los Angeles County, Central District, Los Angeles
Villegas, et al v County of San Bernadino, et al, Superior Court County of San Bernadino, San Bernadino, CA
Powell v AT&T et al, Superior Court Ventura County, Ventura, CA
Lamar v San Gorgonio Memorial Hospital, Superior Court County of Riverside, Riverside, CA
Craig, et al. v County of Orange, et al, United States District Court, Central District, Santa Ana, CA
MJLH, et al. v City of Glendale, et al United States District Court, Central District, Los Angeles,CA
Wilkerson v Patel, Superior Court County of Orange, Santa Ana, CA
Winter v McKeague, Superior Court County of Orange, Santa Ana, CA
Ruknaitas v City of San Diego, Potolocchio et al, Superior Court County of San Diego Central Division, San Diego, CA

**2018 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Sylve v Ford Motor Company, et al, Superior Court County of San Bernadino, San Bernadino, CA
Webb v Skanska, et al, Superior Court Los Angeles County, Central District, Los Angeles, CA
Rodriguez v Ulloa, et al, Superior Court County of Orange, Santa Ana, CA
Brower v Muldoons, et al, Superior Court County of Orange, Santa Ana, CA
Flores et al v County of San Bernadino, et al, United States Central District Court, Western Division
Wadood v JP Normandie Enterprise, Los Angeles Superior Court Central District, Los Angeles, CA
Pensado et al v. Pereyda et al, Eighth Judicial District Court, Clark County, NV
Cardenas v Taormina Jr. et al, Los Angeles Superior Court, Central District, Los Angeles, CA

**2017 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Justin Ledesma and Kanima Beck v JA Stotz, City of Palm Springs, County of Riverside, Chochella Housing Ass., Skanska, etc RCSC Case No.:  INC1302238 and Laura Walter, T Crocker, M Morain, JA Stotz v City of Palm Springs, et al  RCSC Case No. :  INC1302398 Superior Court County of Riverside, Palm Springs, CA
Aaron Rubin v Live Nation Worldwide, et al., Los Angeles Superior Court, Central District, Los Angeles, CA
Jonathan D Bilby v Infante Trucking Inc. et al., Superior Court San Bernadino, San Bernadino, CA
Khanly Saycon, Jr. et al v City of Long Beach, et al, United States Central District Court, Los Angeles, CA
Rousseau-Webb, et al v Skanska-Rados, et al, Superior Court Los Angeles Country, Central District, Los Angeles, CA
Ferry, et al. v. DeLonghi America Inc, et al.  United States District Court, Northern District of California, San Francisco, CA.
Rodriguez v. Ulloa, et al., Superior Court Orange County, Central Justice Center, Santa Ana, CA
Swarthout v. Forward Air Solutions, Superior Court County of San Luis Obispo, Paso Robles, CA
Perez v. Best Tours, Superior Court County of Fresno, Fresno, CA
M.A.C. v City of Los Angeles, United States District Court, Central District, Los Angeles, CA
Souza v OG Erectors, et al. Superior Court County of Orange, Santa Ana, CA

**2016 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

People v A. Ugarte, Superior Court Los Angeles County, Pomona, CA
McCall vs Ceja, et al., Superior Court County of San Luis Obispo, San Luis Obispo, CA
Keith v Roberson's Ready Mix Ltd, Superior Court County of San Bernadino, San Bernadino, CA
Rodriguez v Somerville, Superior Court County of Orange, Santa Ana, CA
Williams v Mouy Suk Kaing, Superior Court County of Orange, Santa Ana, CA
Epitalwalage v Vons, Superior Court County of Los Angeles, Los Angeles, CA
People v Crow, Superior Court Los Angeles County, Pomona, CA
Penhall v Flatiron, et al, Superior Court Los Angeles County, Los Angeles, CA
Ramirez v County of Los Angeles, et al, United States Central District Court Los Angeles, CA
People v. McDonald, Superior Court County of Orange, Santa Ana, CA
Joanna Doe v. Abbey Restaurants and Bars USA, LLC. et al, Los Angeles Superior Court, Los Angeles, CA
Zisette v Starline Tours of Hollywood, Inc. et al., Los Angeles Superior Court, Los Angeles, CA
Barrera v. Murillo et al., Superior Court County of Los Angeles, Los Angeles, CA
Carrillo v Farkhondehpour, Superior Court Los Angeles, North Valley District, CA

**2015 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Bracamontes v Valenzuela, Riverside Superior Court, Riverside, CA
De Los Santos v SDMTS, San Diego County Superior Court, San Diego CA
Brown vs Saltikoff-Orloff, Los Angeles County Superior Court, Los Angeles, CA
Castenada v UPRR, Los Angeles County Superior Court, Los Angeles, CA
Jones v Allen, Ventura County Superior Court, Simi Valley, CA
Vann v. Mitchell, County of Orange Superior Court, Santa Ana, CA
Smith v AAA, County of Los Angeles Superior Court, Los Angeles, CA
R.A. v County of Riverside, US District Court, Central District of California, Riverside, CA
Roberts vs PSA Airlines, Arbitration, Dayton, Ohio
Rabb v Royer, et al, Imperial County Superior Court, El Centro, CA
Delgado v Palmer, County of Orange Superior Court, Santa Ana, CA

**2014 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Jolley/Hiler v County of Kern, Kern County Superior Court, Bakersfield, CA
Gelbach v Domnick, et al, Superior Court County of Riverside, Riverside, CA
ATU Local 1277 v LACMTA, Arbitration, Los Angeles, CA
Turner v. County of Kern, US District Court, Eastern District, Bakersfield, CA
People v Qays Mahjoob, Superior Court Los Angeles County, Pomona, CA
Bryan Stow et al v Los Angeles Dodgers LLC, et al. Los Angeles Superior Court, Los Angeles, CA
Rendon v City of Indio, US District Court, Central District, Riverside, CA
Rosen v Pardo et al, Riverside Superior Court, Riverside, CA
De Los Santos v. SDMTS, San Diego County Superior Court, San Diego CA
Cynthia Kahn v Joel Alexander Murphy, Orange County Superior Court, Santa Ana, CA
Maurice Campbell et al vs Greyhound Lines, et al, Fresno Superior Court, Fresno, CA
Paul Whang v City of Inglewood, Arbitration, Inglewood, CA
L.G. and N.G. v County of Los Angeles, US Central District Court, Los Angeles, CA
Sarabia vs. Ecology Auto Parts, et al., County of Los Angeles, Central District, Los Angeles, CA

**2013 Cases Dr. Vina Spiehler has testified in (in court, hearing or deposition):**

Sanchez v. County of San Bernadino, US District Court, Central District, Los Angeles, CA
Edwards v. Perez, et al, Kern County Superior Court, Bakersfield, CA
Ammari v.  Union Pacific Railroad Co., et al, Riverside County Superior Court, Riverside, CA
Adame-Velasco v. John Visser, County of San Bernadino, Victorville Superior Court, CA
Turner v. County of Kern, US District Court, Eastern District, Bakersfield, CA
Albillo v. Ports O'Call Restaurant, County of Los Angeles, Superior Court, San Pedro, CA
Redman v McCarty, Inc., County of Ventura Superior Court, Ventura, CA
Masgula et al v. City of Riverside, et al, Riverside County Superior Court, Riverside, CA
Stow v Los Angeles Dodgers, et al, Los Angeles County Superior Court, Los Angeles, CA

Dr. V.R. Spiehler
(949)642-0574
spiehleraa@aol.com

**SUMMARY CURRICULUM VITAE**
**VINA R. SPIEHLER, Ph.D., F-ABFT**
**Forensic Pharmacologist**

**PROFESSIONAL EXPERTISE:**

FIELD: Forensic Pharmacology, Toxicology, Drugs and Alcohol
FOCUS: Driving under the influence of drugs or alcohol; testing for drugs and alcohol, drug-involved deaths; drug dose, time and effect on human performance, memory and behavior.

SPECIAL EXPERTISE:

* Calculation of drug or alcohol dose in body, time of dose, time course of effects
* Methamphetamine, cocaine, heroin, opiates, and marijuana pharmacology
* Employee urine drug screening, laboratory accreditation and federal regulations.

**LICENSES, CERTIFICATION**

Diplomate of the American Board of Forensic Toxicology, 1984, Certificate N° 158.
Fellow of the American Board of Forensic Toxicology, 2014, Certificate No. 1298.
Forensic Alcohol Supervisor, 11/07/83, State of California, Dept. of Health Services
Forensic Alcohol Analyst, 4/02/81, State of California, Dept. of Health Services

**EDUCATION:**

1978 Ph.D. Pharmacology & Toxicology, School of Medicine University of California, Irvine
1974 M.A. Analytical Chemistry, California State University, Fullerton

**PROFESSIONAL HISTORY:**

1993-Present Forensic consultant and expert witness. Experience in investigations, interpretation and consultations on alcohol and drug-associated traffic accidents, industrial accidents, employee drug testing and death investigations. Testimony in civil and criminal courts and arbitration hearings.

1989-2014 Laboratory Inspector for laboratory accreditation for the federal HHS National Laboratory Certification Program, for the Forensic Laboratory Accreditation program of the American Academy of Forensic Sciences/American Board of Forensic Toxicologists and for the laboratory certification program of the College of American Pathologists.

1988-1993 Technical Director for Drugs of Abuse testing products, Diagnostic Products Corporation, Los Angeles, CA. Responsible for the research, development and marketing of immunoassay tests and quality control materials for drug testing.

1981-1987 Senior Forensic Toxicologist, Forensic Science Service, Office of the Sheriff-Coroner, County of Orange, Santa Ana, CA. On assignment to the Home Office Forensic Science Service, Aldermaston, U.K as a Fulbright Fellow, 1986-87.

Dr. V.R. Spiehler
(949)642-0574
spiehleraa@aol.com

**Memberships**

International Council on Alcohol, Drugs and Traffic Safety: 2000-present
American Academy of Forensic Sciences: Fellow 1989-present.
Society of Forensic Toxicologists: President 1995.
California Association of Toxicologists: President 1985-86.
The Intl Assoc. Forensic Toxicologists: Secretary 1990-1996; USA Regional Rep 1996-present.
National Committee for Clinical Laboratory Standards, Chair, Toxicology Area Committee, 1990-1994.

**Achievement**

- Received the Alan Curry Award for contributions to forensic toxicology from the International Association of Forensic Toxicologists
* Received the R.N. Harger Award for contributions to Forensic Toxicology from the Toxicology Section of the American Academy of Forensic Sciences
* Elected a member of the International Council on Alcohol, Drugs and Traffic Safety
* USA Regional Representative for the International Association of Forensic Toxicologists
* Published over eighty five papers in peer-reviewed scientific journals.
* Received Fullbright Fellowship and position at Central Research Establishment of the Home Office, Forensic Science Service, Aldermaston, UK resulting in software programs for diagnosis of heroin, amitriptyline and cocaine cases.
* Edited and published the *Bulletin of the International Association of Forensic Toxicologists* for six years.

**Selected Litigation Experience**

- **Stow v. LA Dodgers**: Plaintiff sued sports team when altercation after game resulted in brain damage to plaintiff. Testified on reliability of hospital blood alcohol testing and plaintiff's intoxication at the time of the incident for defense.

* **Rathgeb v USF Reddaway, Inc.**: Plaintiff sued trucking company after plaintiff's son died in traffic collision with defendant's truck. Cannabinoids were found in decedents body. Testified on laboratory errors in testing of cannabinoids, time of ingestion of marijuana, cannabis effects and impairment of driving for defense.

- **People vs. Golay, Rutterschmidt**: Two elderly ladies profited from multiple life insurance policies on transient men who subsequently died in unusual car vs pedestrian accidents. Testified in criminal trial for prosecution on drug effects, drug-drug interactions and level of consciousness produced by multiple drug ingestion with alcohol.

- **Pritchard v. Corum**: Patient received overdose of morphine from PCA pump and suffered brain damage. Testified on morphine analysis, and signs and symptoms, pharmacology and pharmacodynamics of morphine overdose for plaintiff.

- **United States vs. NA Gerald Sory**: Defendant charged with drug use when his urine tested positive for marijuana metabolite. Testified in court as to the error rate and probability of false positives for marijuana metabolite in urine drug testing for the defense.

Frequently provide case review and testimony in wrongful death, civil cases and homicide criminal cases on probability of alcohol and drug-involvement, dose, time and drug intoxication. Approximately half of the time for defense.

**Examples of Prior Cases**

* Blood Alcohol Concentrations from drinking history
* Blood Alcohol Concentrations at time of accident.
* Post-mortem formation of blood alcohol.
* Influence of alcohol on driving behavior.
* Blood Drug concentrations at time of accident.
* Time of use of cannabis (marijuana.)
* Influence of Methamphetamine on driving behavior.
* Influence of Cocaine on driving behavior.
* Influence of Opiates on driving behavior.
- Influence of benzodiazepines (Valium) on driving behavior.
- Influence of cannabis (marijuana) on driving behavior.
- Probability of evidence combining chemical test results, DRE and driving behavior.

* Post-mortem changes in blood drug concentrations.
* Alternative specimen testing for drugs.
* Alcohol-drug and drug-drug interactions.
* Carbon monoxide poisoning
* Urine drug testing procedures and regulations
* Urine drug testing; probability and sources of false positives.

Vina R. Spiehler, Ph.D., DABFT
422 Tustin Ave.
Newport Beach, CA 92663
tel (949)642-0574

spiehleraa@aol.com

**Fees:** research and consulting $450/hr, travel $225.00/hr and expenses deposition or testimony $6000/day or $750/hour
Retainer: $3000; retainer for trial $6000
Designation fee: $1500 if no retainer

# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

CAMERON ROCHA, )
) 
Plaintiff, )
)
vs. ) Case No.: 19-cv-07312-MMC
)
CITY OF ANTIOCH, Antioch Chief )
of Police, )
)
Defendants. )
______________________________ )

DEPOSITION OF
CAMERON ROCHA
Appearing Remotely From
Antioch, California
Wednesday, September 30, 2020

CONFIDENTIAL TESTIMONY
PAGES 167 TO 190
Stenographically reported by:
EMILY SAMELSON, CSR No. 14043
Job No. 4229898

Q Did you ever complain to anybody other than your wife about pain, numbness, or weakness in your hands, your wrists, your arms prior to the injury?

A No.

Q Okay. Let's talk about some things in your medical history. Okay?

Do you recall on December 9th, 2016, being admitted to Sutter Hospital via ambulance?

A Yes.

Q Do you recall that your diagnosis was alcohol abuse and altered mental status?

A I wasn't sure of the actual -- if there was a diagnosis, but I know I was there.

Q Okay. And when you went to Sutter on that day, December 2016, is it fair to say that you entered the hospital heavily intoxicated from alcohol?

A I guess. I was blacked out.

Q Do you remember consuming alcohol prior to going to the hospital?

A Yes.

Q Okay. And what do you -- at what point did you black out on that particular day?

A I don't remember.

Q You remember at some point you weren't drinking and you started drinking. You remember at least that

Q It wouldn't have been out of the ordinary -- right? -- to have marijuana in your system at that particular time?

A No.

Q Let's go back to January 12th, 2017. That's before this incident; right?

Excuse me. That's before the incident with Antioch Police Department?

A Correct.

Q Okay. Do you remember going to Sutter on January 12th, 2017, via ambulance?

A Yes. I'm not sure the date but yes.

Q Sometime back in January 2017?

A Yeah.

Q Okay. And what's your understanding of why you went to the hospital by an ambulance?

A I blacked out, and Shadi called.

Q Okay. And why did you black out?

A Because I drank too much.

Q At that time would it surprise you, based on what we've been talking about with the BAC, that your BAC was a .35? Would that surprise you?

A That would.

Q Your family told the nursing staff that you had a history of depression and self-harm. This is before

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is an accurate transcription thereof.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 13th of October, 2020

E. Samelson

EMILY SAMELSON,

CSR No. 14043